## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ) | |
| ) | |
| IN RE WORLD WRESTLING ENTERTAINMENT, ) | |
| INC. SECURITIES LITIGATION ) | Civil No: 14cv1070 (AWT) |
| ) | |
| ) | <u>Class Action</u> |
| ) | <u>Jury Trial Demanded</u> |

## AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1.      Lead Plaintiff Mohsin Ansari and additional plaintiff Adnan Shafeeq ("Plaintiffs") bring this federal securities class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of purchasers of the securities of World Wrestling Entertainment, Inc. ("WWE" or the "Company") between October 31, 2013, and May 16, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Plaintiffs allege the following based upon the investigation of Plaintiffs' counsel, which included a review of SEC filings by WWE, regulatory filings and reports, securities analysts' reports concerning the Company, press releases and other public statements issued by the Company, media reports about the Company, WWE internal documents not available to the public and interviews with a well-placed, management level former employee of WWE with knowledge of the allegations herein. Moreover, the detailed allegations contained herein were prepared without the benefit of formal discovery and without the ability to communicate with current WWE employees.  In light of the particularized allegations acquired under these restrictive conditions, Plaintiffs believe substantial additional evidentiary support for these allegations will emerge after a reasonable opportunity for discovery.

**OVERVIEW**

3.     WWE is an integrated media and entertainment company that was founded in Stamford, Connecticut in 1980 and focuses on the wrestling entertainment business worldwide. In contrast to the actual sport of wrestling that is a featured event in the Olympics, WWE wrestling is a fictional dramatization in which actors play out scripted matches with predetermined outcomes.

4.     WWE primarily operates in four core segments: Live and Televised Entertainment; Consumer Products; Digital Media; and WWE Studios. Since the 1980's, WWE has generated a large portion of its revenue from periodic pay-per-view events such as Wrestlemania, Royal Rumble, SummerSlam, and Survivor Series. Currently, WWE has 12 pay-per-view events, with one event taking place each month. Outside of the Company's pay-per-view content, the Company's flagship televised entertainment includes its *Monday Night Raw* and *Friday Night Smackdown* properties which air in the United States on NBC Universal affiliates USA Network and Syfy Channel, respectively.

5.     This action stems from Defendants' materially false and misleading statements and omissions made during the Class Period regarding WWE's ability to multiply and transform the Company's earnings profile through the negotiation of a new, lucrative, long-term television license contract. Throughout the Class Period, Defendants caused WWE to issue false and misleading statements in WWE's public filings, press releases, and conference calls that touted the Company's ability to command a fee—commensurate with recent deals for licensing rights of live sports—that would "double or triple" WWE's OIBDA (operating income before depreciation and amortization). Defendants consistently pointed to the $8.2 billion, ten-year licensing deal between NASCAR, NBC and FOX, and misleadingly used that contract as a

benchmark for what investors could expect from WWE's new deal. Yet, contrary to Defendants' statements that "WWE shares the key determinants of value that are attributable to live sports[,]" WWE's could not attract nor retain advertisers like live sports, and because sponsors pay less to reach WWE's viewers than viewers of live sports, networks would not pay close to the premium warranted by live sports.

6. Defendants also grossly inflated the size of WWE's fan base in an effort to convey a larger market value for the Company. Specifically, the Company falsely claimed to have "170 million passionate" fans and "250 million social media followers[,]" when in truth -- as WWE's own internal research and research by third parties showed -- WWE's actual fan base was only about 1.5-3.5 million adult fans, a tiny fraction of these dramatically false numbers.

7. Moreover, Defendants failed to inform investors of the detrimental impact that the Company's launch of its WWE Network, a 24/7 subscription-based streaming network containing pay-per-view events and original and historical programming, had on the television license negotiations with NBC. It was not until May 19, 2014, at the end of the Class Period, that Defendant McMahon publicly admitted during a conference call with analysts that the WWE Network "*definitely had a negative impact*."

8. The allegations herein are supported by a high-level confidential witness ("CW1") who worked as Vice President of WWE's global digital advertising sales team from December 2010 to January 2014. Because of CW1's position within WWE and success at the Company, CW1 attended exclusive meetings during the Class Period held only for the top 1% of WWE management. These meetings were also attended by Defendants Vince McMahon ("McMahon"), George Barrios ("Barrios") and Michelle Wilson ("Wilson"). At one such meeting during the Class Period, CW1 specifically told Defendant Barrios that he projected

advertising revenues would decrease by nearly ten million dollars in 2014. On no fewer than two Class Period occasions, CW1 spoke with Defendant Wilson about the multiple millions of dollars WWE would lose in advertising revenues. Despite this information, Barrios told CW1 that WWE would not alter its upcoming revenue forecasts. Likewise, Defendant Wilson personally approached CW1, requesting that he present false viewership data to potential sponsors that inflated the number of WWE fans tenfold. CW1 indicated that the Defendants lied about the size of the fanbase; that the Company "misled the market completely;" and also that defendant Wilson "misled people in marketing" in connection with the negotiations of the new television license contract.

9.     CW1 stated that by October 13, 2013, the start of the Class Period, Defendants had already met with NBC about renegotiating its television licensing deal, but "WWE didn't really negotiate with NBC" because NBC was not willing to offer WWE much more money. Once the exclusive negotiating period with NBC ended in February, 2014, WWE approached several networks about picking up the contract, yet, according to CW1, there was "just no real attraction" to WWE's product. CW1 stated that there were multiple reasons that the networks, including NBC, deemed WWE much less valuable than Defendants represented to investors and categorically less valuable than live sports such as NASCAR.

**Lack of Advertising Revenue**

10.     First, WWE failed to both attract and maintain meaningful advertising revenue during the Class Period. According to CW1, WWE did not have the "repeat advertisers" of blue chip brands such as Major League Baseball ("MLB"), the National Football League ("NFL"), NASCAR, or Ultimate Fighting Championship ("UFC") that would sign up every year with live sports. These repeat advertisers included car companies and beer companies that paid

considerable sums of money year after year to sponsor live sports events. These types of companies "didn't like the partnership" with WWE. According to CW1, such advertisers did not want to work with WWE because its viewers were typically younger, with less education, and lower incomes, than viewers of live sporting events.

11.     Internal, non-public documents confirm that Defendants knew that WWE's audience had an adverse effect on advertising revenue. A document entitled "Audience Demos_Fall 2012" indicates that the WWE largely appeals to a low income and low education audience that has less spending power than the audience for live sports. In fact, the document indicates that over 40% of WWE's fan base has an annual household income of less than $40,000, with nearly half those fans earning less than $20,000 per year.

12.     CW1 noted that WWE also failed to accommodate sponsors in the manner live sports did, which drove away sponsoring companies. For instance, NASCAR would agree to place sponsorship logos prominently on racecars, racetracks and driver uniforms. By contrast, Defendant McMahon refused to allow advertisements on the wrestling mat, despite requests from sponsoring companies. CW1 stated that WWE would enter into agreements with sponsoring companies and then simply drop them. Specifically, CW1 stated that he procured agreements from both Sony Playstation and Microsoft X-Box, and although both could have been sponsors given that both companies manufactured WWE games for their gaming systems, WWE insisted that CW1 simply drop Playstation as a sponsor. WWE also failed to retain advertisers such as the National Guard and Paramount, which accounted for $6m in annual advertising revenues while CW1 was with the Company.

13.     CW1 attended a Class Period finance meeting with Defendant Barrios, Perkins Miller (head of the digital product group), Brian Hamilton (head of inventory), and others in the

WWE accounting department, in which they discussed specific advertising revenue issues for the 4th Quarter ending December 31, 2013. In the meeting, CW1 specifically told Defendant Barrios that he projected advertising revenues would decrease by millions of dollars in 2014. Yet, despite this information, Barrios told CW1 that WWE would not lower its forecasts for the year. On no fewer than two occasions during the Class Period, CW1 also met with Defendant Wilson and informed her of WWE's decreasing advertising revenues, as well.

**WWE Misrepresentations Regarding Its Fan Base**

14.     According to CW1, the second reason that networks would not pay the premium for WWE television licensing rights garnered by live sports such as NASCAR was that the networks, and specifically NBC, knew that WWE's fan base was not as large as WWE represented to the public. For example, Defendants stated at various times throughout the Class Period that WWE had as many as 80 million active fans in the United States and over 100 million followers on social media. CW1 stated that these numbers were simply wrong, and both WWE and NBC "absolutely" knew it. Per CW1, WWE's own internal research studies demonstrated that WWE's actual fan base was a fraction of what Defendants represented to the public. CW1 stated that, at the very most, WWE had 4-6 million total fans, 2.5 million of which were under the age of 18. Moreover, NBC knew the real size of WWE's fan base, because NBC reviewed the weekly viewership numbers for programming on its network and knew that WWE did not have nearly the number of fans that Defendants represented to the public.

15.     With regard to the social media followers, CW1 stated that management simply recounted the same followers over and over and over again to come up with the figure of 100 million. For example, one twitter fan would follow a dozen different wrestlers, and Defendants would count that single fan as a dozen followers instead of just one. Moreover, according to

CW1, 80% of WWE's digital fan base lived outside of the United States, and thus they had no value to advertisers who were targeting U.S. consumers.

16.     CW1 stated that, in reality, the pay per view audience was a more accurate representation of the size of WWE's fan base, and that was about 1.3 million viewers in any given month.  CW1 also stated that Defendants Barrios and McMahon "absolutely knew" that these were the real figures reflecting the actual size of the fan base because it was a regular topic of discussion and that Defendants Barrios and McMahon had access to the internal and external research reports regarding viewers, pay-per-view viewer numbers, and related data.  However, CW1 stated that management lied regarding the fan base.  In fact, Defendant Wilson repeatedly asked CW1 to present false viewership data to potential sponsors.  Specifically, CW1 was asked by Wilson to represent that WWE had 40 million fans in the United States and over 100 million social media followers.  In this way, CW1 stated that Defendant Wilson would mislead the market as to WWE's popularity.

**Television Licensing Contract Negotiations**

17.     Although live sports have commanded enormous television licensing contracts in recent years, CW1 stated that networks viewed WWE as categorically different from live sports and considerably less valuable.  Internal documents not available to the public confirm that WWE management knew that WWE was in a different league than live sports and could not expect the same type of financial commitment from networks.  For example, in the internal company presentation entitled "WWE 2014 Roadmap to Budget" demonstrates this awareness, stating that WWE is "not the PGA, NFL, or MLB…" and that WWE is "still early in growth stages and need to manage our business accordingly."

18.     According to CW1, WWE began its efforts to renegotiate its television licensing

contract with NBC around May 2013, about a year before the expiration of its previous deal. Defendant Barrios, Defendant Wilson, and Tandy O'Donoghue (Executive Vice President of Strategy & Analytics) were lead negotiators for WWE in securing the deal, and the negotiations were mired from the start. NBC would not pay close to an amount that would allow WWE to "double or triple" its OIBDA—nor did NBC believe any other network would pay that much— and thus, NBC allowed its exclusive negotiating period to expire on February 15, 2014. According to CW1, once the exclusive negotiating window expired, WWE approached every television network, including ESPN, but from the outset no other network expressed interest in working with WWE. "There was just no real attraction" to WWE's product.

19.      No network offered WWE anything remotely approaching the ten-year $8.2 billion NASCAR received in their licensing deal with FOX and NBC. In fact, no network, including NBC, came remotely close to offering NBC's $400 million per year portion of the NASCAR deal. CW1 stated that in order for USA (a division of NBC Universal) to make a profit under that type of contract, they would have needed to get paid four times more per advertising spot ($60,000 per ad spot instead of $15,000, which they were currently getting). According to CW1, "there was no way the market could hold that" type of increase per advertising segment. Without interest from other networks, WWE was stuck pitching the same product to NBC without any bargaining power.

20.      WWE also hampered the negotiations with NBC by premiering the WWE Network, which cannibalized the *Monday Night Raw*, *Smackdown*, and other network television viewership. On February 24, 2014, in the midst of WWE's TV license negotiations with networks, WWE launched the subscription-based WWE Network. For a monthly fee of $10.00, viewers received access to a backlog of past pay-per-view events, future pay-per-view events,

original WWE programming and 24/7 on-demand archival programming of encore broadcasts of, among other things, *Raw* and *Smackdown*, which originally air on NBC affiliates. Thus, the exact same shows aired on cable television pursuant to the potential licensing contract would be subsequently aired on the WWE Network. Although Defendants maintained throughout the Class Period that the launch of WWE Network would not have an adverse effect on the TV licensing negotiations, Defendant McMahon later admitted on May 19, 2014 during a conference call with analysts that, "I think it definitely had a negative impact."

21. On May 15, 2014, after a year of failed negotiations, WWE announced that it had reached a multi-year deal with NBC to distribute its *Monday Night Raw* and *Friday Night Smackdown* properties, but it was not until after the market closed that WWE issued a press release that informed the market the deal was worth a fraction of what Defendants had led the market to expect. Specifically, Defendants had, at various times during the Class Period in SEC filings (10/31/2013 and 2/20/2014 press releases) and during earnings calls (10/31/2013, 12/10/2013, 1/16/2014, 2/20/2014, 5/1/2014) stated that the renegotiated television rights deal would allow WWE to "double or triple" its operating income. However, the press release revealed that the domestic television distribution agreement only increased by approximately $57 million per year over its previous $139.5 million per year contract. Thus, contrary to Defendants' previous statements concerning WWE's ability to double or triple the Company's operating income through its television license agreement, the actual value increase was only approximately 40%.

22. Analyst reports published soon after the announcement confirm that the NBC deal was not in-line with WWE's guidance. For example, in lowering his recommendation for WWE from "Buy" to "Hold" on May 16, 2014, Mike Hickey with Benchmark wrote that "[w]e

estimate management negotiated a +50% increase on the Company's domestic TV rights Fees with NBCu; meaningfully below the guided multiple of 2X to 3X." Similarly, Jeffrey S. Thomison with Hilliard Lyons Equity Research lowered his rating of WWE from "Long Term Buy" to "Buy" on May 20, 2014, and stated that "[c]ommon expectations were for a new domestic deal worth at least double (and possibly triple) the collective value of expiring deals." Thomison continued to say that such "lofty expectations were based" in part on "past favorable commentary from management."

23.     By January 7, 2014, when it was clear to WWE insiders that no network would pay WWE even close to the amount Defendants had misled the market to expect, Defendant McMahon's daughter, Stephanie, a member of the WWE board, suspiciously sold every single share of her WWE stock. In a series of 16 transactions starting on October 3, 2013, Stephanie McMahon quietly sold 441,671 shares for a total of $6,174,551.02, under her married surname, Levesque, rather than her more commonly used maiden name. Indeed, WWE's corporate website that names its executive officers names her Stephanie McMahon, as does her Facebook, Twitter, and Instagram accounts.

24.     When the Company revealed the truth about the value of its new distribution deal, WWE's stock price plummeted from $19.93 at close on May 15, 2014 to $11.27 per share on May 16, 2014, a decline of 43%.

## JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), 20(A), and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78t(a), 78t-1] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). WWE maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

28.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Lead Plaintiff

29.     Lead Plaintiff **MOHSIN ANSARI**, as set forth in his previously-filed certification [Dkt. # 21-1], incorporated by reference herein, purchased the common stock of WWE at artificially inflated priced during the Class Period, and was harmed when the price of WWE securities dropped as a result of the revelations of the truth about WWE's true condition regarding WWE's much publicized ability to transform the Company's earnings profile through, among other things, the negotiation of a lucrative new long-term television license deal.

30.     Additional Plaintiff **ADNAN SHAFEEQ**, as set forth in his previously-filed certification [Dkt. # 26-2], incorporated by reference herein, purchased securities of WWE at artificially inflated priced during the Class Period, and was harmed when the price of WWE securities dropped as a result of the revelations of the truth about WWE's true condition regarding WWE's much publicized ability to transform the Company's earnings profile through, among other things, the negotiation of a lucrative new long-term television license deal.

## Company Defendant

31.     Defendant **WORLD WRESTLING ENTERTAINMENT, INC.** is incorporated in Delaware and maintains its headquarters at 1241 East Main Street, Stamford, Connecticut 06902.

## Individual Defendants

32.     Defendant **VINCENT K. McMAHON** ("McMahon") is WWE's Chairman of the Board and has been since 1980 and Chief Executive Officer ("CEO") and has been since September 2009. Defendant McMahon co-founded WWE.  Defendant McMahon made false and misleading public statements during the Class Period.

33.     Defendant **GEORGE A. BARRIOS** ("Barrios") is WWE's Chief Strategy & Financial Officer and has been since November 2013 and Chief Financial Officer ("CFO") and has been since March 2008.  Defendant Barrios made false and misleading public statements during the Class Period, personally certified all of the Company's financial reports issued during the Class Period, and signed all the Company's SEC filings during the Class Period.

34.     Defendant **MICHELLE D. WILSON** ("Wilson") is WWE's Chief Revenue & Marketing Officer, and has been working for WWE since Feburary 2009.  Defendant Wilson made false and misleading public statements during the Class Period.

35.     Defendants McMahon, Barrios, and Wilson are referred to herein as the "Individual Defendants."  Collectively, Defendants WWE, McMahon, Barrios, and Wilson are referred to herein as "Defendants."

## Additional 20(A) Defendant

36.     Additional 20(A) Defendant **STEPHANIE MCMAHON LEVESQUE** ("McMahon Levesque") has been WWE's Chief Brand Officer since December 2013, and is a

Member of the Board of Directors. She has worked for the Company since 1998. During the Class Period, McMahon Levesque sold 441,671 shares for a total of approximately $6,174,551.02.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE BY DEFENDANTS DURING THE CLASS PERIOD

37. On October 31, 2013, the beginning of the Class Period, the Company issued a press release announcing its financial results for the quarter ended September 30, 2013 ("2013 Third Quarter"). Specifically, the press release stated:

> "During the third quarter, our achievements were highlighted by the production and monetization of new content, including the original series, Total Divas, the expansion of pay-per-view distribution on the Sony PlayStation 3 platform, and the formation of new partnerships with blue-chip sponsors such as General Mills and Kraft," stated Vince McMahon, Chairman and Chief Executive Officer. ***These accomplishments reflect the strength of our brands, including a national television audience that exceeds the annual reach of most other sports and entertainment programs. This strength provides a solid foundation for the renegotiation of our TV contracts and the potential launch of a WWE network.*** Based on our ability to create powerful, entertaining content and to expand distribution, we strongly believe that we are poised to transform our business."

> ***"Given the rising value of live content that has a broad, loyal following, we are confident that we will be able to negotiate our key domestic agreements by the end of April next year and that our efforts, including the potential launch of a WWE network, will keep us on track to double or triple our 2012 OIBDA results of $63 million by 2015,"*** added George Barrios, Chief Financial Officer. "As we strive to transform our earnings profile, we believe that our 2013 OIBDA results, excluding the impact of film impairments, will fall within the previously communicated range of $40- $50 million."

[Emphasis added].

38. The foregoing statements were materially false and/or misleading when made because, according to CW1, at the time these statements were made, Defendants knew or recklessly disregarded that WWE had already begun negotiating with NBC for a new television contract, and those negotiations had already failed to achieve a doubling or tripling of 2012

OIBDA results. When Defendants made this statement, CW1 stated that he and other WWE employees "literally laughed" at the notion of WWE getting a deal worth two to three times more than their current deal, because no network would ever pay that much. Even though Defendants knew or recklessly disregarded that WWE's fan base was smaller than live sports, Defendants falsely stated that "a national television audience that exceeds the annual reach of most other sports" and that "[t]his strength provides a solid foundation for the renegotiation of our TV contracts[,]" which mislead investors to believe that WWE's television licensing was as valuable as or more valuable than live sports. Defendants also knew or recklessly disregarded that WWE's television audience was younger, less educated, and had a lower average income than the audience for live sports, which caused WWE to generate much less advertising revenue than live sports. Internal WWE documents, specifically "Audience Demos_Fall 2012", demonstrate that the Company recognized that WWE's audience has less spending power than live sports. The document indicates that over 40% of WWE's fan base has an annual household income of less than $40,000, with nearly half those fans earning less than $20,000 per year. Defendants also knew or recklessly disregarded that networks viewed WWE as categorically different from and less valuable than the "live content" that had garnered increasingly large television licensing deals.

39. That same day, Defendants held an earnings conference call for the 2013 Third Quarter, during which Defendants McMahon and Barrios further misrepresented the value of WWE's television license agreements. Defendant McMahon stated, in relevant part:

> "We are currently in discussions, many of you know that our largest television agreements come due not only just here in the States, but also in the United Kingdom, and we currently are negotiating a window with BskyB, our distributor over in the United Kingdom, which is a very big partner of ours. India is coming up shortly thereafter. So a lot of these are becoming due, and we are actively pursuing all of them going forward. *So*

*we pretty much think that all of these initiatives are, if all of the stars line up and we believe that they will, and we are working hard to make sure that happens, then our business is going to be transformed as we know it now.*"

[Emphasis added].

40.     Defendant McMahon's statements were materially false and/or misleading when made because Defendants knew or recklessly disregarded that at the time this statement was made, that "all of the stars" were not "lin[ing] up" with their television contracts, because negotiations for a new contract were already faltering.  According to CW1, no network, including NBC, was going to ever pay WWE an amount double or triple the value of its then-current deal.  Without the leverage of interest from other suitors, Defendants could not negotiate a contract that would "transform[]" WWE.

41.     Defendant Barrios also made statements in the October 31, 2013 conference call misleadingly comparing WWE's ability to secure a lucrative television licensing contract with the contract NASCAR was able to secure.  Specifically, Defendant Barrios stated:

> "Now looking ahead. We believe the investments we are making in our brands and content will maximize WWE's future earnings. *We are confident that the rising value of content in the marketplace, and the potential launch of a WWE network will keep us on track to double or triple our 2012 OIBDA results by 2015.* If we are unable to execute our strategic initiatives in a way that places on a path to achieve these goals, then management will undertake some form of restructuring to increase profitability. Over the coming months we expect to renegotiate our four largest television agreements in the US, the UK, and India. Moreover, we expect to negotiate our key domestic agreements by the end of next April.
>
> Benchmarking our rights fees to the fees paid for sports programming and other original scripted series indicates that our license agreement has significant upside potential. *Recent deals such as NASCAR with NBC Sports reinforce our view that the proliferation of distribution alternatives is driving up the value of content, especially compelling content with broad appeal.* <u>*WWE shares the key determinants of value that are attributed to live sports.*</u> Significant first run hours and associated gross rating points, a passionate and loyal fan base, and 90% live plus same day viewership *which makes WWE content like sports DVR-proof.*
>
> *The potential launch of a WWE network is another major source of future earnings*

15

*growth. Our market research and analysis indicate that potential for a meaningful subscriber base and a significant economic opportunity.* This opportunity is comparable whether the network is distributed through traditional cable, satellite, and telco partners, or through over the top digital distribution.

[Emphasis added].

42.     The foregoing statements were materially false and/or misleading when made because, among other things, Defendant Barrios knew or recklessly disregarded that the recent $400 million per year deal that NASCAR negotiated with NBC Sports would not have any impact on WWE's television license negotiations.  Defendants knew or recklessly disregarded that WWE does not "share[] the key determinants of value that are attributed to live sports" because WWE could not generate the type of advertising revenue that live sports generated. According to CW1, in order for a network to enter into a $400 million annual deal with WWE, they would need to generate four times more per advertising spot, which per CW1, both Defendants and networks, specifically NBC, knew was impossible.  Defendants knew or recklessly disregarded that WWE's audience demographic had less spending power than live sport audiences, which adversely affected advertising revenue, and in turn, negotiating power for a lucrative television contract.   Indeed, internal documents not available to the public demonstrate that the Company recognized that WWE is "not the PGA, NFL, or MLB…" and that WWE is "still early in growth stages and need to manage our business accordingly."  Thus, the "rising value of content in the marketplace" was not attributable to WWE's content, and did not "keep [WWE] on track to double or triple our 2012 OIBDA results by 2015."  WWE was not on track, nor was it ever on track to achieve that financial milestone.

43.     Even though WWE fans might view the live programming the same day as it airs on television, WWE content is not "DVR-proof" in the way sports are. Results in sporting events

are newsworthy, and therefore it is difficult for sports fans to record a contest to watch at a later time without learning the results prior to watching the recording. Sports scores are displayed on tickers at the bottom of various television channels, aired on the radio, and appear on non-sports news sites such as CNN. In contrast, WWE match results do not appear in the news, but for perhaps in WWE related web sites, and therefore WWE live matches are easily recorded and can be watched without learning the outcomes beforehand.

44. Furthermore, Defendants knew or recklessly disregarded that the WWE network would not be "another major source of future earnings growth" because, in fact, WWE's "market research and analysis" *did not* "indicate that potential for a meaningful subscriber base and a significant economic opportunity." According to CW1, WWE's own internal research and third party research showed that WWE had, at most, about 1.3 million viewers per month, and about 4 to 6 million fans total—2.5 million of which were under the age of 18—in the United States. CW1 stated that WWE needed approximately one million WWE Network subscribers to break even on the endeavor, so that would mean approximately 75% of its total fan base would need to sign up for the network, which was completely unrealistic. CW1 stated that Barrios "absolutely" knew these real figures, because it was a regular topic of discussion that Barrios and McMahon would discuss and both of them had access to the research study reports.

45. Defendant Barrios also made several statements concerning the size of WWE's fan base on the October 31, 2013 conference call. Specifically, Defendant Barrios stated:

> Over the past 12 months, ***our programming surpassed the cumulative audience delivery of most sports and entertainment programs, including the national broadcast of Major League Baseball, NASCAR, the NHL and even The Walking Dead, and our total social media platform now reaches nearly 219 million followers, including more than 140 million Facebook likes and 70 million Twitter followers***, representing a 28% increase from the end of the preceding quarter and a 92% increase from the end of the third quarter last year. Building the strength of our brand is evidenced in these metrics, and

17

taking advantage of that strength is a critical component of our long-term strategy. [Emphasis added].

46.    Defendant Barrios' statements were materially false and misleading because Defendants knew or recklessly disregarded that these numbers were vastly overinflated. Specifically, CW1 stated that that management would recount the same followers many times over to inflate their numbers.  For example, one twitter fan would follow a dozen different wrestlers, and Defendants would count that single fan as a dozen followers instead of just one. Likewise, Defendants' misrepresented the number of WWE's Facebook likes.  As of the filing of this Complaint, WWE's Facebook page only has approximately 24 million likes, not "more than 140 million" like Defendant Barrios stated. On many occasions, Defendant Wilson asked CW1 to present false viewership data—and specifically, that WWE had 40 million fans in the United States over 100 million social media followers—to potential advertisers.

47.    On December 10, 2013, Defendant Barrios participated in the UBS Global Media and Communications Conference, where he again raised investor expectations concerning the value of the upcoming television license agreement by comparing WWE's televised content to that of NASCAR. Defendant Barrios dramatically overstated the potential value of the television license agreement and emphasized the importance of the agreement on the Company's transformational strategy. Defendant Barrios stated, in relevant part:

> I want to talk about why we think there is such an opportunity, and I'm going to focus on the US because it's, by far, the largest market for us and for everyone on content monetization. The lower half of the page is a calculation that takes the license fees generated by these properties – and this is a money page.
>
> It takes the license fees driven by these properties and essentially compares it to the viewership driven by the property. So I'll do a little quick math. ***Let's take NASCAR, it's one of my favorites.***

*NASCAR did about 330 hours of programming last year. They averaged about 3 million viewers across those 300 hours, so do that multiplication, it's about 940 million viewer hours, the total [in prescient]. Their contracts, their average annual value of their deals are about $820 million. So I mentioned ours are less than $100 million for those four deals. So they're at $820 million.*

*So let's take that and compare it to the WWE. NASCAR did 334 hours, WWE did 314. NASCAR averaged about 3 million, WWE averaged about 3.7 million – so 20% more viewers than NASCAR did.*

*They're at 800, we're at some number around 100. That's why we think this is a massive opportunity for us. Does that all get made up in one renewal cycle? Don't know. What I do know is live content today is incredibly valuable. All these properties are signed up for the long term other than the NBA and WWE, which are the ones coming up -- real opportunity.*

*\* \* \**

*And we believe, with some success across those, we double or triple our 2012 OIBDA and get to $120 million to $190 million.* Internally, that's what we're shooting for.

*A homerun in either of the first two gets you there alone. Three or four million subs on a network gets you there alone. Get halfway between where we are today and where NASCAR is gets you there alone. Some success on both will look and feel pretty good.*

[Emphasis added].

48.     Barrios' statements were materially false and/or misleading when made because Defendants knew or recklessly disregarded that NASCAR and its lucrative television contract were completely distinguishable from WWE and its contract negotiations.   Barrios misled investors to believe that NASCAR and WWE's purportedly similar viewership hours would result in WWE achieving a similar television licensing contract as the $820 million annual deal NBC and FOX made with NASCAR.   Defendants knew or recklessly disregarded that NASCAR's contract did not present a "real opportunity" for WWE, because the content and advertising revenue resulting from WWE programming was far less valuable to networks than NASCAR and other live sports.   According to CW1, Defendants knew or recklessly disregarded that WWE could not generate the type of advertising revenue that live sports generate.   In order

for a network to enter into a $400 million annual deal with WWE, they would need to generate four times more per advertising spot, which per CW1, both Defendants and networks, specifically NBC, knew was impossible.  Therefore, Defendants knew or recklessly disregarded that WWE could not "get halfway between *where we are today and where NASCAR* is" with regard to its licensing contract.  [Emphasis added].

49.     Moreover, Defendants also knew or recklessly disregarded that it could not get "three or four million subs on a network" because that would mean every single WWE fan would have to join the network.  According to CW1, WWE's own internal research and third party research showed that WWE had, at most, about 1.3 million viewers per month, and about 4 to 6 million fans total in the United States, including 2.5 million fans under the age of 18.  CW1 stated that WWE needed approximately one million WWE Network subscribers to break even on the endeavor, and even that number was completely unrealistic. Finally, Defendants also knew or recklessly disregarded that WWE's audience demographic had less spending power than live sport audiences, which adversely affected advertising revenue, and in turn, negotiating power for a lucrative television contract.  Indeed, internal documents not publicly available demonstrate that the Company recognized that WWE is "not the PGA, NFL, or MLB…" and that WWE is "still early in growth stages and need to manage our business accordingly."

50.     Defendant Barrios also stated during the December 10, 2013 conference that "we have 220 million social media followers around the world."  According to CW1, this number was falsely inflated because it counted the same followers many times over.  Defendants knew or recklessly disregarded that these numbers were inaccurate because CW1 specifically refused to present these inflated numbers when asked by Defendant Wilson on the basis that they were false.

51.     On December 17, 2013 *Variety* published an article entitled "WWE Aims to Pin Down Rich New TV Rights Deals (EXCLUSIVE)" based upon interviews with Defendants McMahon, Barrios, and Wilson.  The article contains the following excerpt:

"We've had to evolve our thinking," [Michelle] Wilson says. "We are clearly entertainment-based, but *if you think about the characteristics of our brand, it's live action, and that's sports. We want to be compensated for a live audience, since live content is getting a very significant premium in the marketplace*."

*The company cites Nascar's impressive dealmaking this summer as an example. The racing league secured a new 10-year deal with NBC and Fox worth $820 million a year. And that increase came in the face of declining ratings for many of its races. WWE argues that "Raw" and "SmackDown" alone are just as attractive*, with a rabid fanbase that's helped build networks, and its series are diverse in ethnicity and age.

[Emphasis added].

52.     Defendants' statements were materially false and/or misleading when made because Defendants knew or recklessly disregarded that the "characteristics of [the WWE] brand" were not similar to live sports. WWE's own internal documents not available to the public discuss the Company's recognition that WWE is "not the PGA, NFL, or MLB…" and that WWE is "still early in growth stages and need to manage our business accordingly."  WWE also could not generate the type of advertising revenue that live sports generate, which undermined Defendant Wilson's statement of WWE's desire to be "compensated for a live audience." Moreover, the comparison to NASCAR's lucrative television contract was unfounded, because the content and advertising revenue resulting from WWE programming was far less valuable to networks than NASCAR and other live sports.   According to CW1, Defendants knew or recklessly disregarded that WWE could not generate the type of advertising revenue that live sports generate.  In order for a network to enter into a $400 million annual deal with WWE, they would need to generate four times more per advertising spot, which was not possible.

53.     On January 14, 2014, in a conference call organized by the Company to discuss the launch of its WWE Network, Defendant McMahon attempted to reassure investors that the Company could still command a premium fee in its upcoming negotiations to renew its television license agreement in the United States and indicated that the new WWE Network venture would *increase* its television ratings, and therefore the value of the assets. The conference call went as follows, in relevant part:

Daniel Moore - CJS Securities – Analyst

You mentioned during the prepared remarks that the launch of the Network, you believe, would increase viewership of the Raw and SmackDown -- the traditional TV outlets for NBCU and Syfy. Given the fact that you will be rebroadcasting some of those programmings, just maybe elaborate on why the launch of the Network wouldn't be somewhat cannibalistic to your -- potentially cannibalistic to your current audience base for those key properties?

Vince McMahon - WWE - Chairman and CEO

Well, the idea is live, and that's the value of our output deals. It's live. So Monday Night Raw is live. And that's the huge advantage that NBCU sees in WWE, as well as other providers. They see the value of live. And so -- if you will note, there is no repeats of Monday Night Raw in any form whatsoever on USA. The reason for that is, again, it's the live value that means that much to them.

***And by the way, this is not something that is just a WWE point of view. This is also a USA point of view. Having discussions, obviously, with management there, they too -- the network, USA, they too believe this is going to increase television ratings.*** When we take some of our legacy footage, we take some of the things that we are currently going to do, even some of the pay-per-view, you drop it back into Monday Night Raw, drop it back into SmackDown.

Not to the extent that you don't have the Network, but it's samples. It shows the breadth and depth of our programming and what we can do. Reality shows, things of that nature, that are already in the can. ***So it will increase the overall awareness of WWE exponentially, thus increasing the interest and overall television ratings. So again, it's not just a WWE view. This is a USA view as well.***

[Emphasis added].

54.     The foregoing statement that it was a "a USA view" that the WWE Network

would not have a "cannibalistic" effect on the *Monday Night Raw* audience was materially false and/or misleading when made because McMahon later admitted on May 19, 2014, at the close of the Class Period, that the WWE Network "definitely had a negative impact" on negotiations with NBC. Thus, the statement that "USA, they too believe [the WWE Network] is going to increase television ratings" was patently false, because McMahon admitted that it was a point of contention during the negotiation process.

55. Defendant Barrios also participated in the January 16, 2014 conference call with analysts, and made additional misleading statements comparing WWE to NASCAR and other live sports. Specifically, Barrios stated:

> ***The second major transformable opportunity for us is the renewal of our four largest TV agreements, two in the US with NBCU.*** Our output deal in the UK currently sits with BSkyB and our output deal in India, Taj TV currently. All those deals, the two domestic deals will be new by October 1. India in the UK by January 1, 2015. $140 million in 2012 of global television licensing revenue and those four agreements represent roughly 70% of that. So it is a big opportunity and in the three markets, the US, UK and India, you see similar competitive pressures to acquire content especially live content.

*                    *                    *

> ***Up top you have the live gross rating points delivered by the major live -- deliverers of life content which is sports -- NBA 514; Major League Baseball 295; NASCAR 212. WWE delivered 344 live gross rating points over the last 12 months. The payment for those gross rating points sit somewhere between $2 million and $5 million currently in the marketplace. So the way that math works, if you are NASCAR, you have 212 gross rating points, you are averaging about $4 million per, NASCAR on average is $800 million of domestic rights fees a year.***

> ***As I mentioned before, WWE's four largest deals are at $100 million globally. So the domestic gets obviously less than that. So the range of opportunity sits from somewhere where we are today to those numbers.***

*                    *                    *

> ***We've said with some level of success especially across the network and the rights renewal that we think we can double or triple 2012 OIBDA by 2015.***

[Emphasis added].

56. The foregoing statements made by Defendant Barrios were materially false and/or

misleading when made in that Defendant Barrios misled investors to believe that WWE's television license negotiations would lead to a contract akin to NASCAR's $800 million annual licensing deal because WWE's "live gross rating points" were above both Major League Baseball and NASCAR, indicated that NASCAR. Barrios omitted, however, that the advertising revenue generated from NASCAR programming far exceeded that of WWE, and to even achieve half of NASCAR's $800 million deal, NBC would have needed to get paid four times more per advertising spot ($60,000 per ad spot instead of $15,000, which they were currently getting). CW1 stated that this was impossible and therefore NBC would never pay that much. Thus, it was also materially false and misleading to state that "we think we can double or triple 2012 OIBDA by 2015" with the rights renewal.

57. Defendant Barrios also made statements during the January 16, 2014 conference call regarding the size of WWE's fan base. Particularly, Barrios stated:

> The third item I talked about is our social media and digital audience, 13 million to 14 million uniques to our website, **_250 million social media followers. That is more than the NBA and all of its teams combined. That's more than the NFL and all of its teams combined._** It is an amazing tool for us to reach and engage our audience. The social media chatter on the Network has been through the roof for us globally.

[Emphasis added].

58. The foregoing statements regarding WWE's social media followers were materially false and/or misleading when made because the numbers were grossly inflated. According to CW1, management would recount the same followers many times over in an effort to inflate the number WWE fans. For example, one twitter fan would follow a dozen different wrestlers, and Defendants would count that single fan as a dozen followers instead of just one. These statements were also materially false and/or misleading because Defendants knew or recklessly disregarded that WWE's fan base was not nearly the size of other live sports. Not

only did internal research reports demonstrate that WWE's fan base was a fraction of the number it represented to the public, but an internal company presentation entitled ""WWE 2014 Roadmap to Budget" admits that WWE is "not the PGA, NFL, or MLB…" and that WWE is "still early in growth stages and need to manage our business accordingly." Thus, Barrios' statements that WWE's social media following "is more than the NBA and all of its teams combined" and "more than the NFL and all of its teams combined" was materially false and/or misleading when made.

59.  On February 20, 2014, the Company issued a press release announcing its 2013 fourth quarter ("2013 Fourth Quarter") and full year financial results for the period ended December 31, 2013. In the press release, defendant Barrios reiterated that WWE would command a premium fee in its upcoming negotiations to renew its television license agreement. The press release stated, in relevant part:

> "*Regarding our domestic TV licensing agreements, we are now engaged with potential partners after exiting our exclusive negotiating period with NBCU. Based on our analysis of the value of comparable programs and our extensive research regarding consumer interest in WWE Network, we continue to believe that we can double or triple our 2012 OIBDA results of $63 million by 2015.*"

[Emphasis added].

60.  Barrios' foregoing statements were materially false and/or misleading when made because Defendants knew or recklessly disregarded that other "potential partners" were in fact, not interested in entering into an agreement with WWE over its television licensing rights. According to CW1, from the onset other networks had expressed no interest in working with WWE, because there was no real attraction to WWE's content and its advertising partnerships. Without the interest from other networks, Defendants knew or recklessly disregarded that WWE could not negotiate a contract that would "double or triple" the operating income of WWE based

on a new television contract, because the Company was only renegotiating its contract with NBC without any bargaining power. Barrios' statement WWE "exit[ed] our exclusive negotiating period with NBCU is also false and misleading because it suggests that WWE chose to move on from NBC and wait out the term of the exclusive negotiating period when, in reality, WWE did not have any other options, because NBC would not negotiate the price of its current deal. According to CW1, "WWE didn't really negotiate with NBC" because WWE had no bargaining position.

61.     That same day, the Company held an earnings conference call for its 2013 Fourth Quarter financial results. During the conference call, Defendant Barrios again touted the potential of the new television license agreement. Barrios stated, in relevant part:

> "Now looking ahead, based on our analysis of the value of RAW and SmackDown compared to other benchmark programs and extensive research regarding consumer interest in our WWE Network, *we continue to believe that we can double or triple our 2012 OIBDA results by 2015. Our programs share the key determinants of value that are attributed to live sports, significant first run hours, and the associated gross rating points, a passionate and loyal fan base and 90% live plus same day viewership, which makes WWE content like sports DVR-proof. Benchmarking our rights fees to the fees paid for sports programming and other original scripted series indicates that our license agreements could have meaningful upside potential."*

[Emphasis added].

62.     The foregoing statements were materially false and/or misleading when made because, among other things, Defendant Barrios knew or recklessly disregarded that WWE does not "share[] the key determinants of value that are attributed to live sports" because WWE could not generate the type of advertising revenue that live sports generate. CW1 attended meetings with Barrios in which CW1 and Barrios specifically discussed WWE's inability to secure blue-chip sponsors and maintain relationships with advertisers. Defendants also knew or recklessly disregarded that WWE's audience demographic had less spending power than live sport

audiences, which adversely affected advertising revenue, and in turn, negotiating power for a lucrative television contract. Indeed, internal documents not available to the public demonstrate that the Company recognized that WWE is "not the PGA, NFL, or MLB…" and that therefore Defendants misled investors to believe that WWE could "[b]enchmark[] [its] rights fees to the fees paid for sports programming" and that WWE's "license agreements could have meaningful upside potential" based on these comparisons. Defendants also had no meaningful basis to compare WWE's key determinants to other "significant first run hours" including "original scripted series," which would include, for example, the networks' most popular dramatic series' premiers and season finales.

63. Moreover, WWE content is not "DVR-proof" in the way sports are, because WWE results are not newsworthy. Results in sporting events make headline news, and therefore it is difficult for sports fans to record a contest to watch at a later time without learning the results prior to watching the recording. In contrast, WWE match results do not appear in the news, but for perhaps in WWE related web sites, and therefore WWE live matches are easily recorded and can be watched without learning the outcomes beforehand.

64. During the 2013 Fourth Quarter earnings call, Defendant Barrios also compared the Company's programming to other benchmark sports programming like the NFL, NBA, NHL, and NASCAR in answering a question from an analyst. Barrios answered the question in the following manner:

Mike Hickey - Benchmark – Analyst
I'm guessing this is fairly sensitive, but on the NBCU deal, can give us any color as just some regards to why you were not able to reach an agreement? And do you think that, that the media buyer paying a lower CPM theoretically for the content was a factor?

George Barrios
Yes, Mike, I don't want to characterize any of the discussions we've had including with

NBCU. ***As I have said before, right behind the NFL and NBA comes WWE in terms of generating live gross rating points in the US. So that's ahead of NASCAR, ahead of NHL, it is ahead of Major League Baseball, and all their national deals. So we feel good about the value that we bring to a partner both in advertising, being able to drive their CPM as well as and more importantly in the value to their affiliate revenue streams.***

[Emphasis added].

65.     The foregoing statements were materially false and/or misleading when made because Defendants knew or recklessly disregarded that purportedly comparable "gross rating points" for WWE to the NFL, MLB, NBA, NHL and NASCAR were in no way commensurate with how NBC valued WWE's television license.  Defendants—and specifically, Defendant Barrios—did not or had no reason to "feel good about the value that we bring to a partner both in advertising...as well as and more importantly in the value to their affiliate revenue streams" because WWE management specifically discussed with CW1 and others WWE's inability to secure blue-chip sponsors and maintain relationships with advertisers.  Furthermore, Barrios failed to mention that other networks had already declined to work with WWE, so the Company was only renegotiating its contract with NBC, who would not come close to the $400 million (of the total $800 million) that NASCAR received in its license deal.  Thus, Barrios' statement that WWE was in any way "ahead of NASCAR, ahead of NHL" or "ahead of Major League Baseball, and all their national deals" was materially false and misleading to investors, and directly contrary to the Company's own non-public internal documents that acknowledged that WWE is "not the PGA, NFL, or MLB…" and that WWE is "still early in growth stages and need to manage our business accordingly."

66.     On February 28, 2014, the Company issued a press release announcing its "Business Growth Plan and Potential Path to Significant Earnings Growth." The press release

outlined the Company's "plan to transform" WWE, emphasizing, among other things, the "primary" role the renewal of the television license agreement would have in the strategy to double or triple OIBDA by 2015. Further, the press release emphasized the number of viewers enjoyed by the Company's flagship programs while remaining silent as to the value of those viewers to potential advertisers. The press release also stated the Company's belief in the propriety of equating its content to that of "the rising value of sports programming" for gauging the value of its upcoming television license agreement. The press release stated, in relevant part:

Foundation for Growth: Powerful Global Brands and Rising Value of Content

Leveraging our global brand strength is a key pillar of our long-term strategy. *Audience measures such as the magnitude of our social media followers and the consistent top ratings of our television programs demonstrate WWE's brand strength.* In 2012, the average number of viewers of our Raw and SmackDown programs exceeded the average number of primetime viewers for all cable networks and historically, our programs have ranked as the number one show on their respective networks. *Further, our consumer research indicates a high proportion of U.S. and international TV viewers have an affinity for WWE content. This research indicates that in the U.S., approximately 34% of digital multi-channel TV households have an affinity for WWE content (i.e., 31 million homes), one quarter of which (8 million homes) are characterized as very passionate fan households.* Our research also indicates that an additional 18% of U.S. digital multi-channel TV households, or 16 million homes, include lapsed fans that we have the potential to re-engage with our content.

*Trends in the cable industry support our belief that owning and monetizing WWE content has significant upside potential. Industry data shows that the value of content, as measured by network advertising and consumer paid subscriptions, has steadily increased and is expected to rise further across global markets. We believe that benchmarking the license fees of our content to other original programs and recognizing the rising value of sports programming rights are both indicative of our potential to garner increased revenue from our content.*

[Emphasis added].

67.     The foregoing statements contained in the February 28, 2014 press release were materially false and/or misleading when made for multiple reasons.  On the one hand, Defendants misrepresented the "magnitude of [WWE's] social media followers[.]"  According to

CW1, management would take the actual number of social media followers and erroneously multiply that number many times over to calculate up to the 200+ million number expressed in the Company's October 31, 2013 and December 10, 2013 conference calls. For example, one twitter fan would follow a dozen different wrestlers, and Defendants would count that single fan as a dozen followers instead of just one." Moreover, according to CW1, WWE's "consumer research" **did not** "indicate[] that in the U.S., approximately 34% of digital multi-channel TV households have an affinity for WWE content (i.e., 31 million homes), one quarter of which (8 million homes) are characterized as very passionate fan households." CW1 stated that WWE's internal research indicated that, at most, WWE had 4-6 million fans, 2.5 million of which were children under the age of 18.

68. On the other hand, the February 28, 2014 press release was misleading because Defendants "benchmark[ed] the rising value of sports programming rights" as an indication of WWE's "potential to garner increased revenue from [its] content." Yet, Defendants knew or recklessly disregarded that networks did not value WWE like live sports. Defendants and networks knew that WWE's audience demographic was younger, less educated, and had less spending power than live sport audiences, and that led to lower advertising revenues than live sports. Furthermore, Defendants omitted that other networks had already dropped out of negotiations with WWE, so the Company was only renegotiating its contract with NBC, and that NBC did not value WWE like it did NASCAR or live sports.

69. On May 1, 2014, just two weeks before the end of the Class Period, Defendants held another earnings call with analysts in which Defendant Barrios made the following statements regarding the ongoing television license negotiations:

"Regarding our TV licensing agreements, **we are continuing to negotiate with potential distribution partners in the U.S.** and India.

Given that we are currently in discussions, we will not be answering any questions today about the status of these negotiations. Over the past several years, we've invested in people, and technology and we continue to believe the successful execution of our key initiatives **could potentially result in doubling or tripling our 2012 OIBDA results to a range of $125 million to $190 million by 2015**. We'll provide more information and further guidance for 2014 and 2015 as appropriate."

[Emphasis added].

70.     Defendant Barrios' statements regarding the status of the U.S. television deal negotiations were materially false and misleading because at the time these statements were made, WWE was no longer negotiating with multiple "potential distribution partners." According to CW1, other networks had already expressed no interest in working with WWE, so the Company was only renegotiating its contract with NBC. Moreover, because WWE was simply renegotiating its old contract with NBC without any interest from other networks, Defendant Barrios had no basis for saying that the new contract "could potentially result in doubling or tripling our 2012 OIBDA results" because, according to CW1, NBC was not willing to pay an amount of money for the contract that would come anywhere close to doubling or tripling 2012 OIBDA results.

71.     During the May 1, 2014 call, Defendant Barrios also discussed the size of WWE's fan base. Specifically, Barrios stated:

Our comprehensive consumer research demonstrates that more than 50% of TV homes across WWE's top global markets were about 120 million homes, report some level of affinity for WWE content. **And among these WWE homes, more than 80 million are classified as active, representing more than 170 million passionate and casual fans**.

[Emphasis added].

72.     This statement was materially false and misleading because, according to CW1, Defendants—and specifically, Defendants Barrios and McMahon—knew that these numbers

grossly inflated by tens and tens of millions. Per CW1, Defendants Barrios, McMahon and Wilson had access to pay-per-view numbers and internal and external research reports which indicated that at most WWE had 4-6 million active fans, not "more than 80 million."

## THE TRUTH IS REVEALED

73. On May 15, 2014, the Company announced that it had reached a multi-year deal with NBCUniversal Cable Entertainment to distribute its *Monday Night Raw* and *Friday Night Smackdown* properties. Notably absent from the release was any information concerning the value and length of the agreement.

74. On that same day, after the market closed, WWE issued a press release that shed light on the true value of the Company's key content agreements. Contrary to Defendants' previous statements concerning WWE's ability to double the value of its U.S. television license agreement, the press release revealed that the annual value for all of WWE's television license agreements—domestic and international—was approximately $200 million, an increase of $90 million over the previous deals. The portion attributable to the U.S. licensing agreement only increased about $57 million, or approximately 40% over its previous $139.5 million per year contract, rather than the 200-300% increase that investors had been led to expect. The press release stated, in relevant part:

> Renewal of Key Television Agreements
>
> Over the past six months, the Company has negotiated television distribution agreements in the U.S., U.K. and Thailand, and is in the midst of discussions regarding the distribution of WWE content in India. The Company estimates that it will increase the average annual value of these key television agreements to approximately $200 million, representing an increase of more than $90 million that is nearly three times (3x) the increase achieved in the previous round of negotiations.

75. When the Company revealed the truth about the value of its new distribution deal,

WWE's stock price plummeted from $19.93 per share at close on May 15, 2014 to $11.27 per share on May 16, 2014, a decline of 43% on high trading volume.

## POST CLASS PERIOD ADMISSIONS BY DEFENDANT MCMAHON SUPPORT A STRONG INFERENCE OF SCIENTER

76.     On May 19, 2014, the Company held a conference call to discuss its business outlook with investors. During this conference call, Defendant McMahon admitted that during the Class Period WWE did not provide investors with an accurate picture of negotiations with NBC and the negative impact of the February 2014 launch of the WWE Network on the television license negotiations. The conference call went as follows, in relevant part:

Vince McMahon:
"As all of you know, *we announced our television deal with NBC last Friday, and at the same time, tried to -- whether we failed or not I'm not quite certain, but tried to give you a degree of transparency as far as our network is concerned*, the WWE Network. And *maybe we gave you too much information, or maybe not enough,* I'm not quite certain.

*But in the interest of transparency, that's why we're having this call, to clear up some degree of perhaps misunderstanding of what we're trying to do. We've always prided ourselves on being transparent, and hopefully today, we can give a little bit more light along those lines.*

As far as our television deals are concerned, we are, well, there's a somewhat favorable outcome I should say. We were a little disappointed in our NBCU deal quite frankly, but when you add up all of our larger television deals, we nearly doubled our prior deal, so we're at about $200 million.

So internationally, we did much better than we did domestically, but when you add them up, it's not too bad when you double your television deals.

Again, not what we wanted, and not what our research showed us, well actually internationally it did, and we hit those margins, but not so much domestically. But still a good deal, not what we wanted."

Daniel Moore - CJS Securities – Analyst
"You've maintained, obviously, that the launch of the network would not cannibalize viewership, and would not impact negatively your negotiating position for the TV rights in North America with NBCU. With hindsight, was the launch of the network a sticking point for your current and potential cable partners, and would you have considered

delaying it, if you had to do it over again?"

Vince McMahon
"That's a very fair question. I'll answer that one. ***I think it definitely had a negative impact.*** How much of it, I don't know, by coming out with the network before we finish negotiating all of our rights.

The other aspect of that is that if we didn't come out with the network when we did, it would take us another year, because the idea there was to come out with the network at the strongest point which would be WrestleMania so it's a chicken and egg kind of situation. I do think, though, that was part of, I don't know if it was a significant aspect, but part of a lighter number, in terms of television rights. So I think that's a fair thing to say."

[Emphasis added].

77.     McMahon statements during the May 19, 2014 conference call with analysts provide a stunning Company admission that Defendants failed to give the market a transparent picture of its WWE Network and its negative effect on the television license negotiations with NBC.  McMahon concedes that WWE did not provide the market with the appropriate material information with regard to these facts.

## LOSS CAUSATION/ECONOMIC LOSS

78.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated WWE's stock price and operated as a fraud or deceit on Class Period purchasers of WWE's stock by misrepresenting the status of WWE's internal controls and disclosures.  Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors, shares of WWE declined precipitously -- evidence that the prior artificial inflation in the price of WWE's shares was eradicated.  As a result of their purchases of WWE stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic losses when the Company's true condition and the truth about  was finally and fully revealed and the

artificial inflation was removed from price of the Company's stock, *i.e.*, damages under the federal securities laws.

79. As a direct result of Defendants' disclosure on May 15, 2012, WWE's stock price plummeted to $11.27 per share on May 16, 2014, a decline of 43% from a previous day closing price of $19.93 per share, on high trading volume. The drop removed the inflation from the price of WWE common stock, causing real economic loss to investors who had purchased WWE common stock during the Class Period.

80. The 43% decline in WWE's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of WWE's stock price decline negates any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraud.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

81. At all relevant times, the market for WWE's common stock was an efficient market for the following reasons, among others:

(a) WWE's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE") national market exchange, a highly efficient and automated market;

(b) As a regulated issuer, WWE filed periodic public reports with the SEC and the NYSE;

(c)     WWE regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and,

(d)     WWE was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

82.     As a result of the foregoing, the market for WWE securities promptly digested current information regarding WWE from all publicly available sources and reflected such information in WWE stock price. Under these circumstances, all purchasers of WWE common stock during the Class Period suffered similar injury through their purchase of WWE common stock at artificially inflated prices and a presumption of reliance applies.

## PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of WWE who knew that those statements were false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

84. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of WWE between October 31, 2013, and May 16, 2014, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

85. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, WWE common shares were actively traded on the NYSE. As of April 30, 2014, the Company had 32,856,521 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by WWE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

87. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

88. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of WWE; and

(c) o what extent the members of the Class have sustained damages and the proper measure of damages.

89. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against Defendants WWE, McMahon, Barrios, and Wilson

90. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

91. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did**:** (a) deceive the investing public regarding WWE's business, operations, management and the intrinsic value of WWE securities; (b) enable Defendants to artificially inflate the price of WWE shares; (c) cause Plaintiffs and other members of the Class to purchase WWE common stock at artificially inflated prices, and Plaintiffs and other members of the Class were harmed when the previously undisclosed truth was revealed, or partially revealed causing the corresponding decline in WWE's stock price. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

92. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and, (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for WWE's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

93. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of WWE as specified herein.

94. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of WWE's value and

performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about WWE's television license deal and negotiations with NBC, size and demographics of the Company's fan base and inability to procure and maintain relationships with sponsors, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of WWE securities during the Class Period.

95.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and, (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

96.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, and/or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or

40

omissions were done knowingly and/or with recklessly for the purpose and effect of concealing WWE's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

97. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of WWE securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of WWE's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired WWE securities during the Class Period at artificially high prices and were damaged thereby.

98. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that WWE was experiencing, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their WWE securities, or, if they had acquired such securities during the Class Period, they would not have done so at the

artificially inflated prices which they paid.

99.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

100.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against Defendants McMahon, Barrios, and Wilson

101.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

102.    The Individual Defendants acted as controlling persons of WWE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, attendance at high-level meetings with CW1, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, including, but not limited to statements made about WWE's television license deal and negotiations with NBC, size and demographics of the Company's fan base and inability to procure and maintain relationships with sponsors, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

104.    As set forth above, WWE and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## THIRD CLAIM

### Violation of Section 20(b) of
### The Exchange Act Against Defendants McMahon, Barrios, and Wilson

105.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

106.    The Individual Defendants used their control over WWE to cause the Company to issue materially false and misleading information in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  By virtue of each of the Individual Defendants' acts resulting in the issuance by WWE of materially false and misleading statements to the public, each of the Individual Defendants, directly or indirectly, engaged in conduct that

was unlawful for the Individual Defendants to do under Section 10(b) of the Exchange Act and the rules and regulations promulgated thereunder through another person, WWE.

107. As a direct and proximate result of Defendant WWE's and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

108. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period based on directly or indirectly relying on the material misstatements and omissions issued by the Company.

## FOURTH CLAIM

### Violation of Section 20(A) of
### The Exchange Act Against McMahon Levesque

109. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

110. This Claim is alleged against McMahon Levesque and no other Defendant.

111. While WWE securities traded at artificially inflated and distorted prices, Defendant McMahon Levesque personally profited by selling approximately 441,671 shares of WWE securities while in possession of adverse, material non-public information about WWE, acquiring a total of approximately $6,174,551.02 in illegal insider trading proceeds.

112. Lead Plaintiff purchased WWE securities contemporaneously with McMahon Levesque. McMahon Levesque sold 48,571 shares on December 2, 2013; 27,998 shares on December 3, 2013; 19,593 shares on December 4, 2013; 26,798 shares on December 5, 2013; 17,040 shares on December 6, 2013; 48,443 shares on January 6, 2014; and 21,664 shares on

January 7, 2014. Lead Plaintiff purchased 4,000 shares on December 2, 2013; 2,000 shares on December 3, 2013; 2,000 shares on December 4, 2013; 1,000 shares on December 5, 2013; 2,500 shares on December 6, 2013; 1,000 shares on January 6, 2014; and 7,000 shares on January 7, 2014.

113. By virtue of McMahon Levesque's participation in the scheme to defraud investors described herein, and/or McMahon Levesque's sales of stock while in possession of material, non-public information about the adverse information detailed herein, McMahon Levesque violated the Exchange Act and applicable rules and regulations thereunder.

114. Lead Plaintiff and all other members of the Class who purchased shares of WWE stock contemporaneously with the sales of WWE stock by McMahon Levesque: (i) have suffered substantial damages in that they paid artificially inflated prices for WWE stock as a result of the violations of §§10(b) and 20(A) and Rule 10b-5 herein described; and (ii) would not have purchased WWE stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and/or misleading statements.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.   Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 5, 2015

By: /s/ Kim E. Miller_____
KIM E. MILLER (admitted *pro hac vice*)
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

-and-

Lewis S. Kahn
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, LA 70447
Phone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Mohsin Ansari and the Class*

**BROWER PIVEN**
 A Professional Corporation
DAVID A.P. BROWER
475 Park Avenue South, 33rd Floor
New York, NY 10016
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Counsel for Additional Plaintiff Adnan Shafeeq*

**ROME McGUIGAN, P.C.**
JEFFREY L. MENT (# ct12299)
JONATHAN CHAPPELL (# ct27237)
1 State Street, 13th Floor
Hartford, CT 06103
Telephone: (860) 549-1000
Fax: (860) 724-3921

*Local Counsel for Lead Plaintiff Mohsin Ansari and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2015, I filed the Amended Complaint for Violation of the Federal Securities Laws attached thereto upon all counsel of record by using the CM/ECF system and via e-mail. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF).

_/s/ Kim E. Miller_____
Kim E. Miller