# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE WORLD WRESTLING ENTERTAINMENT, INC. SECURITIES LITIGATION | Civil No. 14c1070 (AWT) |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. MCMAHON, GEORGE A. BARRIOS, MICHELLE D. WILSON, AND STEPHANIE MCMAHON LEVESQUE TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Jerry S. McDevitt (*pro hac vice*)
K&L Gates LLP
210 Sixth Avenue
Pittsburgh, PA 15222-2613
Telephone:  412 355-8608
Facsimile:  412 355-6501
E-mail:  jerry.mcdevitt@klgates.com

Jon Eisenberg (*pro hac vice*)
K&L Gates LLP
1600 K Street, N.W.
Washington, D.C. 20006
Telephone: 202 778-9348
Facsimile:  202 778-9100
E-mail:  jon.eisenberg@klgates.com

Jeffrey P. Mueller (ct27870)
Jonathan B. Tropp (ct11295)
Erick M. Sandler (ct25029)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
Telephone: 860-275-0100
Facsimile: 860-275-0343
Email: jmueller@daypitney.com
Email: jbtropp@daypitney.com
Email: emsandler@daypitney.com

Attorneys  for World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios, Michelle D. Wilson, and Stephanie McMahon Levesque

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

I. BACKGROUND ........................................................................................... 2

    A.    The Parties ...................................................................................... 2

    B.    The Confidential Witness ................................................................ 3

    C.    WWE's Disclosures ........................................................................ 4

    D.    Plaintiffs' Attempt to Convert the Company's Optimism into a Fraud ............................................................................................... 26

II. PLEADING STANDARDS ........................................................................... 30

    A.    Rule 8, Rule 9(b), and the PSLRA ................................................. 30

    B.    Section 10(b) of the Securities Exchange Act ................................ 32

III. ARGUMENT ............................................................................................... 33

    A.    Plaintiffs Have Failed to Plead a False Statement or Omission .............. 34

    B.    Plaintiffs Have Not Pled Facts Creating a Strong Inference of Scienter ........................................................................................... 46

    C.    Plaintiffs Have Failed to Plead Loss Causation ................................... 52

    D.    The Company's Statements Are Protected by the PSLRA Safe Harbors for Forward-Looking Statements ........................................... 54

    E.    The Section 20A Claim Against Levesque Should Be Dismissed .......... 61

    F.    The Claims Against Wilson Should Be Dismissed ............................... 62

    G.    The Controlling Person and Indirect Liability Claims Should Be Dismissed ........................................................................................ 63

CONCLUSION ............................................................................................... 63

# TABLE OF AUTHORITIES

**Cases**

*Andropolis v. Red Robin Gourmet Burgers, Inc.,*
    505 F. Supp.2d 662 (D. Colo. 2007) ................................................................. 48

*Arazie v. Mullane,*
    2 F.3d 1456 (7th Cir. 1993) ........................................................................... 43

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2000) ..................................................................................... 31

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... 31

*Belmont Holdings Corp. v. Suntrust Banks, Inc.,*
    896 F.Supp.2d 1210 (N.D. Ga. 2012) .............................................................. 43

*Campo v. Sears Holdings Corp.,*
    371 Fed. Appx. 212 (2d Cir. 2010) ................................................. 1, 41, 42, 43

*City of Livonia Emps.' Ret. Sys. v. The Boeing Co.,*
    711 F.3d 754 (7th Cir. 2013) ......................................................................... 42

*City of Omaha, Neb. Civilian Emps' Ret. Sys. v. CBS Corp.,*
    679 F.3d 64 (2d Cir. 2012). ..................................................................... 36, 37

*Decker v. Massey-Ferguson, Ltd.,*
    681 F.2d 111 (2d Cir. 1982) ......................................................................... 56

*Denny v. Barber,*
    576 F.2d 465 (2d Cir. 1978) ......................................................................... 45

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336 (2005) ..................................................................................... 52

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir.2009) ..................................................................... 46, 47

Ernst & Ernst v. Hochfelder,
    425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ........................................ 46

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994) ........................................................................... 31

*First New York Sec., LLC v. United Rentals,*
    648 F.Supp.2d 256 (D. Conn. 2009) ............................................................... 50

*Friedman v. Mohasco Corp.,*
    929 F.2d 77 (2d Cir. 1991). ..................................................................... 36, 38

*Friedus v. ING Groep, NV,*
    No. 12-4514-cv (2d Cir. 2013) ...................................................................... 37

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ......................................................29

*George v. China Automotive Sys., Inc.*,
No. 11 Civ. 7533 (S.D.N.Y. 2012) ......................................................50

*Glasser v. The9, Ltd.*,
772 F. Supp.2d 573 (S.D.N.Y. 2011) ......................................................50

*Higginbotham v. Baxter International Inc.*,
495 F.3d 753 (7th Cir. 2007) ......................................................42

*In re Aspeon, Inc. Sec. Litig.*,
168 F. App'x 836 (9th Cir. 2006) ......................................................48

*In re Carter-Wallace Inc., Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000) ......................................................45

*In re Ceridian Corp. Sec. Litig.*,
504 F. Supp.2d 603 (D. Minn. 2007) ......................................................48

*In re Colonial Ltd. Partnership Lit.*,
854 F. Supp. 64 (D. Conn. 1994) ......................................................45

*In re Crystal Brands Sec. Litig.*,
862 F. Supp. 745 (D. Conn. 1994) ......................................................45

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp.2d 266 (S.D.N.Y. 2006) ......................................................48

*In re IAC/Interactive Corp. Sec. Litig.*,
478 F. Supp.2d 574 (S.D.N.Y. 2007) ......................................................50

*In re IBM Sec. Litig.*,
163 F.3d at 107 ......................................................37

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp.2d 358 (E.D.N.Y. 2003) ......................................................48

*In re K-Tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ......................................................48

*In re Lululemon Sec. Litig.*,
No. 13 Civ. 4596 (S.D.N.Y. Apr. 18, 2014) ......................................................38, 50

*In re Magnun Hunter Resources Corp. Sec. Litig.*,
No. 13 Civ. 2668 (S.D.N.Y. June 23, 2014) ......................................................38

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003),
*aff'd on other grounds, Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005),
*cert. denied*, 546 U.S. 935 (2005) ......................................................5

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011) ......................................................48

iii

*In re Sanofi Sec. Litig.*,
  Nos. 13 Civ. 8806, 14 Civ. 2211 (S.D.N.Y. Jan. 28, 2015) ....................................38

*In re Star Gas Sec. Litig.*,
  745 F. Supp.2d 26 (D. Conn. 2010) ..........................................................................38

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
  No. 3:09-cv-1293 (CFD) (D. Conn. Feb. 4, 2011) .....................................................56

*In re Sun Healthcare Group, Inc. Sec. Litig.*,
  181 F.Supp.2d 1283 (D.N.M. 2002) ..........................................................................48

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ...........................................................................................37

*In Re Xerox Corp. Sec. Litig.*,
  935 F. Supp. 2d 448 (D. Conn. 2013) ...............................................................52, 53

*Institutional Investor Group v. Avaya*,
  564 F.3d 242 (2d. Cir. 2009) ......................................................................................47

*Jackson Nat. Life Ins. v. Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir. 1994) .........................................................................................45

*Kaess v. Deutsche Bank AG*,
  No. 13-2364-cv (2d Cir. July 16, 2014). ..............................................................36, 37

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013). ................................................................................36, 37

*Landesbank Baden-Württemberg v. Goldman Sachs*,
  821 F. Supp. 2d 616 (S.D.N.Y. 2014) ........................................................................43

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005),
  *cert. denied*, 546 U.S. 935 (2005) ........................................................................5, 53

*Malin v. XL Capital Ltd.*,
  499. F. Supp. 2d 117 (D. Conn. 2007),
  *aff'd*, 312 F. App'x 400 (2d Cir. 2009) .................................................................5, 38

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ......................................................................................31

*Mizzaro v. Home Depot*,
  544 F.3d 1230 (11th Cir. 2008) .................................................................................48

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
  Civil Action No. 3:09-CV-01740 (VLB) (D. Conn. Mar. 23, 2013) ...................31, 38, 57, 63

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ..........................................................................38, 45, 47

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ......................................................................................31

*Pugh v. Tribune Co.,*
    521 F.3d 686 (7th Cir. 2008) ...................................................................48

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ...................................................................31

*San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Companies,*
    75 F.3d 801 (2d Cir. 1996) ...............................................38, 43, 45, 48, 56

*See also, e.g., Abuhamdan v. Blyth, Inc.,*
    No. 3:12cv1597 (MPS) (D. Conn. Mar. 31, 20114) ........................38, 58

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124, 1129 (2d Cir. 1994)...........................................................45

*Slayton v. American Express Co.,*
    604 F.3d 758 (2d Cir. 2010) ...........................................45, 47, 54, 57, 61

*Stein v. Tangoe, Inc.,*
    Fed. Sec. L. Rep. (CCH) ¶ 98,209 (D. Conn. Sept. 30, 2014)............31, 63

*Stevelman v. Alias Research Inc.,*
    174 F.3d 79 (2d Cir. 1999) ......................................................................45

*The Freeman Group v. The Royal Bank of Scotland Group PLC,*
    No. 12-3642-cv (2d Cir. Sept. 25, 2013).............................................36, 37

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*
    692 F. Supp.2d 387 (S.D.N.Y. 2010).......................................................43

**Statutes**

15 U.S.C. § 77z-2(c)(1)(A)...........................................................................35

15 U.S.C. § 77z-2(c)(1)(B)...........................................................................35

15 U.S.C. § 78j(b) .......................................................................................34

15 U.S.C. § 78u-4(b)(1)(B) ..........................................................................35

15 U.S.C. § 78u-4(b)(2) ..........................................................................35, 49

15 U.S.C. § 78u-4(c)(1) ...............................................................................35

15 U.S.C. § 78u-4(c)(2) ...............................................................................35

15 U.S.C. § 78u-5(i).................................................................................56, 57

15 U.S.C. § 78u-4 .......................................................................................34

15 U.S.C. §77z-1...........................................................................................34

15 U.S.C. §77z-2...........................................................................................34

15 U.S.C. §78u-4(b)(1)(B)............................................................................34

15 U.S.C. §78u-4(b)(2).................................................................................34

15 U.S.C. §78u-5 .........................................................................................34

15 U.S.C. §78u-5(c)(1)(B)..........................................................................................35

15 U.S.C. §78u-5(c)(1))(A) .........................................................................................35

**Rules**

Fed.R.Civ.P. 9(b) ........................................................................................................45

**Other Authorities**

H.R. REP. NO. 104-369 ...............................................................................................34

http://www.brentsherman.com/PDFS/NASCAR.pdf .................................................47

http://www.huffingtonpost.com/john-dick/nascar-has-a-republican-k_b_3992677.html............47

# PRELIMINARY STATEMENT

The Amended Complaint seeks to convert the Company's legitimate and genuine optimism about its future business prospects into a securities fraud. The gravamen of the Amended Complaint is that the Company's forward-looking statements about the potential results of its re-negotiation of four television contracts, which resulted in the Company nearly doubling the average annual revenues from those contracts from $108 million to nearly $200 million, were too optimistic and, therefore, a fraud. To support the elements of falsity and scienter, the Amended Complaint relies exclusively on a single confidential witness who, according to the Amended Complaint's own allegations, had nothing to do with the television contract negotiations, left the Company four months before the negotiations were completed, and rarely, if ever, participated in meetings with senior executives of the Company about anything.

Moreover, the Amended Complaint nowhere alleges that the confidential witness was given an opportunity to review any of the allegations attributed to him in the Amended Complaint. As set forth in the attached affidavit signed by the confidential witness, which this Court may consider under the Second Circuit's decision in *Campo v. Sears Holdings Corp.*, 371 Fed. App'x 212, 216 n.4 (2d Cir. 2010) and related authorities, the confidential witness has now reviewed the statements attributed to him in the Amended Complaint and repudiates them. *Campo*, 371 Fed. App'x at 216-17, 216 n.4 (considering a deposition when affirming dismissal). Even with the allegations that the Amended Complaint attributes to the confidential witness, the Amended Complaint should be dismissed. Given his repudiation, the only meaningful issue left in the case will be whether the plaintiffs violated Rule 11 when they filed the Amended

Complaint—an issue that the Private Securities Litigation Reform Act ("PSLRA") requires the Court to consider after a final adjudication of the action.[1]

As discussed in detail below, the Amended Complaint should be dismissed in its entirety for four separate reasons:

1.  it fails to plead non-conclusory facts showing a material false statement or omission, as opposed to genuinely believed optimism about the Company's future prospects;

2.  it fails to plead non-conclusory facts creating the requisite strong inference of scienter;

3.  it fails to plead non-conclusory facts showing loss causation; and

4.  it is barred by the safe harbor in the PSLRA for forward-looking statements made without actual knowledge of their falsity.

In addition, the claims against Wilson and Levesque should be dismissed because Plaintiffs have not alleged any elements of a violation against them and have ignored that Levesque's shares were sold pursuant to a Rule 10b5-1 plan that was executed and publicly disclosed seven months before the beginning of the class period.

## I. BACKGROUND

### A. The Parties

WWE is an integrated media and entertainment company that was founded in 1980. (Amended Complaint ¶ 3). Its principal place of business is at 1241 East Main Street, Stamford,

---

[1] 15 U.S.C. § 78u-4(c)(1), entitled "Mandatory Review by Court," provides:

> In any private action arising under this title, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

Connecticut. (Amended Complaint ¶ 31). Its shares are traded on the New York Stock Exchange. (Amended Complaint ¶ 81(a)).

McMahon is WWE's co-founder, Chairman of the Board, and Chief Executive Officer. (Amended Complaint ¶ 32).

Barrios is WWE's Chief Strategy & Financial Officer. (Amended Complaint ¶ 33).

Wilson is WWE's Chief Revenue and Marketing Officer. (Amended Complaint ¶ 34). The Amended Complaint's only allegation of a public statement made by Wilson is: "We are clearly entertainment-based, but if you think about the characteristics of our brand, it's live action, and that's sports. We want to be compensated for a live audience, since live content is getting a very significant premium in the marketplace." (Amended Complaint ¶ 51).

Levesque is WWE's Chief Brand Officer. (Amended Complaint ¶ 36). The Amended Complaint alleged Levesque was a director during the class period, but she was not. It names Levesque solely in connection with the sale of a portion of her WWE shares during the Class Period, which the original Amended Complaint alleged was all of her shares but that the corrected Amended Complaint acknowledges was not all of her shares. As discussed below, the shares were sold pursuant to a Rule 10b5-1 trading plan that was entered into and publicly disclosed seven months before the beginning of the Class Period and that ended nearly four months before the television contract negotiations were concluded.

**B.    The Confidential Witness**

The sole confidential witness on whom the Amended Complaint purports to rely was a mid-level manager who left the Company in January 2014 – before the Company was even allowed to begin negotiations with networks other than NBC Universal (Amended Complaint ¶¶ 8, 9, 18). Yet astonishingly it relies on him for his purported description of how negotiations

proceeded *after he was no longer even with the Company.* (Amended Complaint ¶¶ 8, 9, 18, 59-62, 73-77). Moreover, the confidential witness is described as the "Vice President of WWE's global digital advertising sales team" —a sales position involving digital advertising, not the negotiation of the television contracts. (Amended Complaint ¶ 8). The Amended Complaint alleges that Digital Media was not even part of the segment involving Live and Televised Entertainment (Amended Complaint ¶ 4), which is the subject of the Amended Complaint. The Amended Complaint does not allege that he attended any meetings at which the television negotiations were discussed by anyone or, indeed, at which anything other than advertising was discussed.

As discussed below, the confidential witness has submitted an affidavit stating that he was not given an opportunity to review the statements attributed to him in the Amended Complaint, that the statements attributed to him in the Amended Complaint are not accurate, and that he is not aware of any instance in which the Company, or anyone else, made inaccurate public statements about anything referenced in the Amended Complaint. (Affidavit, ¶ 5).

## C.  WWE's Disclosures

The facts set forth below are drawn from the Amended Complaint, documents incorporated by reference therein, and the Company's public disclosure documents filed with the Securities and Exchange Commission. The documents are annexed as exhibits to the Defendants' submission and are referenced below by their exhibit number. This Court has previously held that the following documents may properly be considered on a Rule 12(b)(6) motion to dismiss:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained

in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Malin v. XL Capital Ltd.*, 499. F. Supp. 2d 117, 129 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (quoting *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd on other grounds, Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied,* 546 U.S. 935 (2005). Judicial notice may also be taken of "press releases and news articles and published analyst reports in determining what the market knew." *In re Zyprexa Pros. Lia. Litig.*, 549 F. Supp.2d 496, 501 (E.D.N.Y. 2008). A court may consider such materials "for the purpose of establishing that the information in the various documents was publicly available." *Staehr v. The Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008).

1. **The Company's February 28, 2013 Press Release Announcing "Business Plan and Potential Path to Significant Earnings Growth."**

Paragraphs 66-68 of the Amended Complaint purport to describe a WWE press release issued in the middle of the class period. The Company's press release (Exh. 1), which the Amended Complaint states is "dated February 28, 2014," announced WWE's "Business Growth *Plan* and *Potential* Path to Significant Earnings Growth." (Amended Complaint ¶ 66) (emphasis added). The press release was issued not, as the Amended Complaint alleges, on February 28, 2014, but a year earlier on February 28, 2013 – ten months *before* the beginning of the Class Period. Plaintiffs' treatment of the document as a Class Period document issued one year after it was, in fact, issued is inexplicable and is only one of several "facts" that are misstated in the

Amended Complaint.[2]   Nevertheless, Plaintiffs have incorporated the document by reference and it provides relevant context for the subsequent Class Period disclosures discussed below.

The press release provides a window into the Company's three-year business plan carrying through to the end of 2015.  (Exh. 1 p.3).  The very first paragraph of the release sets forth the Company's key initiatives, expectations, and risks.  We quote it in its entirety:

> WWE (NYSE: WWE) today announced some of the key initiatives in its 2013-2015 business plan, which is designed to achieve significant earnings growth, potentially doubling or tripling the company's current 2012 EBITDA results by 2015.  The primary drivers of this growth include the potential launch of a WWE network, the renewal of key content agreements, and the execution of our digital strategy.  These initiatives, *if successful,* could generate substantial returns.  However, they contain *significant execution risks.*  In order to achieve such growth, WWE will continue to invest in its production and creative capabilities.  As a result, it is expected that WWE's 2013 EBITDA will approximate 2012 results.

(Exh.1 p.1) (emphasis added) (footnote omitted).

There is a footnote reference in the first paragraph of the February 28, 2013 press release after the phrase "significant execution risks."  The footnote states, "WWE could face of *variety of risks* upon entering into new and complementary businesses, including the potential creation of a WWE network.  Risks are outlined in the company's Form 10-K filing with the SEC." (Exh.1 pp.1, 3 n.1) (emphasis added).

The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012 (Exh. 2), referenced in the press release, listed the following as the first two Risk Factors:

---

[2] A number of other allegations discussed below, such as that defendant Levesque was a director, that she made any investment decision at all during the class period, that her sales began on October 3, 2013, and that she sold all of her shares during the class period are equally inexplicable – meaning that there are no facts to support these allegations and they are clearly refuted  by  the Company's public filings (see pp. 49-52 below).  Plaintiffs have recently attempted to correct one of the more egregious errors (the allegation that Levesque sold all her shares), but the attempt is neither procedurally proper nor comprehensive enough to address obvious and inexplicable errors that appear in multiple places in the Amended Complaint – errors that are even more egregious than describing a press release as having been issued during the Class Period when it was clearly issued months before the class period.

The Company has begun and announced that it anticipates increasing content production for distribution on various platforms, including the potential creation of a WWE network, and these efforts could have a material adverse affect on our operating results.

…

Our failure to maintain or renew key agreements could *adversely affect* our ability to distribute television and pay-per-view programming which could *adversely affect* our operating results.

(Exh. 2 at p. 10) (emphasis added)**.**

With regard to the "key agreement" risk factor, the 10-K went on to state:

Our television programming is distributed by broadcast and cable networks, and our pay-per-view programming is distributed by pay-per-view providers. Because our revenues are generated, directly and indirectly, from this distribution of our programming, any failure to maintain or renew arrangements with distributors, the failure of distributors to continue to provide services to us or the failure to enter into new distribution opportunities could adversely affect our operating results. We regularly engage in negotiations relating to substantial agreements covering the distribution of our television programming by carriers located in the United States and abroad. Over the past several years we have expanded our relationship with NBC Universal and they currently distribute a majority of our domestic television programming.

(Exh. 2 at p. 10).

In the section entitled "*Cautionary Statement for Purposes of the 'Safe Harbor' Provisions of the Private Securities Litigation Reform Act of 1995.*" (Exh. 2 p. 43), the 10-K disclosed 22 separate risks, the second of which related to the Company's television contracts. The 10-K stated:

The Private Securities Litigation Reform Act of 1995 provides a "safe harbor" for certain statements that are forward-looking and are not based on historical facts. When used in this Form 10-K, the words "may," "will," "could," "anticipate," "plan," "continue," "project," "intend", "estimate", "believe", "expect" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such words.

> *These statements relate to our future plans, objectives, expectations and intentions and are not historical facts and accordingly involve known and unknown risks and uncertainties and other factors that may cause the actual results or the performance by us to be materially different from future results or performance expressed or implied by such forward-looking statements.* The following factors, among others, could cause actual results to differ materially from those contained in forward-looking statements made in this Form 10-K , in press releases and in oral statements made by our authorized officers: (i) risks relating to increasing our content production for distribution on various platforms including the potential creation of a WWE network;; (ii) *our failure to maintain or renew key agreements could adversely affect our ability to distribute our television and pay-per-view programming. . . .*

(Exh. 2 p. 43) (emphasis added).

In addition to referencing the risk factors in the Company's 10-K, the press release itself stated:

> Forward-Looking Statements: This press release contains *forward-looking* statements pursuant to the safe harbor provisions of the Securities Litigation Reform Act of 1995, which are subject to various *risks and uncertainties*. These risks and uncertainties include, without limitation, *risks relating to maintaining and renewing key agreements, including television and pay-per-view programming distribution agreements. . . .*

(Exh. 1 p.4) (emphasis added).

Four points about the Company's disclosure are important to note and carry forward into the Company's subsequent disclosures:

**First**, the statements are not predicated solely on the future negotiation of television contracts. In fact, the first item referenced in the press release is not the re-negotiation of existing television contracts, but the future launch of a WWE network.

**Second,** the statements are part of a three-year forward-looking business plan that culminates in 2015. (Exh. 1 p.3). They focus on the *future* negotiation of television contracts,

the *future* launch and potential success of the WWE network, and *future* changes to EBITDA (later changed to OIBDA)[3] through the *end of 2015*.

**Third**, there were no guarantees the Company would be successful. The Company's 2013 results, the press release stated, would only approximate its 2012 results. The initiatives "*if successful*," could generate substantial returns by the end of 2015, but the initiatives "*contain significant execution risks*"– the first two of which were risks associated with the launch of a network and risks associated with its key television agreements. (Exh. 1 p.1). With regard to a WWE Network, "Until a base of approximately 1 million subscribers is achieved, we estimate the network would represent a net investment for WWE. *Ultimately*, we believe a network and other distribution and monetization options would represent a sizable economic opportunity in the U.S. and internationally." (Exh. 1 p.2). The Company was not guaranteeing any particular result – it was providing a window into the Company's 2013-2015 business plan and what it hoped to achieve, and was optimistic it would be able to achieve, under that three-year plan.

**Fourth**, while the Company recognized that there were significant execution risks, it was also optimistic about the strength of the Company. With regard to the re-negotiation of its television contracts, over the prior year "our programs have ranked as the number one show on their respective networks." (Exh. 1 p.1). Moreover, "We believe that benchmarking the license fees of our content to other original programs and recognizing the rising value of sports programming rights are both indicative of our potential to garner increased revenue from our content." (Exh. 1 p.1).

---

[3] EBITDA is defined as "Earnings Before Interest, Taxes, Depreciation, and Amortization." The Company later shifted to its close cousin, OIBDA, which stands for "Operating Income Before Depreciation and Amortization." The first measure starts with earnings and adds back interest, taxes, depreciation, and amortization. The second measure starts with operating earnings and adds back depreciation and amortization. *See, e.g.,* Robert B. Dickie, Financial Statement Analysis and Business Valuation for the Practical Lawyer 40 (2d ed.) (2006), attached as (Exh. 3) (defining EBITDA, OIBDA and other measures of operating profits).

With respect to the *potential* launch of a WWE network, WWE's research indicated that "approximately 34% of digital multi-channel TV householders have an affinity for WWE content (i.e., 31 million homes), one quarter of which (8 million homes) are characterized as very passionate fan households" and an additional 16 million homes "include lapsed fans that we have the potential to re-engage with our content." (Exh. 1 p.1). It disclosed that its estimates of WWE fan households "are based on our consumer research performed by a third party, which surveyed a representative sample of more than 9,000 U.S. households." (Exh. 1 n.3).

2.     **The Company's October 31, 2013 Press Release Announcing Its Third-Quarter 2013 Earnings**

The first Class Period public disclosure reference in the Amended Complaint is the October 31, 2013, press release reporting WWE's results for the third quarter ended September 30, 2013. (Exh. 4).[4] Most of the press release focused on the Company's quarterly and nine-month results. The Amended Complaint does not claim that any of the Company's disclosures of its historical financial results were inaccurate. In addition to providing the financial results for the quarter, it highlighted a number of achievements in the quarter, including "the formation of new partnerships with blue-chip sponsors such as General Mills and Kraft." (Exh. 4 p.1).

With respect to forward-looking statements, the Company largely repeated the disclosures related to its 2013-2015 business plan. (Exh. 4 p.10). Barrios stated:

> [W]e are *confident* that we will be able to negotiate our key domestic agreements by the end of April next year and that our efforts, including the launch of a WWE network, will keep us on track to double or triple our 2012 OIBDA results of $63 million by 2015.

(Exh. 4 p.1) (emphasis added).

_____

[4] The Company's quarterly-earnings press releases were also filed as attachments to the Company's Form 8-Ks filed with the SEC.

Although not mentioned in the Amended Complaint, the press release also stated:

> Forward-Looking Statements: This press release contains *forward-looking statements* pursuant to the safe harbor provisions of the Securities Litigation Reform Act of 1995, which are subject to various risks and uncertainties. These risks and uncertainties include, without limitation, *risks relating to maintaining and renewing key agreements*, including television and pay-per-view programming distribution agreements. . . .

(Exh. 4 p.10) (emphasis added).

### 3. The Company's October 31, 2013 Third-Quarter Earnings Call

Throughout the Class Period, the Company participated on earnings calls with analysts, which occurred on the same day that it issued its press releases announcing its quarterly earnings. On October 31, 2013, it participated in an earnings call with analysts about its 2013 third-quarter earnings. (Exh. 5). Although not mentioned in the Amended Complaint, the Company began the call, as it began all of its earnings calls, by stating it would be making "several *forward-looking statements*," that "[t]hese statements are based on management's *estimates*," and that "[a]*ctual results may differ* due to numerous factors as described in our presentation in our filing with the SEC." (Exh. 5 p.2) (emphasis added).

While most of the call dealt with the Company's financial results, McMahon stated that the Company would "continue developing our network," and stated that the Company's television agreements "not only just here in the States, but also in the United Kingdom" and "India is coming up shortly" and "we're actively doing all of them going forward." (Exh. 5 p.3). He stated that "*if all the stars line up*, and we *believe* that they will," then the business would be transformed. (Exh. 5 p.3) (emphasis added).

Consistent with the Company's earlier disclosures, Barrios added, "We are confident that the rising values of content in the marketplace and a potential launch of the WWE network will keep us on track to double or triple our 2012 OIBDA results by 2015." (Exh. 5 p.6). On the

other hand, he acknowledged that the initiatives might not work out. *See* (Exh. 5 p.6). He stated that if the Company was unable to execute its strategic initiatives in a way that enabled it to achieve its goals, "management will undertake some form of restructuring to increase profitability." (Exh. 5 p.6). McMahon added that while the Company did not think cost reductions would become necessary, "if the worst happened, that's what we will go back to." (Exh. 5 p.7).

### 4. Barrios Presentation at the December 10, 2013 UBS Global Media Conference Presentation

On December 10, 2013, Barrios presented at the UBS Global Media and Communications Conference. (Exh. 6). He stated that the components of the Company's future growth would be "[n]umber one, the launch of a network, number two, the renewals of our key content agreements in an environment where the price of content is going up," and number three, "monetizing the large digital audience that I mentioned." (Exh. 6 p.4).

With regard to the WWE Network, which he labeled as the number one driver for future growth, he said one million subscribers was "breakeven." (Exh. 6 p.4). He said 2-4 million would create "incremental $50 to $150 million of OIBDA." (Exh. 6 p.4). With regard to the television contracts, he stated that the Company was in the process of negotiating its "four largest agreements around the world, two here in the U.S., one in India and one in the U.K.," and that those agreements would be in place "no later than January 2015." (Exh. 6 p.4). He said that these four agreements represented $100 million of the Company's $140 million in television licensing revenues. (Exh. 6 p.4).

In discussing the negotiation of the television contracts, Barrios stated that the NHL, NASCAR, major league baseball, and the NBA were "getting anywhere between 50 cents and $1

per viewer hour while WWE was getting around 10 cents per viewer hour.  (Exh. 6 p.5).  He said, "[Y]ou can make your own judgment call about our opportunity there."  (Exh. 6 p.5).

With regard to the NASCAR comparison, he mentioned that the annual value of NASCAR's television contracts was $820 million compared to $140 million for WWE even though WWE averaged 20% more viewers than NASCAR.  *See* (Exh. 6 pp.4-5).  Asked by an analyst whether the nearly 600% difference was because of the different advertisers and demographics for NASCAR, Barrios explained that his understanding was that distribution agreements with affiliates rather than advertising accounted for most of the revenues for a television network[5] and that while he thought the advertising revenues should be pretty close "I don't have the hard data to support that."  *See* (Exh. 6 p. 9).

With regard to how WWE might double or triple its OIBDA by the end of 2015, Barrios said three or four million subscribers to the WWE network would get you there alone, a "home run" on either the WWE network or the re-negotiation of the four key television contracts would get you there alone, or "some success on both we'll look and feel pretty good."  (Exh. 6, p.5)

### 5.    December 17, 2013 *Variety* Article On WWE's TV Contract Negotiations

On December 17, 2013, *Variety* published an article titled, "WWE Aims to Pin Down Rich New TV Rights Deals (Exclusive)."  (Exh. 8).  The article stated that WWE's goal was to "significantly increase" the $139.5 million it received in TV licensing fees in 2012 and "get closer to the rich network deals that sports organizations like the NBA, NHL, NASCAR, as well

---

[5] Comcast/NBC Universal's Annual Report on Form 10-K for the fiscal year ended December 31, 2013 (Exh. 7) states, "Our Cable Networks segment generates revenue primarily from the distribution of our cable network programming and from the sale of advertising.  Distribution revenue is generated from distribution agreements with multichannel video providers.  Advertising revenues is generated from the sale of advertising time on our cable networks and related digital media properties."  (Exh. 7 at 8).  For the fiscal year ended December 31, 2013, NBC Universal reported $4.9 billion in distribution fees and $3.5 billion in advertising for its cable segment.  (Exh. 7 at 57).

as soccer command." (Exh. 8 p.2). It quoted Wilson as saying, "We are clearly entertainment-based, but if you think about the characteristics of our brand, it's live action, and that's sports. We want to be compensated for a live audience, since live content is getting a very significant premium in the marketplace." (Exh. 8 p.3).

The article mentioned that two of WWE's network programs, *RAW* and *SmackDown*, air 156 episodes a year that average a 2.2 household rating, while NASCAR airs 154 races and averages a 1.38 household rating. (Exh. 8 p.2-3). The article also mentioned that NASCAR's audience was 92% white and over 50 and that WWE's audience was "far more diverse and broken out fairly evenly among age groups," with 44% under age 34. (Exh. 8 p.3).

The article mentioned that "Monday Night Raw is a huge ratings generator for USA Network" and that without it, "the network would drop from first place to as low as No. 4 among basic entertainment channels." (Exh. 8 p.5). On the other hand, the article also pointed out, "When it comes to collecting premium advertising dollars, however, USA Network earns the lowest CPMs[6] for "*Raw*" than other programs, sources say. Translation: the ads that air during "*Raw*" are cheap." (Exh. 8 p.5).

### 6. The Company's January 9, 2014 Press Release Announcing the Launch of the WWE Network

On January 9, 2014, WWE issued a press release announcing the scheduled February 24, 2014 launch of the WWE Network, a network distributed over the internet providing access to WWE's pay-per-view offerings and certain other programming. (Exh. 9) The press release stated that the WWE Network would feature all 12 WWE live pay-per-view events, which then

---

[6] CPM stands for "cost per thousand," and is the measure of what an advertiser pays for every 1,000 impressions of its advertisement. *See, e.g., United States v. American Soc. of Composers,* 559 F. Supp.2d 332, 338 (S.D.N.Y. 2008) ("In other words, if the CPM for an ad is $5, then the cost to an advertiser to purchase 1,000 impressions is $5."), *vacated and remanded on other grounds,* 627 F.3d 64 (2d Cir. 2010)  The "M" in CPM represents the Roman numeral for 1,000.

cost fans more than $600 per year, for $9.99 per month with a six-month commitment.  (Exh. 9

p.1).

Consistent with the Company's earlier statements, Barrios stated:

> The creation of a network is one of WWE's primary growth drivers, which also include the renegotiation of key global content agreements and monetization of WWE's best-in-class digital and social media presence.   We continue to believe that these initiatives will enable WWE to significantly raise its earnings profile by 2015.

(Exh. 9 p.1).

On the other hand, he added the following cautionary qualification:

> Although these initiatives hold significant potential, our financial performance for 2014 could fall within a wide range of outcomes depending on the rate of subscriber acquisition for the network, potential pay-per-view cannibalization and the outcome of our content negotiations.   This wide range of outcomes in 2014 includes potentially lower earnings than 2013.

(Exh. 9 p.1).

The press release included the following disclosure:

> Forward-Looking Statements: This press release contains *forward-looking statements* pursuant to the safe harbor provisions of the Securities Litigation Reform Act of 1995, which are subject to various risks and uncertainties. These risks and uncertainties include the risks discussed under the caption "Item 1A. Risk Factors" in the WWE's Annual Report on Form 10-K for the year ended December 31, 2012, filed with the Securities and Exchange Commission on March 1, 2013. In addition, WWE will face a variety of risks associated with launching its OTT network. These risks include the loss of some or all of our pay-per-view business if distributors decide no longer to transmit our pay-per-view programming. In addition, the rate and/or level of network subscriber adoption could be less than anticipated.

(Exh. 9 p.3) (emphasis added).

.

**7. The Company's January 14, 2014 WWE Network Overview Conference Call**

On January 14, 2014, the Company participated in a call with analysts regarding the WWE Network. (Exh. 25). At the beginning of the call, the Company made the following disclosure:

> Today's discussion will include *forward-looking statements*. These forward-looking statements reflect our *current views*, are based on various *assumptions* and are subject to *risks and uncertainties* disclosed from time to time in our SEC filings. *Actual results may differ materially and undue reliance should not be placed on them. . . .*

(Exh. 25 p.1) (emphasis added).

After both Mr. McMahon and Mr. Barrios walked through the Company's continued optimism about the WWE Network, its estimates for subscriber growth and the basis for those estimates, as well as the negotiation of new television contracts, Mr. Barrios gave the following caveat:

> Although these initiatives hold significant *potential*, our financial performance for 2014 could fall within a *wide range of outcomes* depending on the rate of Network subscriber acquisition, the level of potential pay-per-view cannibalization and the outcome of our content negotiations.
>
> This wide range of outcomes in 2014 includes potentially lower earnings in 2013. We expect to have better visibility on the Network and our key content agreement by the time we announce our first quarter earnings. At that time, we expect to update you, our analyst and investors, on our guidance for 2014 and our progress towards doubling or tripling our 2012 OIBDA results of $63 million by 2015
>
> . . . .
>
> Management may change its *expectation* that the planned Network will contribute to *potentially* doubling or tripling the company's 2012 OIBDA results of $63 million by 2015….

(Exh. 25 pp.5-6) (emphasis added).

In response to a question from one of the analysts about what impact he thought the WWE Network would have on the Company's negotiations with NBC Universal, McMahon expressed his then current opinion that the value of WWE to NBC Universal was live broadcasting rather than re-broadcasting old matches (which could also be seen on the WWE network) and that the WWE Network had the potential to increase the overall awareness of WWE, which could increase television ratings. *See* (Exh. 25 p.7). He expressed his understanding at the time, "This is also a USA [cable network] point of view having discussions obviously with management. . . . [T]hey too believe this is going to increase television ratings." (Exh. 25 p.7).

### 8. The Company's January 30, 2014 Press Release Announcing WWE's UK Television Contract

On January 30, 2014, WWE and BSkyB issued a press release announcing that they had "extended their partnership for five more years to exclusively broadcast WWE's weekly flagship programming to the more than 15.5 million homes in the U.K. and Ireland through 2019. This new agreement carries WWE and BSkyB's partnership into a milestone 30th year." (Exh. 10 p.1). The press release did not disclose the terms of the agreement.

### 9. The Company's February 20, 2014 Press Release Announcing Its Year-End Results

On February 20, 2014, the Company issued a press release announcing its results for the year ended December 31, 2013. (Exh. 11 p.1).

While most of the press release addressed the Company's just-released financial results for the fiscal year ended December 31, 2013, McMahon pointed out that the Company had renewed its "television distribution agreement in the U.K., [was] continuing the negotiations regarding [its] domestic agreements, and [was] poised to launch [the] global *WWE Network* in

the next few days." (Exh. 11 p.1). Consistent with the Company's prior disclosures, Barrios reiterated:

> *Based on our analysis* of the value of comparable programs and our extensive research regarding consumer interest in *WWE Network*, *we continue to believe* that we can double or triple our 2012 OIBDA results of $63 million by 2015.

(Exh. 11 p.1) (emphasis added).

The press release contained the following disclosure:

> Forward-Looking Statement: This press release contains *forward-looking statements* pursuant to the safe harbor provisions of the Securities Litigation Reform Act of 1995, including, without limitations, forward-looking statements regarding the Company's growth plans. All of those forward-looking statements are *subject to various risks and uncertainties*. These risks and uncertainties include, without limitation, *risks relating to entering into, maintaining and renewing key agreements,* including television and pay-per-view programming and our new network distribution agreements. . . . *Actual results could differ materially from those currently expected or anticipated.*

(Exh. 11 p.9) (emphasis added).

**10.    The Company's February 20, 2014 Earnings Call**

On the same day it issued its press release on its results for the year ended December 31, 2013, the Company also participated in an earnings call with analysts. (Exh. 12). At the beginning of the call, the company stated that the discussion "will include forward-looking statements," that these statements "reflect our current views are based on various assumptions and are subject to risks and uncertainties disclosed from time to time in our SEC filings," and that "[a]ctual results may differ materially and undue reliance should not be placed on them." (Exh. 12 p.2).

During that call, McMahon stated that the requirement that WWE negotiate exclusively with NBC had expired and "we're out in the marketplace [for] the first time in a long, long

time." (Exh. 12 p.2). He added, "we've begun discussions with any number of individuals and in terms of renegotiating our content agreement coming up in India and others as well when we look to increase our television right fees." (Exh. 12 pp.2-3). Barrios stated that the Company had renewed its key television agreements in the UK and Thailand, "[w]hich now represent our number 1 and number 3 most valuable content deals outside the U.S." (Exh. 12 p.3). He added, "We believe the new agreements in these markets reflect more appropriate value for our content based on our analysis of recent transactions in those markets." (Exh. 12 p.3). He stated that after exiting the exclusive negotiation period with NBC Universal, the Company was engaged with other potential partners in U.S. market, and that it was also in similar discussions in India, "where our analysis also indicate[s] significant economic upside." (Exh. 12 p.3). In response to a question about whether lower CPM might have been the reason NBC Universal and WWE were not able to reach an agreement during the exclusivity period, McMahon said:

> I don't want to characterize any of the discussions we've had including with NBCU. As I have said before right behind the NFL and NBA comes WWE in terms of generating live gross rating points in the U.S. so that's ahead of NASCAR, ahead of NHL, it is ahead of Major League Baseball and other national deals.

> So we feel good about the value that we bring to a partner both in advertising, being able to drive their CPM as well as and more importantly in the value of their affiliate revenue streams.

(Exh. 12 p.8).

## 11. The Company's February 24, 2014 Annual Report on Form 10-K

On February 24, 2014, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2013. (Exh. 13). Item 1A, "Risk Factors," set forth as the very first risk factor the uncertainties associated with the Company re-negotiation of its television contracts, including its contract with NBC Universal. (Exh. 13 p.10). The 10-K stated:

Our television programming is distributed by broadcast and cable networks. Because a large portion of our revenues are generated, directly and indirectly, from this distribution of our programming, any failure to maintain or renew arrangements with distributors and platforms, the failure of distributors or platforms to continue to provide services to us or *the failure to enter into new distribution opportunities on terms favorable to us could adversely affect our operating results.* We regularly engage in negotiations relating to substantial agreements covering the distribution of our television programming by carriers located in the United States and abroad. Over the past several years we have expanded our relationship with NBC Universal ("NBCU") and they currently distribute the vast majority of our domestic television programming. In 2013, these NBCU agreements were made coterminous, ending in September 2014. The Company is now engaged with potential partners after exiting our exclusive negotiating period with NBCU. *The inability of the Company to enter into a domestic distribution agreement(s) on terms favorable to us could substantially affect the Company's financial outlook, liquidity, business and operating results and have a material adverse effect on the price of the Company's Class A Common Stock, which the Company believes reflects market expectations of a substantial improvement in future operating results.*

(Exh. 13 p.10) (emphasis added).

### 12. The Company's May 1, 2014 Press Release Announcing WWE's First-Quarter Results

On May 1, 2014 the Company issued a press release announcing its results for the first quarter ended March 31, 2014. (Exh. 14). The Company announced that the new WWE Network, launched 46 days earlier on February 24, had almost 670,000 subscribers. (Exh. 14 pp. 1, 3). McMahon stated, "With almost 670,000 WWE Network subscribers in the U.S. and nearly 400,000 domestic pay-per-view buying homes for WrestleMania 30, we are confident that we will reach our goal of 1 million subscribers by the end of 2014."[7] (Exh. 14 p.1). Consistent with the Company's prior disclosures, Barrios reiterated:

---

[7] On January 27, 2015, the Company announced it had "surpassed 1 million subscribers just 11 months after launch, making it the fastest-growing digital subscription service." (Exh. 18 p.1).

> Over the past several years, we have invested in people, content and technology and we continue to believe the successful execution of our key initiatives could *potentially* result in doubling or tripling our 2012 OIBDA results to a range of $125 million to $190 million by 2015.

(Exh. 14 p.1) (emphasis added).

The press release also stated:

> Forward-Looking Statements: This press release contains *forward-looking* statements pursuant to the safe harbor provisions of the Securities Litigation Reform Act of 1995, which are *subject to various risks and uncertainties.* These *risks and uncertainties* include, without limitation, risks relating to entering into, maintaining and *renewing key agreements*, including television and pay-per-view programming and our new network distribution agreements; risks relating to the launch and maintenance of our new network. . . . Actual results *could differ materially from those currently expected or anticipated.*

(Exh. 14 p.7) (emphasis added).

### 13.     The Company's May 1, 2014 Earnings Call

On the same day it issued its press release on its results for the quarter-ended March 31, 2014, the Company also participated in an earnings call with analysts. (Exh. 15).   At the beginning of the call, the Company stated that the discussion would include "forward-looking statements," that these statements "reflect our current views and are based on various assumptions, and are subject to risks and uncertainties disclosed from time-to-time in our SEC filings" and that "[a]ctual results may differ materially, and undue reliance should not be placed on them."  (Exh. 15 p.2)

During the call, McMahon stated with respect to the WWE Network,

> As of April 6, we had 667,000 subscribers, that's in addition to a pay-per-view audience as well of some 400,000. The combination of that would put us over 1 million buys. . . .

(Exh. 15 p.2).

With regard to the television negotiations, he stated that the Company was in the middle of negotiations in India and that it would be announcing agreements in the U.S. in several weeks "as we complete some of those negotiations." (Exh. 15 p.2).

Barrios stated, "[W]e believe the network is on track to achieve 1 million subscribers by year end, and 2 million to 3 million subscribers at steady state." (Exh. 15 p.3). He stated, "[W]e view the WWE network as a major source of long-term earnings growth well beyond 2015. And we're planning to initiate the network's global launch later this year. To track the progress of this key initiative, we plan on reporting network subscribers on a quarterly basis." (Exh. 15 p.5). In response to a question about when the Company might achieve 2-3 million subscribers, Barrios stated, "[W]e really haven't put a time stamp on that." (Exh. 15 p.8).

With regard to the television contract negotiations, Barrios stated: "Given that we are currently in discussions, we will not be answer[ing] any questions today about the status of these negotiations." (Exh. 15 p.5).

With regard to the Company's earlier forward-looking statements about potential 2015 OIBDA results, Barrios stated: "Over the past several years, we've invested in people, and technology and we continue to believe the successful execution of our key initiatives could potentially result in doubling or tripling our 2014 OIBDA results to a range of $125 million to $190 million by 2015 as appropriate." (Exh. 15 p.5).

### 14. The Company's May 15, 2014 Press Release Announcing WWE's Agreement in Principle with NBC Universal

On May 15, 2014, WWE issued a press release announcing that it had reached a multi-year agreement in principle to renew its television contract with NBC Universal. (Exh. 16). McMahon stated, "We continue to achieve significant increases in the value of our largest television agreements, a key component of our business plan." (Exh. 16 p.1). Consistent with

the Company's prior statements, the press release reiterated, "Given the anticipated increase in television rights, and with successful WWE Network subscriber growth, WWE management continues to believe that the Company can achieve significant earnings growth, potentially doubling or tripling 2012 OIBDA results to a range of $125 million to $190 million by 2015." (Exh. 16 p.1) (footnote omitted). Barrios added, "With the favorable renegotiation of our largest television agreements, WWE transitions to a subscription-based business model for future growth. Successful execution of our WWE Network strategy could significantly raise the Company's earnings profile and better reflect WWE's tremendous global appeal and brand strength." (Exh. 16 p.1).

The press release contained a chart showing the impact of the renegotiation of its television contracts in the U.S., the U.K., Thailand, and India. It showed that the negotiations would result in nearly doubling the annual contract value of the agreements from $108 million a year to nearly $200 million a year. (Exh. 16 p.1).

### 15. The Company's May 19, 2014 Business Outlook Conference Call

On May 19, 2014, the Company also participated in an earnings call with analysts to discuss the Company's business outlook. (Exh. 17). With regard to the television contract re-negotiation, McMahon expressed the view that the results as a whole were favorable even though he had hoped for better results with NBC Universal. He stated:

> As far as our television deals are concerned, we are, well, there's a somewhat favorable outcome I should say. We were a little disappointed in our NBCU deal quite frankly, but when you add up all of our larger television deals, we nearly doubled our prior deal, so we're at about $200 million. So internationally, we did much better than we did domestically, but when you add them up, it's not too bad when you double your television deals.
>
> Again, not what we wanted, and not what our research showed us…..But still a good deal, not what we wanted.

(Exh. 17 p.2).

Consistent with the Company's prior statements, Barrios reiterated his belief that "the creation of the WWE Network, the renewal of key content agreements, and the monetization of our digital and social media presence. . . could generate OIBDA in the range of $125 million to $190 million by 2015." (Exh. 17 p.3). With regard to the television contract negotiations, he stated that the Company's estimates had been correct "in three out of four markets," but not in the United States. *See* (Exh. 17 p.3).

During the Q&A session, one of the analysts asked whether "backward-looking" and "with hindsight," the launch of the WWE Network might have hurt WWE's negotiation position with NBC Universal. He asked: "With hindsight, was the launch of the network a sticking point for your current and potential cable partners, and would you have considered delaying it, if you had to do it over again?" (Exh. 17 p.7).

Mr. McMahon responded:

> I think it definitely had a negative impact. How much of it, I don't know, by coming out with the network before we finish negotiating all of our rights. . . .
>
> I do think, though, that was part of it. I don't know if it was a significant aspect, but part of a lighter number, in terms of television rights. …

(Exh. 17 p.7).

In response to a question about whether WWE's demographics may have affected negotiations, Barrios stated, "they didn't seem to have an impact in 3 of the 4 markets," and that "if you think that the WWE universe is pretty broad, we didn't see an impact in three out of the four markets on the deal size." (Exh. 17 p.11). In response to a question about hitting the Company's financial goals, Barrios added, "…every day we have new learnings, and I know people want certainty, and I wish I could give it to you, but I can't." (Exh. 17 p.13).

16. **The Company's January 27, 2015 Press Release Announcing that the WWE Network Had Surpassed One Million Subscribers**

On January 27, 2015, the Company issued a press release announcing "that WWE Network has surpassed 1 million subscribers just 11 months after launch, making it the fastest-growing digital subscription service." (Exh. 18 p.1). McMahon stated, "We're thrilled that we've surpassed the 1 million subscriber milestone less than a year after launching WWE Network and in advance of *WrestleMania*, our biggest event of the year on March 29…." (Exh. 18 p.1).

\*\*\*\*\*

In short, both before and during the Class Period, the Company provided investors a window into its initiatives under its 2013-2015 business plan, shared its goal of doubling or tripling OIBDA by 2015, explained that the two most critical initiatives were the launch and ultimate success of the WWE Network and the re-negotiation of four key television contracts, expressed optimism about the Company and these initiatives, and also disclosed that they carried risks and that the ultimate results were uncertain. Ultimately, the Company did negotiate four new television contracts that nearly doubled the revenues associated with the prior deals and, less than a month after the end of 2014, announced that it had achieved over one million subscribers for the WWE Network.

**D.     Plaintiffs' Attempt to Convert the Company's Optimism into a Fraud**

Plaintiffs' central allegation of fraud is that WWE, McMahon, and Barrios predicted that the re-negotiated televisions rights deal with NBC Universal would allow WWE to double or triple its earnings (Amended Complaint ¶¶ 5, 18, 21, 37, 41, 42, 47, 55, 56, 59, 60, 61, 66, 74). That characterization is false. These statements were always based on a combination of factors, including the launch of the WWE network, the television negotiations with NBC Universal, and the television negotiations with other carriers. Moreover, 1) the Company's statements about the *potential* impact of a number of initiatives were forward-looking; 2) there are no facts at all that show defendants did not believe these statements at the time they were made; 3) the Company's predictions were never phrased as guarantees and were regularly accompanied by cautionary statements; and 4) the statements were focused on results that would not be achieved until, if then, the end of 2015.

Plaintiffs also allege that it was fraudulent for WWE, McMahon, and Barrios to compare WWE to NASCAR or other live sports programs that had more lucrative television contract arrangements (Amended Complaint ¶¶ 5, 41, 45, 47, 51, 55, 64), and to state that WWE had 250 million social media followers and 170 million passionate fans (Amended Complaint ¶¶ 6, 14, 50, 57, 71). They base their allegation that these alleged statements were fraudulent on a single confidential witness (Amended Complaint ¶¶ 2, 8-10, 12,-19, 38, 40, 42, 44, 46, 48-50, 52, 56, 58, 60, 62, 65, 67, 70, 72, 102). The single confidential witness, however, was a middle manager in digital sales and the Amended Complaint does not reference a single meeting that he attended regarding television contracts or the Company's overall financial results. Nevertheless, the Amended Complaint relies on him to support every allegation of fraud, including with respect to

events that occurred after he left the Company and about which he is not alleged to have any knowledge. Based on the purported confidential witness statements, the Amended Complaint alleges:

1. After the "exclusive negotiating period with NBC ended in February 2014, … there was 'just no real attraction' to WWE's product" by other networks and that "from the outset no other network expressed interest in working with WWE." *E.g.,* (Amended Complaint ¶¶ 9, 18). But the confidential witness was no longer even employed by WWE in February 2014 when negotiations began with other networks and never had any involvement in any television negotiations, much less the negotiations that occurred after he was no longer with the Company. (Amended Complaint ¶ 8).

2. "WWE didn't really negotiate with NBC." *E.g.,* (Amended Complaint ¶ 9). But the confidential witness was part of a digital sales team, is not alleged to have had any involvement in the television negotiations, is not alleged to have had any discussions with senior executives regarding the television negotiations, and is alleged to have left the Company four months before the negotiations were concluded. *See* (Amended Complaint ¶¶ 8, 9, 12).

3. WWE could not attract and maintain "meaningful advertising revenue." *E.g.,* (Amended Complaint ¶ 10). But if that were true, WWE would never have been able to negotiate television contracts worth almost double the value of its prior agreements. And advertisers like General Mills and Kraft Foods are clearly "blue chip" companies.

4. The confidential witness told Barrios that he believed advertising revenues would be down "by nearly ten million" and that Barrios did not adjust forecasts based on the confidential witness's statement. *E.g.,* (Amended Complaint ¶ 8). But the Amended Complaint offers no reason why Barrios should adjust total advertising revenues based on projections by

one individual whose only role in the company was digital sales. And there is no allegation in the Amended Complaint that advertising revenues did, in fact, drop.

5. The confidential witness believed that the Company's pay-per-view audience of 1.3 million viewers was "a more accurate representation of the size of WWE's fan base." *E.g.,* (Amended Complaint ¶ 16). But the Amended Complaint offers no reason the fan base should exclude, for example, individuals who say they are fans in response to surveys conducted by third-party research providers, fans of WWE's number one rated shows on their respective cable networks, or fans attending live events throughout the year.

6. The confidential witness stated that WWE inflated its social media following because if one fan followed many different wrestlers or used multiple social media sites (such as Facebook and Twitter), WWE's methodology did not determine the number of unique fans across WWE and all of its wrestlers. *E.g.*, (Amended Complaint ¶ 15). But the Amended Complaint provides no basis for concluding that investors and analysts thought that the Company had gone through hundreds of millions of followers involving multiple social media sites and multiple wrestlers and determined the identity of each follower and then developed a methodology to reduce to one each identity that showed up more than once.[8]

7. The confidential witness stated that he attended "exclusive meetings" for the "top 1% of WWE management." *E.g.*, (Amended Complaint ¶ 8). However, the forty-six page Amended Complaint references not a single specific meeting that the confidential witness ever had with McMahon, references only one specific meeting in four years with Barrios (at which

---

[8] An independent third-party that measures "social media engagement" by measuring the total number of social media "actions" ranked WWE sixth among the Top U.S. Social Brands for the period January-December 2014 with 195,004,452 "total actions." Shareable, "Shareablee Reveals Top 25 Social U.S. Brands of 2014," (Feb. 3, 2015), http://blog.shareablee.com/post/109977591274/shareablee-reveals-top-25-social-u-s-brands-of, attached as (Exh. 19). WWE ranks ahead of, for example, Fox News, The Huffington Post, MTV, ABC News, and People.

advertising, rather than television negotiations, was discussed), and no meetings on the television negotiations, the WWE network, the Company's public statements, the basis for those public statements, any third-party surveys of WWE's fan base, or discussions with any executive about those matters. *See* (Amended Complaint ¶ 13).

The Amended Complaint also references two documents. It alleges that one document, for which it provides no context at all other than that it is entitled "Audience Demos_Fall 2012," demonstrates that WWE's audience has less spending power and is less attractive than the audience for live sports. *See* (Amended Complaint ¶¶ 11, 38, 42, 62, 68). Defendants, however, never purported to know or draw comparisons to the demographics of fans for different programs. The Amended Complaint alleges that a second document, entitled "WWE 2014 Roadmap to Budget," acknowledges that WWE is "not the PGA, NFL, or MLB." (Amended Complaint ¶¶ 17, 42, 49, 52, 58, 62, 65). But it provides no context for this statement. To be sure, sports and entertainment programs each have some unique features and some overlapping features, and no Defendant ever stated otherwise. Nor would it matter since, in a "fraud-on-the-market" case, which the Amended Complaint alleges this is, information generally known to the market is part of the total mix of information already reflected in the price of the securities.[9]

Finally, the Amended Complaint alleges that on May 19, 2014, McMahon provided a "stunning" admission that he thought the timing of the launch of the WWE Network had a "negative effect" on the negotiations with NBC Universal. (Amended Complaint ¶77). The question he was responding to was whether "with hindsight" he thought the WWE Network had

---

[9] In a fraud-on-the-market case, a court may take "into account information already in the public domain and facts known or reasonably available to the shareholders." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 (2d Cir. 2000) (quoting *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979). In a fraud-on-the-market case, publicly-known information, regardless of the source, is already reflected in the stock's price and makes up the total mix of information available to shareholders.

a negative impact on the negotiations with NBC Universal, and he responded with the benefit of that hindsight. (Amended Complaint ¶ 76). There was nothing "stunning" about it. Moreover, his "stunning" admission was coupled with, "I don't know if it was a significant aspect." (Amended Complaint ¶ 76).

With regard to Wilson, the Amended Complaint does not allege she made any public statements at all other than being quoted in one article that appeared in *Variety* for the proposition that while WWE is "clearly entertainment based," one characteristic of that entertainment is "live action" and "that's sports" and "[w]e want to be compensated for a live audience." (Amended Complaint ¶51).

With regard to Levesque, the Amended Complaint does not allege she made any public statements at all, but claims she violated insider-trading laws when she "quietly" and "suspiciously" sold WWE shares during the Class Period. (Amended Complaint ¶ 23). What it leaves out, which this Court may consider on a motion to dismiss,[10] is that on April 1, 2013, the Company filed a report on Form 8-K (Exh. 22), disclosing that on March 28, 2013 "Stephanie McMahon Levesque" adopted a Rule 10b5-1 stock trading plan, expiring on January 31, 2014, pursuant to which the brokerage firm was authorized to sell up to 1,260,000 shares. Thus, the plan was entered into seven months before the class period began, and expired four months before the television negotiations were concluded, and was publicly disclosed.

## II.  Pleading Standards

### A.      Rule 8, Rule 9(b), and the PSLRA

Under Rule 8 of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"

---

[10] *See* discussion at page 50 below.

to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2000) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is inadequate if the factual allegations do not "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). A complaint that "offers labels and conclusions" and "'naked assertion[s]' devoid of 'further factual enhancement'" must be dismissed. *Iqbal*, 556 U.S. at 678. *See also, e.g., Stein v. Tangoe, Inc.*, Fed. Sec. L. Rep. (CCH) ¶ 98,209 at 93,168, 2014 U.S. Dist. Lexis 137966, at 25-26 (D. Conn. Sept. 30, 2014); *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, Civil Action No. 3:09-CV-01740 (VLB), 2013WL1188050, at *13-14 (D. Conn. Mar. 23, 2013). A court need not accept the legal conclusions drawn from the facts, and unwarranted inferences, unreasonable conclusions or arguments. *See, e.g., First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994).

A complaint alleging a securities fraud is subject to two heightened pleading requirements. First, Fed. R. Civ. P. 9(b) requires that "a party . . . state with particularity the circumstances constituting the fraud…." The heightened pleading requirements under Rule 9(b) "serve to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). In the Second Circuit, Rule 9(b) requires a complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Second, a securities fraud complaint must meet the heightened pleading requirements of the PSLRA discussed in part III below.

## B.      Section 10(b) of the Securities Exchange Act

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC to implement Section 10(b), makes it unlawful for any persons, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

The elements of a Section 10(b) claim are "(1) a material misrepresentations or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plan and Trust Funds,* 133 S.Ct. 1184, 1192 (2013), (quoting *Matrixx Initiatives, Inc. v. Siracusano,* 131 S.Ct. 1309, 1317 (2011)).

## III.    ARGUMENT

In 1995, Congress overrode a presidential veto to enact the PSLRA.[11]  As set forth in the Conference Report on the PSLRA, Congress was motivated by a belief that "the investing public and the entire U.S. economy have been injured … because of fear of baseless and extortionate securities lawsuits."[12]  In such cases "innocent parties are often forced to pay exorbitant 'settlements'. … [and] [i]nvestors always are the ultimate losers."[13] Such litigation also "severely affects the willingness of corporate managers to disclose information to the marketplace."[14]

In response to these concerns, the PSLRA 1) requires that a complaint "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind";[15] 2) imposed a requirement that every complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed";[16] 3) created a safe harbor for forward-looking statements accompanied by meaningful cautionary statements;[17]  4) created a second safe harbor for forward-looking statements in which defendants lacked "actual knowledge" that the statements were false or misleading;[18] and 5)

---

[11] Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995).  The key sections of the PSLRA are codified at 15 U.S.C. §§ 78u-4,78u-5, 77z-1 and 77z-2.

[12] H.R. REP. NO. 104-369, at 31–32 (1995) (Conf. Rep.)

[13] Id. at 32.

[14] Id. at 42.

[15] Pub. L. No. 104-67 §21D, 109 Stat. at 747 (codified as amended at 15 U.S.C. § 78u-4(b)(2)) (emphasis added).

[16] 15 U.S.C. § 78u-4(b)(1)(B).

[17] 15 U.S.C. §§ 77z-2(c)), 78u-5(c)(1))(A).

[18] 15 U.S.C. §§ 77z-2(c)(1)(B), 78u-5(c)(1)(B).

requires the district court, even if neither side files a Rule 11 motion, to determine each party's compliance with the rule and to impose sanctions if at the end of the case the court finds that the rule has been violated.[19] As discussed below, the Supreme Court has held that the "strong inference" standard requires that the facts pled in a securities fraud claim create an inference of scienter that "must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

The Amended Complaint here seeks to convert a company's forward-looking optimism about its future prospects into a securities fraud because the reality turned out not to be as bright as the Company expected. It fails the heightened pleading requirements for securities fraud claims in at least four separate respects:

1.  it fails to plead non-conclusory facts showing a false statement, as opposed to genuinely believed optimism about the Company's future prospects;

2.  it fails to plead non-conclusory facts creating a strong inference of scienter;

3.  it fails to plead non-conclusory facts showing loss causation; and

4.  it is barred by the safe harbors in the PSLRA for forward-looking statements.

Moreover, the claims against Wilson and Levesque do not meet *any* of the pleading requirements necessary to state a claim.

## A. Plaintiffs Have Failed to Plead a False Statement or Omission

The statements the Defendants made about the outcome of the negotiation of different television contracts and the potential impact on 2015 OIBDA and the comparisons that they thought were relevant were opinions. Management never stated that future results were guaranteed or a sure thing. With regard to the television contracts, it stated that the Company's

---

[19] 15 U.S.C. § 78u-4(c)(1), (2).

initiatives "*if successful*" could generate substantial returns, that the Company was "*confident*" it would be able to negotiate key agreements by the end of April, that these initiatives would pay off "*if all the stars line up,* and we *believe that they will,*" that "*you can make your own judgment call about our opportunity there,*" that "we *want to be* compensated for a live audience," (page 15), and that "we *feel good* about the value that we bring to a partner" (page 22)**.**

With regard to potentially doubling or tripling 2015 OIBDA, Defendants stated that the Company's three-year business plan was "*designed*" to achieve significant earnings growth, "*potentially* doubling or tripling" 2012 results by 2015, that management was "*confident*" that they would be "on track to double or triple our 2012 OIBDA results of $63 million by 2015," that "we are *confident* that the rising values of content in the marketplace and a *potential* launch of the WWE network will keep us on track to double or triple our 2012 OIBDA results by 2015," that "we *continue to believe* that these initiatives will enable WWE to significantly raise its earnings profile by 2015," that "management may change its *expectations* that the planned Network will contribute to *potentially* doubling or tripling the company's 2012 OIBDA results of $63 million by 2015," that "we continue to believe that we can double or triple our 2012 OIBDA results of $63 million by 2015," that "we continue to *believe* the successful execution of our key initiatives could *potentially* result in doubling or tripling our 2012 OIBDA results to a range of $125 million to $190 million by 2015," that "WWE management continues to believe that the Company can achieve significant earnings growth, *potentially* doubling or tripling 2012 OIBDA results to a range of $125 million to $190 million by 2015"), and that "the creation of the WWE Network, the renewal of key content agreements, and the monetization of our digital and social media presence . . . *could* generate OIBDA in the range of $190 million by 2015." (see Section I-C above).

These statements are every bit as much opinions as, in other cases, management's judgment about future loan losses,[20] or management's estimation of its exposure to residential mortgage-backed securities,[21] or management's expression of confidence in its risk management procedures,[22] or management's optimism about the outcome of clinical trials for a pharmaceutical drug,[23] or management's judgment about goodwill,[24] or a financial adviser's prediction about the price at which debentures would trade after a merger.[25]

The leading Second Circuit decision on the issue of liability for optimistic opinions is *Fait v. Regions Financial Corp.,* 655 F.3d 105 (2d Cir. 2011). In that case, plaintiffs alleged that the defendants overstated goodwill, stated that it was not impaired, vastly underestimated the company's loan loss reserves, and failed to disclose that the loan loss reserves were inadequate. *Fait*, 655 F.3d at 108. The district court dismissed on the ground that the challenged statements were ones of judgment and opinion, rather than fact, and the complaint failed to allege that those opinions were not truly held at the time they were made. *Id.* at 109. The court of appeals affirmed stating that liability for an allegedly false opinion "lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." *Id.* at 110. The court cited 1) its decision in *Friedman v. Mohasco Corp*. 929 F.3d 77, 78-79 (2d Cir. 1991) for the proposition that "a company's representation that securities it issued in connection with a merger would attain a certain market value, which they did not

---

[20] *Fait v. Regions Fin.Corp.*, 655 F.3d 105, 112-13 (2d Cir. 2011).

[21] *Kaess v. Deutsche Bank AG*, 572 Fed. App'x 58, 59 (2d Cir. 2014).

[22] *Freeman Group v. Royal Bank of Scotland Group PLC*, 540 Fed. App'x 33, 35, 37 (2d Cir. 2013)(summary order) (notably the litigation was brought "under sections 11, 12(a)(2), and 15of the Securities Act of 1933").

[23] *See Kleinman v. Elan Corp.*, 706 F.3d 145, 153-54 (2d Cir. 2013).

[24] *City of Omaha, Neb. Civilian Emps' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012).

[25] *Friedman v. Mohasco Corp.*, 929 F.2d 77, 78-79 (2d Cir. 1991).

ultimately attain, was not actionable under the 1933 or 1934 Act because the company's projections were stated as opinions rather than guarantees," 2) its decision in *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 266 (2d Cir. 1993) for the proposition that

> "expressions of opinion and … projections" in a company's statements about its future prospects were not actionable because "the complaint contain[ed] no allegations to support the inference that the defendant either did not have the[] favorable opinions on future prospects when they made the statements or that the favorable opinions were without a basis in fact,"

and 3) its decision in *In re IBM Securities Litigation,* 163 F.3d 102, 107, 110-11 (2d Cir. 1998) for the proposition that "a company's alleged statements that were 'expressions of optimism' and 'projections of future performance' were not actionable under the 1933 or 1934 Acts." It went on to affirm the dismissal of the complaint in *Fait* because the complaint failed to "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them." *See Fait*, 655 F.3d at 112, 113.

Both before and after *Fait*, cases based on allegedly false opinions have routinely been dismissed, and those dismissals have routinely been affirmed by the Second Circuit, because the non-conclusory factual allegations did not create an inference that the defendants disbelieved the opinions they expressed at the time they expressed them.[26] Here, the plaintiffs attempt to support

---

[26] See, e.g., *Kaess v. Deutsche Bank AG,* 572 Fed App'x 58, 59-60 (2d Cir. 2014) (summary order) (affirming dismissal where district court correctly held that estimation of its exposure to residential mortgage-back securities "amounted only to statements of opinion" and plaintiffs failed to show that defendants' statements of opinion were "both objectively false and disbelieved by the defendant[s] at the time [these statements] w[ere] expressed"); *Friedus v. ING Groep, NV,* 543 Fed. App'x 93, 95 (2d Cir. 2013) (summary order) (affirming dismissal based on company's statements that its assets were of "relative high quality" in part because "[l]iability for opinions under the Securities Act will lie 'only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed'"); *Freeman Group v. Royal Bank of Scotland Group PLC,* 540 Fed. App'x 33, 37 (2d Cir. 2013) (summary order) (affirming dismissal, for claims brought under sections 11 and 12(a)(2) of the Securities Act where statements about effective risk management procedures were statements of opinion and plaintiffs had failed to show that the statements were "both objectively false and disbelieved by the defendant at the time [they were] expressed"); *Kleinman v. Elan Corp.,* 706 F.3d 145, 153-54 (2d Cir. 2013) (affirming dismissal in part because "[s]ubjective statements can be actionable only if the 'defendant's opinion were both false and not honestly believed when they were made'"); *City of Omaha, Neb. Civilian Emps' Ret. Sys. v. CBS Corp.,* 679 F.3d 64,

an allegation that the defendants did not believe the opinions they expressed by reference to a confidential witness and two internal reports. But they provide no support at all.

As the Second Circuit stated in *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), a confidential witness must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Courts frequently dismiss complaints that rely extensively on confidential witness allegations.[27]

---

68 (2d Cir. 2012) (affirming dismissal of claims based on statements regarding a company's goodwill and its general financial condition because plaintiffs' failed to plausibly allege "that defendants did not believe the statements of opinion regarding goodwill at the time they made them"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)(finding that plaintiffs failed to plead fraud because they did not "allege[] circumstances indicating that any of the statements … were false); *Friedman v. Mohasco Corp.*, 929 F.2d 77, 77, 79 (2d Cir. 1991) (affirming dismissal of complaint because the documents "plainly state that the price was only the opinion of financial advisers as to the price the debentures would trade when issued"); *In re Sanofi Sec. Litig.*, Nos. 13 Civ. 8806, 14 Civ. 2211, 2015WL365702, at *12 (S.D.N.Y. Jan. 28, 2015) ("In contrast to objective statements of material fact, subjective statements of opinion are generally not actionable as fraud"); *In re Magnun Hunter Ress. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 284, 295-96 (S.D.N.Y. 2014) (granting motion to dismiss claims about the effectiveness of the company's controls where the confidential witnesses did not "support an inference that the defendants' statements or omissions regarding their controls were known to be false at the time made"); *In re Lululemon Sec. Litig.*, No. 14 F. Supp. 3d 553, 571, 577 (S.D.N.Y. 2014) (granting motion to dismiss claims based on statements about the quality of the company's products and the strength of its brand where the confidential witnesses failed to show defendants did not believe the statements at the time they made them; "A statement believed to be true when made, but later shown to be false, is insufficient.")

27 *See, e.g.*, *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 206 (D. Conn. 2014) (granting motion to dismiss complaint in part relying on confidential witness where statements by the confidential witness were too vague); *NECA-IBEW Health & Welfare Fund. v. Pitney Bowes Inc.*, Civil Action No. 3:09-CV-01740 (VLB), 2013WL1188050, at *35 (D. Conn. Mar. 23, 2013) (granting motion to dismiss complaint finding that fourteen confidential witnesses could not establish scienter because the allegations did not show that the confidential witnesses had contact with the individual defendants, "reported any concerns regarding the alleged omissions [or] misrepresentations" to the individual defendants, "played any direct or meaningful role in the company-wide financial forecasting or reporting process," were "privy to all of the reports and forecasts compiled or considered in generating company-wide figures, reports and forecasts," accused the company of any type of fraud, "provided facts supporting Plaintiff's contention that Defendants knew of the alleged problem areas," or identified any report that showed defendants "knew that the statements were fraudulent when made"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140-41 (D. Conn. 2007) (granting motion to dismiss complaint relying on four confidential witnesses where confidential witnesses made "general, unsupported allegations" that did not support a finding that defendants made knowingly or reckless misrepresentations and where the confidential witnesses were not alleged "to have been involved in or to have any familiarity with the process of setting or estimating loss reserves"); *see In re Star Gas Sec. Litig.*, 745 F. Supp.2d 26, 36, 38-39 (D. Conn. 2010) (imposing Rule 11 sanctions after dismissal of complaint involving twelve confidential witnesses who did not credibly support the allegations of fraud).

The description of the confidential witness in the Amended Complaint is someone who was a vice president of a digital sales team (Amended Complaint ¶ 8). He is not alleged to have had any involvement in the television negotiations or to have had any discussions with any of the Defendants about those negotiations, and he left in January 2014 — prior to the expiration of the exclusive negotiation period with NBC Universal and four months before the negotiations were concluded. *See* (Amended Complaint ¶ 8, 9). Nor is he alleged to have had any meetings with executives about the Company's potential 2015 OIBDA results or the basis for any of the public statements management made. He is not alleged to have had a single discussion with any Defendant about either the television negotiations or the Company's optimistic views regarding 2015 OIBDA results. His own speculative opinions, if they ever existed, would be no more relevant than the speculative opinions of any other former employee with no direct involvement in the underlying facts.

Of equal significance, the confidential witness does not stand behind the statements attributed to him in the Amended Complaint. He has submitted an affidavit, annexed hereto, that flatly contradicts every statement attributed to him. The affidavit states:

> 1.    I was not given any opportunity to review the Amended Complaint before it was filed or any other opportunity to review the statements that the Amended Complaint attributes to the "confidential witness" before the Amended Complaint was filed. I did not consent to the use of any purported statements by me in the Amended Complaint…. (Affid. ¶ 4).
>
> 2.    Contrary to the Amended Complaint, I am not aware of any instance in which the Company or anyone else made inaccurate or intentionally misleading public statements about the size of WWE's fan base, the number of its social media followers, the potential outcome of its negotiations of television contracts, the launch and ultimate success of the WWE network, the potential impact of those on its future financial results, or anything else referenced in the Amended Complaint. (Affid. ¶ 5).
>
> 3.    I became an employee of WWE in 2010 and left on January 16, 2014 — four months before WWE announced that it had concluded its negotiations with

NBCU.  Likewise, I left before the WWE network was even launched.  (Affid. ¶ 6).

4.      During the time I was employed by WWE, I was a vice president responsible for digital advertising sales.  My position was a middle management position.  I did not attend meetings of the senior executive team at WWE.  I do not believe that I ever attended a business meeting with Vincent McMahon or that I was present at any meeting at which Stephanie McMahon Levesque was present and any of the matters referenced in the Amended Complaint were discussed.  I believe that I met with Mr. Barrios only once during the four years I was employed by WWE.  At that meeting, I spoke to him about advertising, not television contracts, not the WWE network, not the number of fans WWE has, not the number of social media followers WWE has, and not the potential impact of these on the Company's financial results.  My conversations with Michelle Wilson were overwhelmingly about digital advertising rather than about matters referenced in the Amended Complaint.  (Affid. ¶ 7).

5.      I have no reason to believe that anyone at WWE made inaccurate or intentionally misleading public statements about their expectations regarding the potential success of the television contract negotiations or anything else regarding the television negotiations.  (Affid. ¶ 8).

6.      I had no discussions with Plaintiff's counsel regarding the specific rates that television advertisers pay television networks for WWE programming or what they pay for other programming.  (Affid. ¶ 13).

7.      I do not believe that the Company's public statements about its social media followers were in any way inaccurate or intentionally misleading.  I am not aware of any public company that discloses the number of "unique" social media followers to the public. (Affid. ¶ 14).

8.      I do not believe that the Company's statements about its fan base were in any way inaccurate or intentionally misleading.  WWE has many different types of fans — for example, there are fans of different WWE television programs in the U.S., fans of WWE television programs overseas, fans of individual wrestlers affiliated with WWE, fans who attend live WWE events, fans who purchase pay-per-view events, fans who follow WWE on various social media, fans who follow individual wrestlers on social media, and fans who subscribe to the WWE network. (Affid. ¶ 15).

9.      The complaint alleges that an individual defendant told me to lie to advertisers about the size of WWE's fan base.  That is not true.  I was never told to lie about the size of WWE's fan base by that individual defendant or any other WWE employee. (Affid. ¶ 17).

10. The complaint alleges that I told Mr. Barrios that advertising revenues would decline and that he did not change the forecast. I told Mr. Barrios that I thought digital advertising revenues would be down, not that advertising revenues in the aggregate would be down. I have no reason to believe that Mr. Barrios issued forecasts that did not reflect his reasonable good faith belief in the accuracy of the forecasts. (Affid. ¶ 18).

11. I am not aware of any inaccurate or intentionally misleading public statements made by the Company or any of the individual defendants in this action. (Affid. ¶ 19).

While it is not necessary for the Court to consider the affidavit to conclude that the confidential witness adds absolutely nothing to the Amended Complaint, the Court may consider it on a motion to dismiss. In *Campo v. Sears Holdings Corp.,* 371 F. App'x 212, 217 (2d Cir. 2010), the Second Circuit addressed whether a court could consider extrinsic evidence, in that case in the form of a deposition, in which a confidential witness disavowed the statements attributed to him in a complaint. *Campo,* 371 F. App'x at 217. In affirming the dismissal, the court relied on deposition testimony from two confidential witnesses that they had no direct contact with the defendants and no personal knowledge of the defendants' opinions. *Id.* The court held that "the confidential witness testimony discussed precludes us from concluding that an inference of scienter is 'cogent and at least as compelling as [the] opposing inference' . . . ." *Id.* With respect to considering matters outside the record on a motion to dismiss, the Court of Appeals stated:

> The anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrates the requirement, announced in *Tellabs*, that a court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." … Because Fed. R. Civ. P. 11 requires that there be a good faith basis for the factual and legal contentions contained in a pleading, the district court's use of the confidential witnesses' testimony to test the good faith basis of plaintiffs' compliance with *Tellabs* was permissible. The court made no credibility determinations, nor did it weigh competing testimony.

To the contrary, it relied upon the deposition testimony for the limited purpose of determining whether the confidential witnesses acknowledged the statements attributed to them in the complaint. Under these circumstances, we identify no error.

*Id.* at 216 n.4 (internal citations omitted)[28]

Similarly, in *City of Livonia Employees' Retirement System & Local 295/Local 851. v. Boeing Co.,* 711 F.3d 754 (7th Cir. 2013), the complaint relied on a confidential witness but "[n]o one had bothered to show the complaint to [the confidential witness]. . . and investigation by [defendant] soon revealed that the complaint's allegations concerning him could not be substantiated….Deposed by defendants' counsel, [the confidential witness] denied virtually everything that the investigator had reported." *Boeing,* 711 F.3d at 759-60. The Seventh Circuit affirmed the dismissal of the complaint with prejudice, and remanded the case for the court to consider the imposition of sanctions, which the district court subsequently imposed in *City of Livonia Employees' Ret. Sys. v. Boeing Co.,* No. 09C7143, 2014WL4199136 (N.D. Ill. Aug. 21, 2014). *Boeing,* 711 F.3d at 760.

Thus, under *Campo* and *Boeing,* when a plaintiff attributes statements to a confidential witness, a court may consider, on a motion to dismiss, "whether the confidential witnesses

---

[28] The court cited the Seventh Circuit's decision in *Higginbotham v. Baxter International Inc.*, 495 F.3d 753, 757 (7th Cir. 2007), which stated,

> One upshot of the approach that *Tellabs* announced is that we must discount allegations that the complaint attributes to five 'confidential witnesses' . . . . It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.

*Higginbotham*, 495 F.3d at 756-57. The court went on to state, "No decision of which we are aware concludes that anonymous accusers can demonstrate that scienter is 'at least as [likely] as any opposing inference one could draw from the facts alleged.'" *Id*. at 757. *Accord City of Livonia Employees Ret. Sys. & Local 295.Local 851.v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013) ("Allegations concerning. . . unnamed confidential sources of damaging information require a heavy discount. The sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent — a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement or inducing more favorable settlement terms.")

acknowledged the statements attributed to them in the complaint." *Campo*, 371 F. App'x at 216 n.4; *Boeing*, 711 F.3d at 759-60. While the confidential witness disclaimer in those two cases came through a deposition, nothing in the opinions suggests a different result when a confidential witness makes clear through an affidavit or declaration that he does not acknowledge the statements attributed to him in the complaint.[29]

Plaintiffs also purport to rely on two internal documents: 1) a document entitled "Audience Demos_Fall 2012," for the proposition that WWE's fan base had less spending power than fans of other sports (Amended Complaint ¶¶ 11, 38), and 2) a document, entitled "WWE 2014 Roadmap to Budget," that allegedly said WWE was "not the PGA, NFL, or MLB." (Amended Complaint ¶¶ 17, 58) These documents add nothing to the analysis. Where a complaint purports to rely on an internal report to contradict a company's public statements, the complaint must specifically identify "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them." *San Leandro Emergency Med. Plan v. Phillip Morris,* 75 F.3d 801, 813 (2d Cir. 1996) (quoting *Arazie v. Mullane,* 2 F.3d 1456, 1467 (7th Cir. 1993). *See also, e.g., Landesbank Baden-Württemberg v. Goldman Sachs,* 821 F. Supp. 2d 616, 621 (S.D.N.Y. 2014), *aff'd,* 478 Fed. App'x 679 (2d Cir. 2012) ("To move past the pleading stage, plaintiff must 'specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8,* 692 F. Supp.2d

---

[29] Although the affidavit/declaration issue has not been specifically addressed within the Second Circuit, *Belmont Holdings Corp. v. Suntrust Banks, Inc.,* 896 F.Supp.2d 1210 (N.D. Ga. 2012) is consistent with the Second Circuit's guidance in the context of a declaration. In that case, plaintiff purported to rely on a confidential witness to support his allegations the defendants engaged in fraud and, on that basis, the court initially denied the motion to dismiss. *Belmont,* 896 F.Supp.2d at 1215, 1217-19. Defendants then filed a declaration from the confidential witness disavowing the statements that the complaint attributed to him. *Id.* at 1221-23. Based on the declaration, the court reconsidered and granted the motion to dismiss with prejudice. *Id.* at 1229-33.

387, 394 (S.D.N.Y. 2010) (dismissing fraud claim where plaintiff failed to allege how loans in a damaging report were connected to the securities at issue).

Here plaintiffs have not provided *any* of the required context about the reports — who prepared them, when they were prepared, which officers reviewed them, or what they actually show. There is no allegation that the "Roadmap to Budget" document was even important enough to reach the Company's executives. There is no allegation about who prepared the document or the subject matter covered. The confidential witness affidavit states that the document was created under the confidential witness's direction "and relates solely to sales of digital advertising. It has nothing to do with WWE's television advertising or the WWE network" and that "any comparisons in that document to other sports relate to digital advertising alone, the revenues from which are a small fraction of and distinct from WWE's television revenues." (Affid. ¶ 11).

Likewise, the Amended Complaint provides no information about who prepared the document entitled "Audience Demos_Fall 2012," what the basis for the statements in the document was, or virtually any relevant context. The document notes that WWE is not the same as the PGA, NFL, or MLB (Amended Complaint ¶ 42), but no one ever said WWE was the same as the PGA, the NFL, or MLB. Nor did any defendant try to compare the demographics of fans of different sports. Such demographics would be subject to potentially widely varying interpretations because different advertisers may target different demographic groups and the same advertisers may target different groups for different products.[30] Like the confidential

---

[30] The Amended Complaint provides no basis for knowing how a comparison of fan demographics for WWE and NASCAR (or other sports) would turn out and, indeed, it might not turn out well for NASCAR. *See, e.g.,* John Dick, *NASCAR Has a Republican Kind of Problem*, The Huffington Post (Oct. 2, 2013, 4:43 OM), http://www.huffingtonpost.com/john-dick/nascar-has-a-republican-k_b_3992677.html (stating that NASCAR "is seeing its lowest TV ratings in 29 years" and that the problem is that its base is male, older, white, and rural, while the country's demographics reflect "[a] growing Hispanic population, a shrinking old white male population, and a

witness statement, the reports add absolutely nothing to the Amended Complaint's allegations of fraud.

Finally, the Amended Complaint seeks to support its fraud claim by the "stunning" admission of McMahon that "in hindsight" the launch of the WWE Network did have a negative impact on the negotiations with NBC Universal, though he coupled that statement with "I don't know if it was a significant aspect." (Amended Complaint ¶¶ 76-77). But, as every securities lawyer who practices in this district should know, allegations of "fraud by hindsight" are dead on arrival.[31] The fact that McMahon had a different opinion after the negotiations had concluded than he did several months before is neither "stunning" nor significant.

All the non-conclusory facts in the Amended Complaint merely show that management consistently expressed pride in the Company and optimistic opinions about the future renegotiation of its television contracts, the future of the WWE Network, and the future of its

---

progressive, younger generation") (Exh. 20). One article states that relative to the U.S. population, NASCAR appears to be underweighted among 18-24 years olds and 25-34 year olds, and its audience is only 9% Hispanic and 8% African-American. *See* Brent Sherman, *NASCAR Fan Base Demographics*, (2011), http://www.brentsherman.com/PDFS/NASCAR.pdf (Exh. 21). To the extent that the Amended Complaint suggests that advertisers do not want to reach persons who are 18-34 years old, or Hispanics, or African-Americans, or persons who make a modest income, it provides no basis for that conclusion.

[31] *E.g., Slayton v. American Exp. Co.,* 604 F.3d 758, 776 (2d Cir. 2010) ("That the losses eventually reported in July greatly exceeded $182 million likewise does not undermine the nonfraudulent inference because the plaintiffs may not plead fraud by hindsight"); *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000) ("we have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight'"); *In re Carter-Wallace Inc., Sec. Litig.,* 220 F.3d 36, 42 (2d Cir. 2000); *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir. 1999) ("[Plaintiff's] arguments with regard to [defendant's] account irregularities and overly optimistic disclosures, by themselves, appear to amount to allegations of 'fraud by hindsight,' which this Court has rejected as a basis for a securities fraud complaint"); *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 812 (2d Cir. 1996) ("This appears to be a case of plaintiffs alleging 'fraud by hindsight'"); *Jackson Nat'l Life Ins. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir. 1994) ("Just because Jackson National's high risk investment turned out to be an unworkable one does not allow Jackson National to second-guess its investment decision and plead 'fraud by hindsight'"); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124 (2d Cir. 1994) ("We have rejected the legitimacy of 'alleging fraud by hindsight.'"); *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir. 1978) ("the complaint is an example of alleging fraud by hindsight."); *In re Crystal Brands Sec. Litig.,* 862 F. Supp. 745, 750 (D. Conn. 1994) ("The Court concludes that plaintiffs' resort to the 1993 disclosures is yet another fruitless attempt to allege fraud by hindsight"); *In re Colonial Ltd. Partnership Lit.,* 854 F. Supp. 64, 97 (D. Conn. 1994) ("It is insufficient to allege that the defendants knew or should have known that the projections were fraudulent because they were not ultimately realized — the so-called "fraud by hindsight" theory.").

2015 OIBDA results. It also showed that the Company negotiated four television contracts that will produce annual revenues nearly double the annual revenues of the pre-existing television contracts, that three of the contracts worked out as the Defendants expected, and that one did not. Plaintiffs have failed on both the "objective" falsity and the "subjective disbelief" requirements to plead a false opinion.

### B.     Plaintiffs Have Not Pled Facts Creating a Strong Inference of Scienter

A plaintiff claiming fraud must allege scienter, "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)), and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference of scienter" is one that is "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 323-24.   For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324.

The Second Circuit has held that a plaintiff may satisfy this requirement by alleging facts that establish either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.

2001) (quoting *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. 1987), *overruled on other grounds by United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc)).

With regard to the motive and opportunity test, generic motives that are common to corporate officers do not suffice. Motive must be "concrete and personal," and "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA & Local 134*, 553 F.3d at 198.

With regard to the second test, the non-conclusory facts alleged must rise to the level of "conscious recklessness" – "a state of mind *approximating actual intent,* and *not merely a heightened form of negligence.*" *S. Cherry St., LLC v. Hennessee Grp., Ltd.*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original) (quoting *Novak*, 216 F.3d at 312 (internal quotations omitted)). Moreover, as discussed in section III/D below, even conscious recklessness is not adequate in the case of forward-looking statements: "the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton v. American Express Co.,* 604 F.3d 758, 772-74 (2d Cir. 2010), quoting *Institutional Investor Grp. v. Avaya,* 564 F.3d 242, 274 (3d. Cir. 2009).

Insofar as motive is concerned, it is difficult to imagine two people with less of a motive to mislead the market about the Company's future results than McMahon and Barrios. McMahon, the Company's co-founder, Chairman, and CEO is described in the Company's 10-K as owning a "substantial majority" of the 43,797,830 Class B shares outstanding (Exh. 13 at  20, F-5, F-23, F-24). The Amended Complaint does not allege that he sold a single share during the Class Period. Barrios is the Chief Strategy & Financial Officer and a person who regularly

meets with securities analysts and investors. He too is not alleged to have sold any stock during the Class Period. There is no conceivable motive they would have to commit a fraud to keep the price of the shares up only to disappoint investors and see the share price fall for them and all other investors when the negotiations concluded and the outcome was announced.

Both within and outside the Second Circuit, the absence of sales by insiders has repeatedly been recognized as inconsistent with a motive to defraud.[32] "The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders." *In re N. Telecom Ltd. Sec. Litig.,* 116 F. Supp.2d 446, 462 (S.D.N.Y. 2000).

---

[32] *San Leandro Emergency Med. Plan v. Philip Morris*, 75 F.3d 801, 814 (2d Cir. 1996) ("the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant period sufficiently undermines plaintiffs' claim regarding motive"); *Mizzaro v. Home Depot*, 544 F.3d 1230, 1253 (11th Cir. 2008) ("Stock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter; the lack of similar sales weighs against inferring scienter"); *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir. 2008) (stating that failure to plead defendants sold stock at an inflated price negated an inference of scienter); *In re Aspeon, Inc. Sec. Litig.,* 168 F. App'x 836, 839-40 (9th Cir. 2006) ("insider trading . . . may provide circumstantial evidence of conscious or deliberately reckless conduct. ... Accordingly, the absence of insider trading may raise the opposite inference: a stock purchase may indicate that the corporate insider knew or believed that the issued statements were accurate"); *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) ("evidence that the individual defendants abstained from trading may undercut allegations of motive"); *Turner v. MagicJack Vocaltec, Ltd.*, No. 13 Civ. 0448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("That three of the four individual Defendants, all high-ranking executives at the Company, did not sell stock during the Class Period, and that two of these Defendants instead purchased stock during the relevant period, rebuts an inference of scienter"); *In re MRU Holdings Sec. Litig.,* 769 F. Supp. 2d 500, 519 (S.D.N.Y. 2011) ("purchase and 'retention of the shares . . . [is] inconsistent with the allegation that [they] harbored information that the Company's financial health was in grave jeopardy'") (quoting *In re Keyspan Corp. Sec. Litig.,* 383 F. Supp.2d 358, 383 (E.D.N.Y. 2003)); *In re eSpeed, Inc. Sec. Litig.,* 457 F. Supp.2d 266, 291 (S.D.N.Y. 2006) ("it is difficult to conclude that sales by two of the four defendants of less than twenty percent of their individual holdings represent such unusual selling activity as to give rise to an inference that either defendant intended to defraud investors"); *In re N.Telecom Sec. Litig.,* 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders . . . is inconsistent with an intent to defraud shareholders"); *In re Homebanc Corp. Sec. Litig.*, 706 F. Supp.2d 1336, 1359 (N.D. Ga. 2010) ("inference of scienter is particularly weak where … the complaint fails to allege inside stock sales intended to take advantage of the company's purportedly inflated stock prices"); *Andropolis v. Red Robin Gourmet Burgers, Inc.,* 505 F. Supp.2d 662, 668 (D. Colo. 2007) ("the want of any allegation of insider trading … provides no support for an inference of scienter"); *In re Ceridian Corp. Sec. Litig.,* 504 F. Supp.2d 603, 618 (D. Minn. 2007), *aff'd*, 542 F.3d 240 (8th Cir. 2008) ("the fact that [defendant] did not sell *any* stock during the class period substantially undermines any inference of scienter"); *Druskin v. Answerthink, Inc.,* 299 F.Supp.2d 1307, 1336 (S.D. Fla. 2004) (finding no scienter where the company's CEO sold no stock during the class period despite his holding of 1,466,670 shares, which lost 82% of their value during the Class period); *In re Sun Healthcare Grp., Inc. Sec. Litig.,* 181 F.Supp.2d 1283, 1297 (D.N.M. 2002) (finding no motive to commit fraud when defendants did not sell their stock).

The original complaint in this case did not allege any trading by any defendant. In the Amended Complaint, however, plaintiffs alleged that Stephanie McMahon Levesque (McMahon's grown, married daughter), whom the Amended Complaint falsely characterized as "a member of the WWE board," "suspiciously sold every single share of her WWE stock" "under her married surname, Levesque, rather than her more commonly used maiden name," in transactions beginning on October 3, 2013. (Amended Complaint ¶ 23). There are at least six false or misleading statements in paragraph 23 of the Amended Complaint regarding Levesque's sales.

**First**, the shares that Levesque sold were sold pursuant to a 10b5-1 plan that was reported in an April 1, 2013 current report on Form 8-K filed with the SEC seven months before the beginning of the class period. (Exh. 22). The filing, which is annexed as Exh. 22 and can be found on both the SEC's and the Company's public websites, stated that on March 28, 2013 "Stephanie McMahon Levesque…" adopted a Rule 10b5-1 stock trading plan that provided for the sale of up to 1,260,000 shares between May 15, 2013 and January 31, 2014. (Exh. 22). It explained that the plan was adopted pursuant to Rule 10b5-1, which "allows individuals who are not in possession of material non-public information at the time a stock trading plan is adopted to establish prearranged written plans to buy or sell a specified number of shares of a company's stock." (Exh. 22). It then stated that the transactions "will be disclosed publicly through Form 4 and Form 144 filings with the Securities and Exchange Commission to the extent required by law." (Exh. 22). Thus, Levesque's investment decision was made not during the class period, but seven months before it even began, at a time when no one alleges that Levesque or anyone else knew material nonpublic information about the television negotiations or anything else. Moreover, Levesque's trading ended nearly four months before the television negotiations

concluded and before the WWE network was even launched. There is nothing at all suspicious about her trading. Indeed, there are no facts alleged that would support an inference that Levesque knew material nonpublic information at any time during the class period, much less at a time when she made a decision to sell.

**Second, a**s plaintiffs should have known, courts routinely hold on motions to dismiss that sales undertaken pursuant to Rule 10b5-1 plans do not give rise to any inference of scienter if the 10b5-1 plans were adopted prior to the class period. *E.g., First New York Sec., LLC v. United Rentals,* 648 F.Supp.2d 256, 268-69 n. 4 (D. Conn. 2009) (no finding of scienter where sales were made as part of a 10b5-1 plan "over which the individuals presumably had no control") , *aff'd on other grounds*, 391 Fed. App'x 71 (2d Cir. 2010); *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) ("Trades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter"); *George v. China Auto.Sys., Inc.,* No. 11 Civ. 7533, 2012WL3205062 at *9 (S.D.N.Y. Aug. 8, 2012); *Glasser v. The9, Ltd.*, 772 F. Supp.2d 573, 592 n. 14 (S.D.N.Y. 2011) ("it is well established that trades made under 10b5-1 plans do not raise a strong inference of scienter") (internal citation and quotation marks omitted); *In re IAC/Interactivecorp. Sec. Litig.*, 478 F. Supp.2d 574, 604 (S.D.N.Y. 2007) ("Because Barton's sales were part of a periodic divestment plan, the timing and amount of the sales does not raise a strong inference of scienter").

**Third**, the notion that Levesque "suspiciously" sold the shares under her married surname rather than her more commonly used maiden name is farcical. The public 8-K filing with the SEC identifies in the first sentence that the shares are being sold for "Stephanie McMahon Levesque." *See* (Exh. 22). A Google search of "Stephanie McMahon Levesque" returns over 45,000 results. This is not someone trying to hide her identity.

**Fourth**, the Amended Complaint states that the shares that she sold were "every single share of her WWE stock." (Amended Complaint ¶ 23). But the Company's February 7, 2014 Schedule 13D (Exh. 23), also available on the SEC's public website, which plaintiffs could have checked before filing their Amended Complaint, states that Levesque still owns 2,511,071 shares. That means that the shares she sold were only a fraction of her total shares, and even then, all of the sales were pursuant to a 10b5-1 plan. *See* (Amended Complaint ¶ 23; Exh. 22.; Exh. 23). Perhaps that is why Plaintiffs, without filing any motion with the Court or obtaining the consent of the Defendants as they are required to do, have filed a "correction" that deletes that phrase "every single share" in paragraph 23 of the Amended Complaint. *See* Fed. R. Civ. Pro. R. 15 (West 2015).

**Fifth**, the Amended Complaint states that Levesque was "a member of the WWE Board." (Amended Complaint ¶ 23). But Levesque was not elected to the WWE Board until February 26, 2015—nine months *after* the end of the class period and, indeed, well after the Amended Complaint was filed. (Exh. 24). Prior to February 26, 2015, Levesque had never been a WWE director.

**Sixth,** the Amended Complaint states that Levesque's transactions started on October 3, 2013, just before the class period began. But Levesque's Form 4s (Change in Beneficial Ownership), publicly available on the SEC website and also available on the Company's website under the category "Insider Ownership,"[33] shows that Levesque began selling shares on May 15, 2013 (pursuant to her 10b5-1 plan) at a price of $9.19 a share (Exh. 26, p.1), and that prior to October 3, 2013, she filed additional Form 4s publicly reporting her sales on May 17, 2013, May 21, 2013, May 23, 2013, May 29, 2013, June 5, 2013, June 10, 2013, July 3, 2013,

---

[33] avail. at http://ir.corporate.wwe.com/insiders.aspx?iid=4121687&start=121&mask=345

July 9, 2013, July 12, 2013, August 5, 2013, August 8, 2013, September 5, 2013, September 10, 2013, September 13, 2013, and September 17, 2013. (Exhs. 26). As was true with the confidential witness who knew nothing of the television contract negotiations, the two reports that shed no light at all on anything at issue in the Amended Complaint, and now the completely false accusation of suspicious trading, there is simply nothing there. And the most basic of checks of the Company's and Levesque's filings with the SEC or the Company's website, which compiles all of the Insider Filings, should have made that plain to the Plaintiffs.

There remains the issue of whether the facts alleged show that Defendants acted with "conscious recklessness" - a state of mind "approximating actual intent" to mislead rather than being optimistic about negotiations that ultimately produced a near doubling of the annual television contract revenues. Here there are no well-pled facts that would support an inference of conscious recklessness. For the reasons already discussed in Sections III/A and III/B, the Amended Complaint fails to meet this standard as well.

## C. Plaintiffs Have Failed to Plead Loss Causation

Plaintiffs have also failed to plead loss causation. Loss causation is the requirement that "plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss," which, in turn, requires proof that the price fell significantly "after the truth became known. . . ." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 345-47 (2005)[34]. Plaintiffs routinely seek to show loss causation through a corrective disclosure, as they have done here with respect to the Company's May 15, 2014 press release announcing the outcome of the re-negotiation of the television contracts.

---

[34] The standards for loss causation are discussed in *In re Xerox Corp. Sec. Litig.,* 935 F. Supp. 2d 448, 493-494 (D. Conn. 2013), in which the Court stated, "To be 'corrective' a disclosure must 'reveal the falsity of the alleged misstatements" (internal quotations omitted). *In re Xerox*, 935 F. Supp. 2d at 493-94, *aff'd*, 766 F.3d 172 (2d Cir. 2014).

The leading Second Circuit case on loss causation and corrective disclosures is *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 174-78, 175 n. 4 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005).  In Lentell, plaintiffs filed 140 securities class action complaints against Merrill Lynch and its "former star analyst," Henry Blodget, alleging that he had issued research opinions recommending Internet companies he did not genuinely believe were good investments, and that when he issued new research reports no longer recommending these stocks, the price of the stocks plummeted and the investments became nearly worthless.  *Id.* at 164-65, 174 n.2.

In affirming Judge Pollack's dismissal on loss causation grounds, the Second Circuit stated, "There is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations. . . ."  *Id.* at 175. With respect to plaintiffs' claim that the subsequent research opinions no longer recommending the stocks were "corrective disclosures" for purposes of the loss causation analysis, the Second Circuit held that these were not corrective disclosures because they did not reveal the falsity of the prior opinions.  It stated:

> Plaintiffs contend that they *have* alleged a corrective disclosure to the market, in alleging that Merrill's eventual downgrades of 24/7 Media and Interliant stock (from "accumulate" to "neutral" and from "buy" to "accumulate," respectively) negatively impacted the price of those securities. These allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations. …

*Id*. at 175 n.4.  *See also In re Initial Pub. Offering. Sec. Litig.,* 399 F.Supp.2d 261, 266 (S.D.N.Y. 2005) ("a failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect"), quoted with approval in *In re Xerox Corp. Sec. Litig.,* 935 F.Supp.2d 448, 496 (D. Conn. 2013), aff'd, 766 F.3d 172 (2d Cir. 2014)..

So too here the Company's May 15, 2014 press release disclosing the results of the Company's re-negotiation of its four television contracts did not "correct" or reveal the falsity of

the Company's prior opinions or, indeed, the falsity of anything. It revealed a new fact – the results of the just completed negotiations – but not that the Company's opinions were false when made. (Amended Complaint ¶ 76). And, it repeated that management continued to believe that the Company can achieve significant earnings growth, potentially doubling or tripling 2012 "OIBDA in the range of $125 million to $190 million by 2015." (Exh. 17 p.4). It provided no statements at all, much less something that could be characterized as a corrective statement, about the Company's fan base or its social media following. Investors may have been disappointed that the results were not even better, but there was nothing "corrective" in the Company's statements and, therefore, nothing that would support an allegation of loss causation under *Lentell*. *See Lentell*, 396 F.3d 161, 174-78, 174 n.4. The absence of loss causation provides yet another independent reason the Amended Complaint must be dismissed.

**D.     The Company's Statements Are Protected by the PSLRA Safe Harbors for Forward-Looking Statements**

The PSLRA created a safe harbor to "encourage[e] companies to disclose forward-looking information" by "protect[ing] [them] from liability in private lawsuits" based on such forward-looking statements. H.R. Conf. Rep. No. 104-369 at 43 (1995). It applies if either the forward-looking statements are accompanied by meaningful cautionary language, or the defendant made the statements without actual knowledge that they were false or misleading. H.R. Conf. Rep. No. 104-369 at 43-44. State of mind is irrelevant if there is adequate cautionary language; whereas cautionary language is irrelevant if the defendant acts without actual knowledge of deception. *See* 15 U.S.C. § 78u-5(c), (i); *Slayton v. Am. Exp. Co.,* 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge

that it was false or misleading.")  In particular, the safe harbor provides that a person (including a company) shall not be liable "with respect to any forward-looking statement, whether written or oral, if and to the extent that—

> (A) the forward-looking statement is—
>
>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>>
>> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement—
>
>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>>
>> (ii) if made by a business entity; was—
>>
>>> (i)     made by or with the approval of an executive officer of that entity; and
>>>
>>> (ii)     made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5 (West 2015).

A "forward-looking" statement includes, among other things, "a statement containing a projection of revenues, income. . . or other financial items," "a statement of the plans and objective of management for future operations," "a statement of future economic performance," and "any statement of the assumptions underlying or relating to any" of the above forward-looking statements.  15 U.S.C. § 78u-5(i) (West 2015).

Even before Congress enacted the safe harbor for forward-looking statements, the Second Circuit applied the bespeaks caution doctrine to reject claims based on forward-looking statements regarding projected earnings where, as here, they reflected "hope, adequately tinged with caution" on the ground that "[D]efendants' lack of clairvoyance simply does not constitute

securities fraud." *San Leandro Emergency Med. Plan v. Phillip Morris*, 75 F.3d 801, 811 (2d Cir. 1996) (quoting *Acito v. IMCERA Grp., Inc.* 47 F.3d 47, 53 (2d Cir. 1995)). "[E]conomic prognostication, though faulty, does not, without more, amount to fraud." *Id.* at 813, (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982)). "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994). The Second Circuit has explained that a forward-looking statement "expresses the issuer's inherently contingent prediction of risk or future cash flow" while "a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction." *Iowa Pub. Emps.' Ret. v. MF Global,* 620 F.3d 137, 143 (2d Cir. 2010). For example, in *In re Sturm, Ruger & Co., Inc. Sec. Litig.,* No. 3:09-cv-1293 (CFD), 2011 WL 494753 at *4 ((D. Conn. Feb. 7, 2011), defendants allegedly 1) "believed" that the impact of a LIFO liquidation would not have a material impact on the financial position of the company; and that they 2) "believed" that the company had "adequate quantities of raw materials … to provide ample time to locate and obtain additional items … without interruption of its manufacturing operations." The court held that these statements were protected by the safe-harbor for forward-looking statements because the company's cautionary statements stated, 1) "The Company may, from time to time, make forward-looking statements and projection concerning future expectations"; 2) "Such statements are based on current expectations and are subject to certain qualifying risks and uncertainties, such as market demand, sales levels of firearms, anticipated castings sales and earnings. . . .; and 3) "Readers are cautioned not to place undue reliance on these forward-looking statements. . . ." *Id.* at 5. The court held that these statements were not

actionable because the "cautionary language does contain substantive information about what may affect their financial projections. . . ."  *Id.* at 6.

Similarly, in *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, Civil Action No. 3:09-CV-01740 (VLB), 2013WL1188050 (D. Conn. Mar. 23, 2013), Pitney Bowes disclosed in its press release: 1) "This document contains 'forward-looking statements' about our expected future business and financial performance"; 2) "Words such as 'estimate,' 'project,' 'plan,' 'believe,' 'expect,' 'anticipate,' 'intend,' and similar expressions may identify forward-looking statements"; 3) "For us forward-looking statements include, but are not limited to, statements about possible restructuring charges and our future guidance, including our expected revenue in the third quarter and full year 2007, and our expected diluted earnings per share for the third quarter and for the full year 2007"; 4) "Forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those projected"; 5) "These risks and uncertainties include, but are not limited to: negative developments in economic conditions, including adverse impacts on customer demand, timely development and acceptance of new products or gaining produce approval; successful entry into new markets; changes in interest rates; and changes in postal regulations. . ."  *NECA-IBEW*, 2013WL1188050 at *10.

The court found that words like "anticipates" and "expects" and "we're comfortable with our guidance" involved forward-looking statements and were not actionable because they were accompanied by meaningful cautionary language.  *Id.* at *17, 23.  The court rejected the argument that the cautionary language was too general.  It stated that cautionary language "need not include the particular factor that ultimately causes the projection not to come true" but must convey substantive information and not be pure "boilerplate."  *See id.* at 18 (quoting *Slayton v.*

*Am. Express Co,*, 604 F.3d 758, 772 (2d Cir. 2010).  The identification of "crucial areas of risk" was sufficient for the court to grant the motion to dismiss.  *Id.* at 21.

Similarly, in *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 191 (D. Conn. 2014), the court found that statements that the company was "planning for continued strong growth" and that it was increasing "earnings guidance" were forward-looking statements that were not actionable. It stated that using words like "expect," "forecast," "planning" and stating that the press release contained "forward-looking statements" adequately identified the statements as forward-looking. *See id.* at 193.  And it held that that cautionary language stating that "actual results could differ materially due to various factors, including . . . risks associated with our ability to recruit independent sales consultants, . . . and other factors described . . . in the Company's most recently filed Report on Form 10-K" were adequate cautionary statements under the safe-harbor. As a result, the court granted the motion to dismiss.  *Id.*

The Company's statements regarding the *potential* results of its television contract negotiations with independent third-parties and other initiatives, such as the WWE Network, on 2015 OIBDA were unquestionably forward-looking statements (see pp. 35-35 above).  They were couched as forward-looking statements, each earnings call at which they were discussed highlighted that the discussions would include forward-looking statements, and the Company's Form 10-K stated that the words "may," "will," "could," "anticipate," "plan," "continue," "project," "intend," "estimate," "believe," "expect," and similar expressions are intended to identify forward-looking statements."  These statements, the 10-K noted, "relate to our future plans, objectives, expectations and intentions and are not historical facts and accordingly involve known and unknown risks and uncertainties and other factors that may cause the actual results of

the performance by us to be materially different from future results or performance expressed or implied by such forward-looking statements." (Exh. 2 p. 43; Exh. 13 p. 44).

With regard to which risk factors were most important to its business, the Company's 10-K issued on February 24, 2014 – right in the middle of the Class Period – identified as the very first risk factor in a long list of risk factors the failure "to maintain or renew key domestic television agreements . . . could adversely affect our operating results." (Exh. 13 p.10). The risk factors stated:

First, "a large portion" of the Company's revenues are generated from television agreements. *See* (Exh. 13 p.10).

Second, any "failure to enter into new distribution opportunities on terms favorable to us could adversely affect our operating results." (Exh. 13 p.10).

Third, "We regularly engage in negotiations relating to substantial agreements covering the distribution of our television programming by carriers located in the United States and abroad." (Exh. 13 p. 10).

Fourth, "Over the past several years we have expanded our relationship with NBC Universal ("NBCU") and they currently distribute the vast majority of our domestic television programming." (Exh. 13 p.10).

Fifth, "In 2013, these NBCU agreements were made coterminous, ending in September 2014." (Exh. 13 p.10).

Sixth, "The Company is now engaged with potential partners after exiting our exclusive negotiating period with NBCU." (Exh. 13 p.10).

Seventh, "The inability of the Company to enter into a domestic distribution agreement(s) on terms favorable to us could substantially affect the Company's financial outlook, liquidity,

business and operating results and have a material adverse affect on the price of the Company's Class A Common Stock. . . ." (Exh. 13 p.10).

Eighth, the Company believes that price of the Class A common stock "reflects market expectations of a substantial improvement in future operating results." (Exh. 13 p.10).

The same Form 10-K contained an additional list of 24 separate cautionary factors. The very first factor listed out of the 24 was "risks relating to entering, maintaining and reviewing major distribution agreements, including our domestic television programming agreements which terminate in September 20, 2014." (Exh. 13 p.44).

And there were myriad other cautionary statements as well. Indeed, nearly every earnings call, as discussed above, began with a statement that the Company would be making "several forward-looking statements," that these statements "are based on management's estimates" and that "actual results may differ due to numerous factors as described in our presentation and in our filing with the SEC" and that "undue reliance" should not be placed on the forward-looking statements. *Every* press release in which forward-looking statements were made stated that it contained forward-looking statements and listed as either the first or second risk "risks relating to maintaining and renewing key agreements, including television and pay-per-view programming distribution agreements." (*E.g.,* Exh. 1 p.4; Exh. 4 p.10; Exh. 11 p.9).

There is no question that the Company's predictions about the outcome of the re-negotiation of its television contracts were forward-looking, that the Company's predictions about the impact of its various initiatives on 2015 OIBDA were forward-looking, that these forward-looking statements were identified as such, and that they were accompanied by meaningful cautionary language warning of the fact that NBC Universal distributed the vast majority of the Company's television programs, that the Company was engaged in negotiations

on those agreements, that the failure to enter into new agreements "on terms favorable to us" could adversely affect the Company's operating results, and that the Company believed that the price of its shares "reflects market expectations of a substantial improvement in future operating results." This is the very definition of meaningful cautionary language, and requires that the Amended Complaint be dismissed.

The second, independent, part of the safe harbor applies if the plaintiff fails to show that the forward-looking statements were made "with actual knowledge by that officer that the statement was false or misleading." In the case of forward-looking statements, recklessness is not sufficient. Knowing falsity is required. *Slayton v. American Express Co.,* 604 F.3d 758, 772-74 (2d Cir. 2010). As difficult as it is to show scienter in the case of an opinion, it is that much more difficult to show scienter in the case of an opinion related to future events. We have demonstrated in Sections III/A and III/B above why Plaintiffs failed to plead either false opinions or scienter; the same analysis is fatal to the Plaintiffs' claims under the safe harbor as well.

### E. The Section 20A Claim Against Levesque Should Be Dismissed

Section 20A of the Securities Exchange Act provides:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

*See* 15 U.S.C.A. § 78t-1 (West 2015).

The original complaint contained no insider trading allegations at all. In the Amended Complaint, new counsel falsely accused Levesque, a supposed "director" who "suspiciously"

sold, in her married name, "every single share" of stock she owned. (Amended Complaint ¶¶ 23, 36, 109-14). But as we discuss at pages 49-50 above, all of the shares Ms. Levesque sold were sold pursuant to a 10b5-1 plan entered into and disclosed in an SEC filing seven months before the Class Period began, courts routinely reject insider trading claims when the trades are made pursuant to a 10b5-1 plan entered into before the Class Period, Ms. Levesque sold only a fraction of her shares rather than "every single share," Levesque was not a director of WWE until well after the class period ended, and she is well known as both "Stephanie McMahon Levesque." Plaintiffs have pled no basis at all for concluding that Levesque violated the Securities Exchange Act by selling while in possession of material nonpublic information.

### F.     The Claims Against Wilson Should Be Dismissed

The original complaint did not name Wilson as a defendant. It is nothing short of remarkable that new counsel for the Amended Complaint did. The only public statement attributed to her is the allegation that on December 17, 2013, she was quoted in *Variety* as stating, "We are clearly entertainment-based, but if you think about the characteristics of our brand, it's live action, and that's sports. We want to be compensated for a live audience, since live content is getting a very significant premium in the marketplace." (Exh. 8 p.2). No facts are alleged that create an inference that these are anything other than honestly and legitimately held opinions and aspirations; there is nothing fraudulent about them.

The Amended Complaint also contains an allegation that Wilson asked the confidential witness to inflate the number of fans WWE had when he spoke to sponsors and that he refused to do so. (Amended Complaint ¶¶ 8, 16, 46, 50). The confidential witness has absolutely denied that in his attached Affidavit. (Affidavit, ¶ 15). But, equally importantly, even the allegations in the Amended Complaint do not state that, in response to an alleged direction that the confidential

witness denies receiving, the confidential witness made any false statements, much less false statements made publicly. Indeed, there is absolutely nothing in the Amended Complaint that suggests that the confidential witness ever had any contact at all with any investors.

### G. The Controlling Person and Indirect Liability Claims Should Be Dismissed

The Amended Complaint alleges controlling person and indirect liability claims under Sections 20(a) and 20(b) of the Securities Exchange Act. Because there is no primary violation, the controlling person allegations fail as well. *See, e.g., Stein v. Tangoe*, Civil Action No. 313-civ-00286(VLB), 2014 U.S. Dist. Lexis 137966, at *94 (D. Conn. Sept. 30, 2014); *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, Civil Action No. 3:09-CV-01740 (VLB), 2013WL1188050, at *37 (D. Conn. Mar. 23, 2013). Moreover, there are no well-pled allegations that Ms. Wilson is a controlling person with respect to any of the statements made by others.

Plaintiffs also assert a claim of indirect liability under Section 20(b) of the Securities Exchange Act. But Section 20(b) contains no private right of action, and, in any event, the Section 20(b) claims fails for the same reasons the Section 20(a) claims fails.

### CONCLUSION

Plaintiffs have filed an Amended Complaint that seeks to convert forward-looking corporate optimism into a securities fraud by: 1) purporting to rely on a confidential witness who has no knowledge of the relevant facts based on Plaintiffs' own characterization and who has also disclaimed the statements attributed to him; 2) relying on two reports for which it provides no meaningful background or context; 3) relying on trading that was done pursuant to a Rule 10b5-1 plan created and publicly disclosed seven months before the Class Period; and 4) relying on a meaningless statement of opinion made "with hindsight" that the launch of the WWE network had a negative effect on negotiations, though not necessarily a significant impact. Their effort has resulted in an Amended Complaint that fails to plead a false statement or

omission, fails to plead scienter, fails to plead loss causation, and is based on forward-looking statements that are protected by the PSLRA safe harbors. It also fails to plead any elements of a violation against Wilson or Levesque. The Amended Complaint should be dismissed with prejudice.

Dated:        March 9, 2015

Respectfully submitted,


/s/      Jerry S. McDevitt
Jerry S. McDevitt (*pro hac vice*)
K&L Gates LLP
210 Sixth Avenue
Pittsburgh, PA 15222-2613
Telephone: 412 355-8608
Facsimile:  412 355-6501
E-mail:  jerry.mcdevitt@klgates.com

Jon Eisenberg (*pro hac vice*)
K&L Gates LLP
1600 K Street, N.W.
Washington, D.C. 20006
Telephone: 202 778-9348
Facsimile: 202 778-9100
E-mail: jon.eisenberg@klgates.com

Jeffrey P. Mueller (ct27870)
Jonathan B. Tropp (ct11295)
Erick M. Sandler (ct25029)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
Telephone: 860-275-0100
Facsimile: 860-275-0343
Email: jmueller@daypitney.com
Email: jbtropp@daypitney.com
Email: emsandler@daypitney.com

Attorneys  for World Wrestling Entertainment, Inc.,
Vincent K. McMahon, George A. Barrios, Michelle
D. Wilson, and Stephanie McMahon Levesque

## CERTIFICATION

I hereby certify that on this date a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey P. Mueller*
Jeffrey P. Mueller (ct27870)