# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | X | CIVIL NO. 3:14-CV-1070 (AWT) |
| IN RE WORLD WRESTLING ENTERTAINMENT, INC. SECURITIES LITIGATION | : | |
| | : | CLASS ACTION |
| | : | |
| | : | |
| | X | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT .............................................................................1

STATEMENT OF FACTS ......................................................................................4

    A. Overview..........................................................................................................4

    B. Defendant McMahon Levesqye Sold Stock During the Class Period While in
       Possession of Non-Pubic Adverse Information ................................................6

    C. Revelation of the True, Adverse Concealed Facts ...........................................6

  I. ARGUMENT ....................................................................................................8

    A. Applicable Pleading Standards .......................................................................8

    B. Plaintiffs Have Alleged Materially False and/or Misleading Statements and Omissions ...9

       1. The False and Misleading Nature of Defendants' Statements and Omissions Is
          Strongly Supported by the Allegations of CW1 ........................................10

       2. The Actionability of Defendants' Statements of Opinion Are Reinforced by New,
          Controlling Supreme Court Precedent in *Omnicare* ...................................12

       3. Defendants' Material Misstatements and Omissions Are Not Shielded by the Safe
          Harbor ....................................................................................................15

       4. Defendants' Material Misstatements and Omissions Are Not Inactionable Puffery ...20

    C. Plaintiff Has Alleged Facts Giving Rise to a Strong Inference of Scienter ......................22

       1. CW1 and Internal Documents Corroborate Defendants' Scienter ...............................23

       2. The Importance of Television Licensing Contract Support Scienter for the  High-
          Level Individual Defendants.......................................................................27

       3. Defendant McMahon's Admissions Support a Strong Inference of Fraud.................30

       4. The Close Proximity of False Statements To the Revelation of the Truth Supports
          Scienter ....................................................................................................31

5.   Defendants' Strong Motives To Commit Fraud ..............................................31

D.  Plaintiff Has Adequately Pleaded Loss Causation...........................................35

E.  Plaintiff Adequately Alleges The Section 20A Claim Against Defendant McMahon
Levesque ...........................................................................................................38

F.  Plaintiff Has Adequately Pleaded 20(a) Control Person Liability Against Defendants
McMahon, Barrios, and Wilson........................................................................40

CONCLUSION................................................................................................................41

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) ........................................................................... 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 8

*Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011) .......................................................................... 29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................... 8

*Berson v. Applied Signal Tech.*, Inc.,
  527 F.3d 982 (9th Cir. 2008) ........................................................................................ 31

*Cellular Tech. Servs. Co. v. TruePosition, Inc.*,
  609 F. Supp. 2d 223 (D. Conn. 2009) ......................................................................... 35

*Chalverus v. Pegasys, Inc.*, 59 F. Supp. 2d 226 (D. Mass. 1999) ............................... 30

*City of Brockton Ret. Sys. v. Shaw Group. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008) .......................................................................... 23

*City of Providence v. Aeropostable, Inc.*,
  2013 U.S. Dist. LEXIS 44948  (S.D.N.Y. March 25, 2013) ............................... 15, 17

*Cohen v. Citibank, N.A.*,
  954 F. Supp. 621 (S.D.N.Y. 1996) ............................................................................... 41

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989) ............................................................................................... 29

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*,
  No. 99 Civ. 12046, 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001)) ........................ 19

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014) .......................................................................................... 38

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................................. 35, 36

*ECA Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .................................................................................... 22, 23

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
  343 F. 3d 189 (2d Cir. 2003) ........................................................................................ 37

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
  466 F.3d 1 (1st Cir. 2006) ............................................................................................. 31

*Fait v. Regions Fin. Corp.*,
 655 F.3d 105 (2d Cir. 2011) .......................................................................... 13, 14

*Freidus v. ING Groep NV et al.*,
 543 F. App'x 93 (2d Cir. 2013) .......................................................................... 14

*Freudenberg v. E\*Trade Fin. Corp.*,
 712 F .Supp.2d 171 (S.D.N.Y. 2010) ............................................................. 18, 31

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000) .............................................................................. 21

*Gavish v. Revlon, Inc.*, No. 00-7291,
 2004 U.S. Dist. LEXIS 19771 (S.D.N.Y. Sept. 30, 2004)....................................... 20

*Gross v. Medaphis Corp.*,
 977 F. Supp. 1463 (N.D. Ga. 1997)..................................................................... 35

*Hall v. Children's Place Retail Stores, Inc.*,
 580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................................. 19

*Heller v. Goldin Restructuring Fund, L.P.*,
 590 F. Supp. 2d 603 (S.D.N.Y. 2008) .................................................................. 36

*In re 21st Century Holding Co. Sec. Litig.*,
 No. 07-61057, 2008 U.S. Dist. LEXIS 108196 (S.D. Fla. Nov. 7, 2008) .................. 26

*In re Able Labs. Sec. Litig.*,
 No. 05-2681, 2008 U.S. Dist. LEXIS 23538 (D.N.J. Mar. 24, 2008) ....................... 40

*In re AIG 2008 Sec. Litig.*,
 741 F. Supp. 2d 511 (S.D.N.Y. 2010) .................................................................. 19

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
 693 F.Supp.2d 241 (S.D.N.Y. 2010) .................................................................... 16

*In re APAC Teleservice, Inc. Sec. Litig.*,
 No. 97-9145, 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 19, 1999)..................... 32

*In re Bristol Myers Squibb*,
 No. 00-1990, 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005) ....................... 36

*In re Bristol Myers Squibb Co. Sec. Litig.*,
 586 F. Supp. 2d 148 (S.D.N.Y. 2008) .................................................................. 35

*In re Cardinal Health, Inc. Sec. Litig.*,
 426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................ 33, 40

*In re Charles Schwab Corp. Sec. Litig.*,
 No. 08-01510, 2009 U.S. Dist. LEXIS 8125 (N.D. Cal. Feb. 4, 2009) ..................... 37

*In re Complete Mgmt. Inc. Sec. Litig*,
 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ......................................................... 16, 29, 35

*In re Computer Associates Class Action Sec. Litig.*,
 75 F. Supp. 2d 68 (E.D.N.Y. 1999) ...................................................................... 21

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ................................................................. 23

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................................... 37

*In re Donald J. Trump Casino Sec. Litig.*,
   7 F.3d 357 (3d Cir. 1993) ...................................................................................... 17

*In re Dynex Cap. Inc. Sec. Litig.*,
   No. 05-1897, 2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19, 2009 .................. 26

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................... 29

*In re EVCI Colls. Holding Corp. Secs Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006)....................................................................... 33

*In re Fannie Mae Sec.*,
   503 F. Supp. 2d 25 (D.D.C. 2007) .......................................................................... 33

*In re InfoSonics Corp. Derivative Litig.*,
   No. 06-1336, 2007 U.S. Dist. LEXIS 66043 (S.D. Cal. Sept. 4, 2007) ........... 33, 40

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005)..................................................................... 37

*In re IPO Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................................... 32

*In re Loewen Group, Inc. Sec. Litig.*,
   395 F. Supp. 2d 211 (E.D. Pa. 2005) ...................................................................... 36

*In re MicroStrategy Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................... 35

*In re Motorola Sec. Litig.*,
   505 F. Supp. 2d 501 (N.D. Ill. 2007) ...................................................................... 36

*In re MTC Elec. Techs. S'holders Litig.*,
   898 F. Supp. 974 (E.D.N.Y. 1995) ......................................................................... 32

*In re Openwave Sys. Sec. Litig.*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007) ..................................................................... 37

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................... 16, 32

*In re Pall Corp.*,
   No. 07-3359, 2009 U.S. Dist. LEXIS 88240 (E.D.N.Y. Sept. 21, 2009) ............... 30

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005)..................................................................... 36

*In re Priceline.com Inc.*,
   342 F. Supp. 2d 33 (D. Conn. 2004).......................................................................... 9

*In re Prudential Securities Inc. Ltd. Partnerships Litigation,*
930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................... 19

*In re Quintel Entm't, Inc. Sec. Litig.*,
72 F. Supp. 2d 283 (S.D.N.Y. 1999) ....................................................... 21

*In re Regeneron Pharms., Inc. Sec. Litig.*,
No 03-3111, 2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 1, 2005)................................ 15, 17

*In re Reserve Fund Sec. & Deriv. Litig.*,
732 F. Supp. 2d 310 (S.D.N.Y. 2010)........................................................ 28

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ................................................................ 8, 27

*In re Sepracor, Inc. Sec. Litig.*,
308 F. Supp. 2d 20 (D. Mass. 2004) ........................................................ 20

*In re Symbol Techs., Inc., Sec. Litig.*,
No. 05-CV-3923, 2013 U.S. Dist. LEXIS 171688 (E.D.N.Y. Dec. 5, 2013) .................... 17, 26

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) ...................................................... 16

*In re Vivendi Universal, S.A. Sec. Litig.*,
No. 02-5571, 2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. Apr. 22, 2004) ...................... 34

*In re Winstar Commc'ns*,
No. 01-3014, 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 24, 2006)...................... 28

*In re Xerox Corp. Sec. Litig.*,
165 F.Supp.2d 208 (D. Conn. 2001)......................................................... 20, 22

*Inst. Investors Group v. Avaya, Inc.,*
564 F.3d 242 (3d Cir. 2009) ............................................................... 17, 26

*Iowa Pub Emps.' Ret. Sys. v. MF Global Ltd.,*
620 F.3d 137 (2d Cir. 2010) .............................................................. 16

*Janus Capital Group, Inc. v. First Deriv. Traders,*
131 S. Ct. 2296 (2011)..................................................................... 40

*Kaltman v. Key Energy Servs., Inc*.,
447 F. Supp. 2d 648 (W.D. Tex. 2006) .................................................... 20

*Klein v. PDG Remediation*,
937 F. Supp. 323 (S.D.N.Y. 1996) ........................................................ 21

*Lamie v. United States Tr.*,
540 U.S. 526 (2004)........................................................................ 38

*Landesbank Baden-Wurttemburg v. Goldman Sachs & Co.*,
821 F. Supp. 2d 616 (S.D.N.Y. 2011) ..................................................... 18

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005) ............................................................... 36

*Lewy v. Skypeople Fruit Juice, Inc.*,
  No. 11 Civ. 2700, 2012 U.S. Dist. LEXIS 128416 (S.D.N.Y. Sept. 7, 2012) ........................... 8

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wash. 2006) ................................................................................ 27

*Lormand v. U.S. Unwired, Inc.*,
  565 F. 3d 228 (5th Cir. Apr. 9, 2009) ...................................................................................... 19

*Makor Issues and Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................................................. 29, 31

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) ...................................................................................... 33

*Manavazian v. ATec Group, Inc.*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...................................................................................... 21

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996); ...................................................................................... 32

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) ..................................................................................................... 8, 23

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) .............................................................................. 34, 40

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*,
  709 F.3d 109 (2d Cir. 2013) ..................................................................................................... 11

*Nakkhumpun v. Taylor*,
  No. 14-1060, 2015 U.S. App. LEXIS 5547, at *21 (10th Cir. Apr. 7, 2015) ..................... 25, 38

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................................................. 28, 31

*Novak v. Kasaks*,
  216 F. 3d 300 (2d Cir. 2000 ..................................................................................... 11, 20, 24, 31

*Nursing Home Pension Fund v. Oracle Corp.*,
  No. 01-00988, 2006 U.S. Dist. LEXIS 94470 (N.D. Cal. Dec. 20, 2006) ................................ 36

*Omnicare, Inc. v. Laborers Dist..Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318, 191 L. Ed. 2d (2015) ............................................................................ *passim*

*Pirraglia v. Novell, Inc.*,
  339 F.3d 1182 (10th Cir. 2003) ............................................................................................... 31

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
  792 F. Supp. 2d 328 (D. Conn. 2011) ........................................................................................ 8

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .................................................................................................... 19

*Rosen v. Textron, Inc.*,
  321 F. Supp. 2d 308 (D.R.I. 2004) ........................................................................................... 20

*Rubinstein v. Collins*,
 20 F.3d 160 (5th Cir. 1994) ............................................................................ 32

*San Leandro Emergency Med. Plan. v. Phillip Morris*,
 75 F.3d. 801 (2d Cir. 1996) ........................................................................... 18

*Sawant v. Ramsey*,
 570 F. Supp. 2d 336 (D. Conn. 2008) ............................................................ 23

*Schottenfeld Qualified Associates, L.P. v. Workstream*, *Inc.*,
 No. 05 Civ. 7092 (CLB), 2006 U.S. Dist. LEXIS 96035 (S.D.N.Y. May 3, 2006) ................ 17

*Shomo v. City of New York*,
 579 F.3d 176 (2d Cir. 2009) ............................................................................ 8

*Silverman v. Motorola, Inc.*,
 No. 07-4507, 2008 U.S. Dist. LEXIS 76799 (N.D. Ill. Sept. 23, 2008) .................. 27

*Slayton v. Am. Express Co.*,
 604 F.3d 758 (2d Cir. 2010) ...................................................................... 15, 17

*Stevelman v. Alias Research Inc.*,
 174 F.3d 79 (2d Cir. 1999) ............................................................................. 32

*Stocke v. Shuffle Master, Inc.*,
 615 F. Supp. 2d 1180 (D. Nev. 2009) ............................................................. 33

*Stratte-McClure v. Morgan Stanley*,
 784 F. Supp. 2d 373 (S.D.N.Y. 2011) ............................................................. 29

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
 531 F.3d 190 (2d Cir. 2008) ............................................................................ 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ....................................................................... 22, 23, 31

*Tinsley v. Fleetboston Fin. Corp.*,
 No. 2:01-215, 2001 U.S. Dist. LEXIS 25103 (E.D. Va. July 17, 2001) ................ 41

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
 692 F. Supp. 2d 387 (S.D.N.Y. 2010) ............................................................. 18

*Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*,
 No. 11-2327, 2014 U.S. Dist. LEXIS 173613 (S.D.N.Y. Dec. 10, 2014) ................ 40

*United States v. O'Hagan*,
 521 U.S. 642 (1997) ......................................................................................... 39

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ........................................ 38

Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78(b) .............. 22, 39, 40

Securities Exchange Act of 1934, Section 20(a), 15 U.S.C. §78t-1(a) .................. 38, 39

Securities Exchange Act of 1934, Section 20(b), 15 U.S.C. §78t(b) .................... 40, 41

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u- 5(c)(1) .............................. 22

**Regulations**

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ................................................................. 39

SEC Rule 10b5-1, 17 C.F.R. § 240.10b5-1 ................................................. 32, 33, 39, 40

**Other Authorities**

SEC Release No. 34-43154........................................................................... 40

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8....................................................................................... 35

Fed. R. Civ. P. 8(a)(2).............................................................................. 35

Fed. R. Civ. P. Rule 15 ............................................................................. 41

## PRELIMINARY STATEMENT

In the face of incredibly detailed allegations that provide a level of specificity exceeding the requirements of the PSLRA and Rule 9(b), Defendants resort to a grossly improper procedure that cannot be countenanced at the motion to dismiss stage.  The Complaint provided such a high level of detail concerning Confidential Witness Number 1 ("CW1"), a former high-level employee of WWE who provided extensive information to Plaintiffs' counsel that painted a vivid picture of Defendants' securities fraud, that Defendants had no trouble hunting him down.  Having done so, Defendants obtained his signature – by means which will need to be explored thoroughly in discovery – on a carefully-wordsmithed affidavit in support of their Motion to Dismiss. Defendants now seek to rely upon this Affidavit to make a deeply-suspect and procedurally flawed factual attack on the well-pleaded allegations of the Complaint, which must be taken as true at this stage.

This is not the time or place for Plaintiff to rebut the facts in the Affidavit, particularly where, as here, no discovery has been permitted during the pendency of Defendants' motion pursuant to 15 U.S.C. §78u-4(b)(3)(B).  Accordingly, the Affidavit and related materials in Defendants' motion to dismiss should be stricken for reasons set forth in Plaintiff's Motion to Strike, filed on April 29, 2015, prior to the filing of this opposition brief.  In the event that that motion is denied, Plaintiff has requested in his Motion to Strike that the Motion to Dismiss be converted, as is necessary and appropriate, into a motion for summary judgment under Fed. R. Civ. P. Rule 56, which would provide all parties with an opportunity to conduct discovery related to the well-pled factual allegations that Defendants have attempted to put into dispute.   *See* Dkt. No. 79 at 3 n. 2.  Plaintiff would in that event seek to take depositions of Mr. Maddox, whom Defendants have identified as CW1, as well as any and all persons who assisted him with the

drafting of his Affidavit and/or prepared it on his behalf.  Plaintiff would also seek to depose any persons with whom Mr. Maddox discussed the Affidavit, as well seeking document discovery and other related discovery to test the reliability of "his" statements in the Affidavit.

Putting aside the improperly-submitted Affidavit and Defendants' premature and procedurally improper reliance upon that Affidavit in their Motion to Dismiss, Plaintiffs' allegations based on CW1 are reliable, detailed, and corroborated by other specific information alleged in the Complaint.  These allegations are based on information that a person hired by Defendants to perform high-level management in global advertising for WWE's important digital sector would be well-positioned to know.  The allegations are also highly specific and include allegations: (1) that the Company's own internal research studies directly contradicted WWE's public statements regarding the size of its fan base; (2) that NBC had access to the true numbers, which were a fraction of the size represented to the public (¶14); (3) that Defendants Barrios and McMahon knew the actual figures, hidden from investors, because they had access to research reports regarding viewers and related data and because it was a regular topic of discussion (¶¶ 8, 16, 44); (4) that WWE management would recount the number of social media followers to present a larger, yet inaccurate, picture of the WWE fan base; and (5) that Defendant Wilson herself asked CW1 to present false viewership data to potential sponsors, which he refused to do.  ¶¶14-15.[1]

This is not a situation where the CW did not have contact with the Individual Defendants or heard information through the grapevine.  Rather, CW1 was a high level employee, had regular contact and meetings with Individual Defendants, and had substantial contact with Defendant Wilson who asked him repeatedly to lie about the fan base by inflating the numbers while in possession of internal reports that demonstrated the falsity of such representations.  CW1's

---

[1] All "¶ references" are to the Amended Complaint ("Complaint") unless otherwise noted.

allegations are corroborated by internal, non-public WWE documents discussed in detail in the Complaint.  For example, the internal Company presentation entitled "WWE 2014 Roadmap to Budget" demonstrates the Company's awareness that WWE's viewership and profitability is unlike that of actual live sports.

Additional compelling indicia of scienter include Defendant Vince McMahon's express admissions that WWE did not provide investors with the true state of negotiations with NBC, and his further admission that the WWE Network "definitely had a negative impact" on negotiations with NBC.  ¶54.  The suspiciously-timed stock sales by Defendant McMahon's daughter, Defendant McMahon Levesque, further support a strong inference of scienter.

Defendants' technical materiality arguments are premature cannot succeed.  For example, Defendants' argument that their statements and omissions of opinion are inactionable is directly contrary to recent, controlling Supreme Court precedent – *Omnicare, Inc. v. Laborers Dist..Council Constr. Indus. Pension Fund,* 135 S. Ct. 1318, 191 L. Ed. 2d (2015) – that shows that Defendants' opinion statements and omissions are actionable where, as here, Defendants had no reasonable basis for such opinions.  Defendants' efforts to shield themselves from liability under the safe harbor for forward looking statements fare no better, since the vast majority of their statements concerned present or historical fact.  Even if any were forward looking, they failed to contain meaningful cautionary language.  The Complaint also adequately alleges causation with a 43% stock drop on high volume on a disclosure concerning, *inter alia*, the renegotiated television rights deal that is a core allegation of the Complaint.

Defendants' motion to dismiss should be denied in full.

## STATEMENT OF FACTS

### A.  Overview

WWE is an integrated media and entertainment company that was founded in Stamford, Connecticut in 1980 and focuses on the wrestling entertainment business worldwide.   ¶3. Throughout the Class Period, the Complaint alleges that WWE made materially false and misleading statements and omissions regarding WWE's ability to multiply and transform the Company's earnings profile through the negotiation of a new, long-term television license contract. ¶5.  While Defendants were making these statements and convincing investors and analysts that a much more lucrative contract was imminent and downplaying concerns that the Company's new, subscription-based 24/7 WWE network would have a cannibalistic effect on its audience thereby hampering negotiations with television networks, the Complaint alleges that Defendants knew or recklessly disregarded undisclosed facts to the contrary.   Defendants also made materially false and misleading statements and omissions regarding the size of the fan base, advertising revenue, and similarities of WWE to live sports programming.

A former high-level and well-positioned employee of WWE, CW1, provides a specific eyewitness account that supports the allegations that the Company grossly inflated the size of WWE's fan base in order to convey a larger market value for the Company and misleadingly touted WWE's ability to command a fee—commensurate with recent licensing deals of live sports—that would "double or triple" WWE's OIBDA (operating income before depreciation and amortization).  ¶¶5, 7-9.  The allegations attributable to CW1 strongly support Plaintiff's scienter allegations that Defendants knew during the Class Period that negotiations with NBC and other networks would not result in a doubling or tripling of WWE's OIBDA.  ¶18.  According to CW1, once the exclusive negotiating window expired, WWE approached every television network,

including ESPN, but from the outset no other network expressed interest in working with WWE. *Id*. No network offered WWE anything remotely approaching the $400 million per year that NASCAR received by NBC in its contract. ¶19. CW1 stated that in order for USA (a division of NBC Universal) to make a profit under that type of contract, they would have needed to get paid four times more per advertising spot ($60,000 per ad spot instead of $15,000, which they were currently getting) and "there was no way the market could hold that" type of increase per advertising segment. *Id*.

Moreover, CW1 explained that the Company's own internal research studies directly contradicted WWE's public statements regarding the size of its fan base, and that NBC had access to the true numbers, which were a fraction of the size represented to the public. ¶14. CW1 also stated that WWE management would recount the number of social media followers to present a larger, yet inaccurate, picture of the WWE fan base, and that Defendant Wilson herself would ask CW1 to present false viewership data to potential sponsors, which he did not do. ¶¶14-15.

CW1's statements are supported by internal, non-public WWE documents. For example, the internal Company presentation entitled "WWE 2014 Roadmap to Budget" demonstrates the Company's awareness that WWE's viewership and profitability is unlike that of actual live sports, stating that WWE is "not the PGA, NFL, or MLB…" and that WWE is "still early in growth stages and need to manage our business accordingly." ¶17. Moreover, a document entitled "Audience Demos_Fall 2012" indicates that the WWE largely appeals to a low income and low education audience that has less spending power than the audience for live sports. ¶11. In fact, the document indicates that over 40% of WWE's fan base has an annual household income of less than $40,000, with nearly half those fans earning less than $20,000 per year. *Id*.

With regard to the impact of the 24/7 WWE Network, Defendants made Class Period statements that it was only "a USA view" that the WWE Network would not have a "cannibalistic" effect on the Monday Night Raw audience, yet Defendant McMahon himself admitted after the close of the Class Period, that the WWE Network "definitely had a negative impact" on negotiations with NBC.  ¶54.

### B.  Defendant McMahon Levesque Sold Stock During the Class Period While in Possession of Non-Public Adverse Information

During the Class Period, Stephanie McMahon Levesque, Defendant Vince McMahon's daughter, sold millions of dollars of WWE stock.  Defendant McMahon Levesque has been WWE's Chief Brand Officer since December 2013 and is currently a member of WWE's Board of Directors.[2]  ¶36.  The Complaint alleges that in a series of stock sales from October 3, 2013 to January 7, 2014, when it was clear to WWE insiders that no network would pay WWE even close to the amount Defendants had misled the market to expect, Defendant McMahon Levesque sold over $6 million worth of WWE stock.  ¶23.  By virtue of her stock sales while in possession of material, non-public information about the Company's ability to multiply WWE's earnings profile through its new television license contract, the Complaint alleges that McMahon Levesque violated Section 20A of the Exchange Act.  ¶113.

### C.  Revelation of the True, Adverse Concealed Facts

On May 15, 2014, WWE announced that it had reached a multi-year deal with NBC to distribute its *Monday Night Raw* and *Friday Night Smackdown* properties, and after the market closed, issued a press release that explained the value of the agreements.  ¶¶73-74.   Contrary to

---

[2] Despite Defendants' contention to the contrary, the Complaint does not allege that Defendant McMahon Levesque was a Board member during the Class Period.  Def. Br. at 51.  The Complaint states that she "has been WWE's Chief Brand Officer since December 2013, and is a Member of the Board of Directors," which she has been since February 26, 2015.  ¶36.

Defendants' previous statements concerning WWE's ability to double or even triple the value of its U.S. television license agreement, the press release revealed that it only increased about $57 million, or approximately 40% over its previous $139.5 million per year contract.  ¶74.

When WWE revealed the truth regarding the value of its new U.S. licensing agreement, WWE's stock price plummeted from $19.93 per share at close on May 15, 2014 to $11.27 per share on May 16, 2014, an astounding decline of 43% on high trading volume.  ¶75.  Class members were harmed when the truth was revealed and the artificial inflation in the stock was removed.

Analyst reports published soon after the announcement confirm that the NBC deal was not in-line with WWE's guidance.  For example, in lowering his recommendation for WWE from "Buy" to "Hold" on May 16, 2014, Mike Hickey with Benchmark wrote that "[w]e estimate management negotiated a +50% increase on the Company's domestic TV rights Fees with NBCu; meaningfully below the guided multiple of 2X to 3X."  ¶22.  Similarly, Jeffrey S. Thomison with Hilliard Lyons Equity Research lowered his rating of WWE from "Long Term Buy" to "Buy" on May 20, 2014, and stated that "[c]ommon expectations were for a new domestic deal worth at least double (and possibly triple) the collective value of expiring deals."  Thomison continued to say that such "lofty expectations were based" in part on "past favorable commentary from management."  *Id*.

On May 19, 2014, just days after WWE's announcement, WWE held a conference call with analysts in which Defendant McMahon provided a stunning Company admission that Defendants failed to give the market a transparent picture of its WWE Network and its negative effect on the television license negotiations.  ¶77.  Specifically, Defendant McMahon stated:

> As all of you know, ***we announced our television deal with NBC last Friday, and at the same time, tried to -- whether we failed or not I'm not quite certain, but***

7

> *tried to give you a degree of transparency as far as our network is concerned, the*
> *WWE Network. And maybe we gave you too much information, or maybe not*
> *enough, I'm not quite certain.*

*Id.* (Emphasis added). When asked if the launch of the WWE network cannibalized viewership and negatively impacted the Company's negotiating position for the U.S. television rights deal, Defendant McMahon stated, "I think it definitely had a negative impact." *Id.*

## I.   ARGUMENT

### A.  Applicable Pleading Standards

On a motion to dismiss under Rule 12(b)(6), claims should be liberally construed, all facts alleged in a complaint are to be taken as true, considered collectively, and all reasonable inferences should be drawn in plaintiff's favor. *Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 333-34 (D. Conn. 2011) *citing Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322-23 (2011); *see Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (when deciding motion to dismiss, "all reasonable inferences [are drawn] in the plaintiff's favor") (citation and internal quotations omitted).  To survive a motion to dismiss, a complaint must allege "enough facts to state a claim [of] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Therefore, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.

It is also well-settled that a plaintiff need not plead evidence.  *See*, *e.g., In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 72 (2d Cir. 2001); *see also Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700, 2012 U.S. Dist. LEXIS 128416, at *40-*41 (S.D.N.Y. Sept. 7, 2012) ("[a] motion

to dismiss is not the proper vehicle to test the . . . manner in which plaintiffs will attempt to prove their allegations.").  Further, a Rule 12(b)(6) motion should not ordinarily be granted without first affording plaintiff an opportunity to amend the complaint.  *See, e.g., In re Priceline.com Inc.,* 342 F. Supp. 2d 33, 68 (D. Conn. 2004).

### B.  Plaintiffs Have Alleged Materially False and/or Misleading Statements and Omissions

Side-stepping the strong allegations of material falsity based on CW1 and Defendant McMahon's own admissions, Defendants make technical, fact-based arguments that Plaintiff has failed to allege material misstatements because they are either non-actionable expressions of corporate "opinion," protected by the safe harbor or else mere puffery.  These efforts fail. Defendants' ostensible attempt to pepper their Form 10-K or other documents with purported "language of opinion" is dramatically undercut by new, controlling Supreme Court authority in *Omnicare,* which holds that statements and omissions of opinion are actionable where, as here, Defendants had no reasonable basis for such opinion statements or omissions.  In fact, even if Defendants subjectively believed their opinions (which the Complaint alleges they did not), the statements are actionable under *Omnicare* if they lacked a reasonable basis.  The safe harbor also does not apply because the statements at issue concerned present or historical facts, do not contain meaningful cautionary language, and in any event were made with actual knowledge of falsity. Finally, the statements cannot be dismissed as "puffery," an outdated doctrine that rarely forms the basis for dismissal for fact-based materiality questions.[3]

---

[3] The Complaint alleges that WWE issued a press release on February 28, 2014 announcing the Company's "Business Growth Plan and Potential Path to Significant Earnings Growth;" Defendants correctly point out the press release was issued on February 28, 2013, prior to the Class Period.   Plaintiff apologizes for the error.

### 1. The False and Misleading Nature of Defendants' Statements and Omissions Is Strongly Supported by the Allegations of CW1

The allegations based on statements attributable to CW1 strongly support the materially false and misleading nature of Defendants' statements and omissions.  The Complaint contains specific and detailed allegations based on CW1 who is described in the Complaint as a well-placed, management level former employee of WWE who worked as Vice President of WWE's global digital advertising sales team from December 2010 to January 2014.  ¶¶ 2, 8.   CW1 attended exclusive meetings during the Class Period for the top 1% of WWE management.  ¶8.  CW1 attended these meetings with Defendants McMahon, Barrios, and Wilson.  *Id*.  The Complaint alleges in detail that CW1 had at least two Class Period discussions with Defendant Wilson and that she "requested that he present false viewership data to potential sponsors that inflated the number of WWE fans tenfold."  *Id*.  The Complaint alleged that Defendants "lied about the size of the fan base;" "misled the market completely;" and that Defendant Wilson "misled people in marketing" in connection with the negotiations of the new television license contract.  *Id*.  *See also* ¶¶8, 9 ("WWE didn't really negotiate with NBC"), 10 (according to CW1, such advertisers did not want to work with WWE because its viewers were typically younger, with less education, and lower incomes, than viewers of live sporting events), 12, 13, 14 (CW1 stated that the fan base numbers were simply wrong, and both WWE and NBC "absolutely" knew it), 15, 16, 18, 19.

In their motion to dismiss, Defendants take a swipe at Mr. Maddox's credibility with regard to his detailed statements regarding the television licensing contract negotiations based on the timing of his departure and his position at the Company, which they claim – again, contrary to the well-pleaded allegations of the Complaint – precludes him from knowing anything about those negotiations or the allegations stemming therefrom.  Def. Br. at 27.  Plaintiff's allegations based on CW1 concerning television licensing contract negotiations are perfectly proper because the

allegations are based on personal knowledge of the facts he reports.  For example, CW1 provides

the basis for allegations concerning the identities of the lead negotiators were for the deal (¶18);

the fact that no network offered anything approaching the NASCAR deal (including NBC's $400m

per year portion); and detailed allegations specifying that in order for USA (a division of NBC

Universal) to make a profit under that type of contract, USA would need to get paid four times

more per advertising spot ($60,000 per ad spot instead of the then-current rate of $15,000).  ¶¶19,

42, 48, 52, 65.  As noted by CW1, "there was no way the market could hold that" type of increase

per advertising segment.  ¶19.  These details are the very type of facts that a high-level manager

in WWE's global digital advertising sales team can be expected to be privy to focus on in order to

satisfactorily perform the job for which Defendants hired him.

Plaintiffs' allegations based on CW1 are reliable, detailed, and based on information a

person in his position hired by Defendants to perform high-level management in global advertising

for WWE in its important digital sector would know; accordingly, his account strongly supports

the Complaint's allegations that Defendants made materially false and misleading statements and

omissions.  CW1 was at WWE during the Class Period until January 16, 2014. This means CW1

was at WWE from the start of negotiations in May of 2013 until after January 7, 2014, by which

time WWE insiders knew no network would pay WWE close to the amount Defendants led the

market to expect. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d

109, 123-124 (2d Cir. 2013) ("Even under the higher standard imposed by the PSLRA, however,

we have permitted plaintiffs to rely on unnamed sources so long as "they are described in the

complaint with sufficient particularity to support the probability that a person in the position

occupied by the source would possess the information alleged") (quoting *Novak v. Kasaks,* 216 F.

3d 300, 314 (2d Cir. 2000)).

CW1's allegations are also corroborated by other detailed allegations in the Complaint. For example, the contract negotiation allegations are corroborated by an internal company presentation obtained by Plaintiff's Counsel which indicates that WWE was in a different league than live sports and could not expect the same type of financial commitment from networks. ¶¶17, 42, 49, 52, 58, 62, 65.

### 2. The Actionability of Defendants' Statements of Opinion Are Reinforced by New, Controlling Supreme Court Precedent in *Omnicare*

Defendants wrongly argue that their class-period statements are merely non-actionable assertions of opinion rather than fact. The Supreme Court recently held that liability with respect to a statement of opinion may be proven by showing that the statement's issuer lacked a reasonable basis for the opinion expressed, even if he or she subjectively held such an opinion. *Omnicare*, 191 L. Ed. 2d at 268-69 (liability with respect to a statement of opinion may be shown be establishing that the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion"). The Supreme Court rejected defendants' argument that a statement of opinion is not actionable "[a]s long as it is sincerely held." *Id.* at 267-68. Rather, the Supreme Court held that a plaintiff may establish liability for even sincerely held opinions by showing that the statement's issuer "lacked the basis for making those statements that a reasonable investor would expect." *Id.* at 273.

The *Omnicare* opinion also emphasized that investors' expectations about the degree of certainty underlying an opinion will be a function of the context in which the opinion is expressed, including the specificity of the opinion itself and the speaker's special knowledge that is unavailable to investors. *Id.* at 269-70, n.8. The Supreme Court held the proper analysis is what a reasonable person "would naturally understand a statement to convey beyond its literal meaning. . . . [a]nd for expressions of opinion, that means considering the foundation [investors]

would expect an issuer to have before making the statement." *Id*. at 271.  If an issuer "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then [the] omissions clause creates liability." *Id*. at 268-69.

Under the framework outlined in *Omnicare*, Defendants' arguments that various alleged misrepresentations are inactionable statements of opinion fail.  Defendants point to various alleged misrepresentations and omissions concerning WWE's expectation of doubling or tripling its earnings profile with a new U.S. television licensing deal, and argue that the "opinion" words, such as "feel," "think,"  "confident," or "believe," protect Defendants from liability.  *See* Def. Br. at 35 (*e.g.*, "we continue to believe that these initiatives will enable WWE to significantly raise its earnings profile by 2015," "we continue to believe that successful execution of our key initiatives could potentially result in doubling or tripling our 2012 OIBDA results to a range of $125 million to $190 million by 2015," "WWE management continues to believe that the Company can achieve significant earnings growth, potentially doubling or tripling 2012 OIBDA results to a range of $125 million to $190 million by 2015.").    But Defendants failed to disclose facts undercutting those opinions rendering such opinions unreasonable.

The primary case cited by Defendants in support of their argument, *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), is no longer good law.  The *Fait* court held that liability for an allegedly false opinion statement "lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." *Id*. at 110.  But the Supreme Court in *Omnicare* not only held, to the contrary, that a plaintiff may establish liability for even sincerely held opinions by showing that the statement's issuer "lacked the basis for making those statements that a reasonable investor would expect" (*Id*. at 273), the Court reinforced this holding

13

by expressly vacating *Freidus v. ING Groep NV et al.*, 543 F. App'x 93, 95 (2d Cir. 2013), and remanding it to the Second Circuit for reconsideration in light of the standard announced in *Omnicare*.  2015 U.S. LEXIS 2297 (U.S. Mar. 30, 2015). The only issue in the Second Circuit's unpublished *Freidus* ruling that was at issue in *Omnicare* was whether the District Court had erred in dismissing the Complaint on the grounds that plaintiff failed to plausibly allege that defendant did not believe certain statements of opinion.  *Freidus,* 543 F. App'x at 95.  The *Freidus* court's only cited authority for the proposition that dismissal was proper under those circumstances was *Fait,* the very case that Defendant relies upon for the proposition that subjective disbelief is a necessary predicate to liability for opinion statements.  *Id.*  Thus, *Fait* has been overruled and is no longer good law.

Here, the Complaint sufficiently alleges, with support by a well-positioned former employee, that Defendants lacked the basis for making statements regarding the ability of the Company to achieve the growth represented to investors.  *See* ¶38 ("Defendants knew . . . negotiations had failed to achieve a doubling or tripling of 2012 OIBDA results"); 40 ("negotiations for new contract were already faltering"); ¶42 ("WWE was not on track . . . to achieve that financial milestone"); ¶44 ("WWE's market research and analysis did not indicate . . . potential for meaningful subscriber base and a significant opportunity"); ¶46 ("management would recount the same followers many times over to inflate their numbers"); ¶48 ("WWE could not generate the type of advertising revenue that live sports generate"); ¶50 (The Company's number of social media followers were "falsely inflated because it counted the same followers many times over"); ¶52 ("the comparison to NASCAR's lucrative television contract was unfounded"); ¶56 ("NBC would never pay" NASCAR level advertising rates); ¶58 ("WWE's fan base was a fraction of the number presented to the public"); ¶60 ("from the onset other networks had expressed no

14

interest in working with WWE"); ¶62 (WWE was unable "to secure blue-chip sponsors and maintain relationships with advertisers"); ¶65 (statements "directly contrary to the Company's own non-public internal documents"); ¶67 ("management would take the actual number of social media followers and erroneously multiply that number many times over up to the 200+ number"); ¶70 ("NBC was not willing to pay an amount of money for the contract that would come anywhere close to doubling or tripling 2012 OIBDA results"); ¶72 (Defendants "had access to pay-per-view numbers and external research reports which indicated that at most WWE had 4-6 active fans, not 'more than 80 million'").

Thus, under the Supreme Court's new, controlling framework for analyzing opinion statements outlined in *Omnicare*, each of the challenged statements and omissions of opinion outlined in the Complaint is actionable.

### 3. Defendants' Material Misstatements and Omissions Are Not Shielded by the Safe Harbor

The provisions of the PSLRA safe harbor offer Defendants no protection here. The PSLRA's safe harbor provisions apply only to actual forward-looking statements (1) identified as forward-looking statements and accompanied by meaningful cautionary language; or (2) that "the plaintiff fails to prove" were made with actual knowledge of falsity. 15 U.S.C. § 78u- 5(c)(1); *see also In re Regeneron Pharms., Inc. Sec. Litig.*, No 03-3111, 2005 U.S. Dist. LEXIS 1350, at *39 (S.D.N.Y. Feb. 1, 2005). To "avail themselves of safe harbor protection under the 'meaningful cautionary language' prong, Defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information.'" *Slayton v. Am. Express Co.,* 604 F.3d 758, 772 (2d Cir. 2010).

First, the safe harbor does not apply to material omissions. *City of Providence v. Aeropostale, Inc.,* 2013 U.S. Dist. LEXIS 44948  (S.D.N.Y. March 25, 2013); *see also In re*

*Complete Mgmt. Inc. Sec. Litig,* 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 141 (S.D.N.Y. 1999).   Defendants' failure to disclose the truth about the Company's contracts, social media business, and financial projections (¶¶38 – 72), are unprotected by the safe harbor, regardless of whether the statements thereby rendered misleading were actually forward-looking. *See Complete Mgmt*., 153 F. Supp. at 340.   The safe harbor provisions also do not apply to statements of current or historical fact, also as outlined herein above.   Such statements are not deemed to be forward-looking.   *In re Vivendi Universal, S.A. Sec. Litig*., 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("[S]tatements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward looking statements falling within the PSLRA's safe harbor."); *In re Ambac Fin. Group, Inc. Sec. Litig*., 693 F.Supp.2d 241, 272 n.36 (S.D.N.Y. 2010) (The safe harbor "applies only to forward-looking statements," not factual representations.).[4]

Defendants assert that <u>all</u> of their alleged misstatements during the Class Period, as discussed in detail herein above, are "forward-looking" and accompanied by "meaningful cautionary statements."   Defendants appear to argue that the appearance of certain trigger words, *per se*, create or identify forward-looking statements.   They are wrong.   Merely using such words in the Company's Form 10-K does not and indeed cannot "change the assertive nature" of Defendants' statements when viewed in context. *Oxford*, 187 F.R.D. at 141.

Even if Defendants were correct and all of their misstatements were actually forward-looking, they are not protected by the safe harbor because they are not accompanied by

---

[4] At the very least, "mixed" present and future statements are severable. *See Iowa Pub Emps.' Ret. Sys. v. MF Global Ltd.,* 620 F.3d 137, 144 (2d Cir. 2010) ("A statement may contain some elements that look forward and others do not . . . . But in each instance the forward-looking elements and the non-forward-looking are severable.").

"meaningful cautionary statements," and are insufficiently specific to remedy the Defendants' multiple material omissions of fact. *City of Providence,* 2013 U.S. Dist. LEXIS at *32.

Defendants proffer eight purported cautionary "risk factors," which they claim are set forth in the Company's 10-K, dated February 24, 2014 (Defs Br at 59-60), and inoculate against all liability in this case.  But the risk factors are meaningless or generic, and they convey no meaningful information or information everyone already knew about the Company.   Moreover, they provided no warnings to investors of the actual risks and faced by the Company (¶¶37-72), and failed to remedy the Defendants' multiple omissions, telling investors nothing they did not already know.  Indeed, to qualify as meaningful cautionary language, cautionary statements must be "substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 371-72 (3d Cir. 1993). Vague or boilerplate disclaimers will not suffice.  *Schottenfeld Qualified Associates, L.P. v. Workstream*, Inc., No. 05 Civ. 7092 (CLB), 2006 U.S. Dist. LEXIS 96035, 2006 WL 4472318, at *3 (S.D.N.Y. May 3, 2006); *see also Slayton*, 604 F.3d at 772 (*quoting Inst. Investors Group v. Avaya, Inc.,* 564 F.3d at 256)); *see also  Regeneron.,* 2005 U.S. Dist. LEXIS 1350.  Additionally, Defendants have the burden of demonstrating that their cautionary language was not boilerplate and conveyed substantive information." *Slayton,* 604 F.3d at 772

Defendants' purported cautionary language was meaningless. For example, their assertion during the Class Period that "NBC Universal distributed the vast majority of the Company's television programs," (Defs Br. at 60) conveyed nothing to investors. *See*, *e.g.*, *In re Symbol Techs., Inc., Sec. Litig.*, No. 05-CV-3923, 2013 U.S. Dist. LEXIS 171688, at 50-51 (E.D.N.Y. Dec. 5, 2013). The investing public already knew this.  Moreover, investors know that hypothetically anything can go wrong with a given company. Simply stating the obvious tells investors nothing.

Moreover, the Complaint alleges that critical information was available to and omitted by Defendants; and it demonstrates that the misinformation issued by the Company was known by them to be false.  The true nature of the misinformation could be found in CW1 reports or internal, non-public Company documents,[5] which are set forth in great detail in the Complaint.  *See* ¶¶38, 40, 42, 48, 52, 56, 62, 67, and 72.  Forward-looking "statements are not protected where defendants 'had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality.'" *Hall v. Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (quotation omitted); *see also Freudenberg v. E\*Trade Fin. Corp.,* 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) ("Even where the safe harbor is triggered, it does not protect statements made

---

[5] The document entitled "Roadmap to Budget" is alleged to have been created under the direction of the Vice President of the Company's Digital Sales Team. ¶8. Defendants' statement (Defs. Br. at 44) that the document "has nothing to do with WWE's television advertising or the WWE network" is at best a factual question but, given the strong emphasis the Company place on its digital and social media business, is baseless.  Also, Defendants do not deny the document entitled "Audience Demos_Fall 2012" is a Company document but merely complain it lacks context.  To the contrary, the allegations regarding this document support allegations concerning fan base.  The Complaint alleges the document indicates that over 40% of WWE's fan base has an annual household income of less than $40,000, with nearly half those fans earning less than $20,000 per year" ¶11. The cases cited by Defendants concerning these documents are distinguishable. *San Leandro Emergency Med. Plan. v. Phillip Morris,* 75 F.3d. 801 (2d Cir. 1996), dealt with an alleged accounting fraud, and defendants failed to particularize the nature of the projected figures, and an "unsupported general claim of the existence of confidential company . . . reports"). In *Landesbank Baden-Wurttemburg v. Goldman Sachs & Co.*, 821 F. Supp. 2d 616 (S.D.N.Y. 2011), *aff'd*, 478 Fed. App'x 679 (2d Cir. 2012), the court found that the report in question was dated 2007 and, thus, could not support a fraud claim for securities sold in March of 2006.  Further, plaintiffs failed to connect the mortgages in question in the report and those that were part of the fraud allegations. *Id.* at 622.  In *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010), the documents  at issue (an appraisal and a judgment that a property's value supports a particular loan amount) were found not to have supported the allegations because they were not statements of fact, but subjective opinion based on "particular methods and assumptions the appraisal" used, *id.* at 393, and the complaint did not allege that the speaker did not truly hold the opinion at the time made, as required by the Securities Act. *Id.* Further, plaintiffs' quotation from the report was found to be misleading because plaintiffs did not disclose that only twenty-two loans were examined, only some of the appraisals were not in compliance, and there was no suggestion that the loans examined were in the pool in question. *Id.* at 394.

with actual knowledge or falsity."); *Lormand v. U.S. Unwired, Inc.*, 565 F. 3d 228 (5th Cir. 2009) (rejecting a safe harbor defense because plaintiff had adequately pled defendants' actual knowledge and noting that, even if plaintiff had failed to plead actual knowledge, "the safe harbor provision still would not apply here, because the alleged misrepresentations are not accompanied by 'meaningful cautionary language.'"). "[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (*quoting Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99 Civ. 12046, 2001 U.S. Dist. LEXIS 3332, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 27, 2001)).

The purported cautionary language cannot be considered meaningful because Defendants knew that many of the risks were not merely hypothetical but had come to pass and were continuing to occur.  That is what makes Defendants' forward-looking disclosures (if they are indeed forward-looking) misleading.  As Judge Pollack noted some years ago, in the context of the  "bespeaks caution" doctrine (analogous to and a predecessor of the PSLRA's safe harbor provision): "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit." *In re Prudential Securities Inc. Ltd. Partnerships Litigation,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).  This is exactly what happened here.

Accordingly, based on CW1 reports, internal, non-public Company documents, and other detailed allegations set forth in the Complaint, Defendants failed to issue meaningful cautionary statements and, moreover, knew the true undisclosed facts at issue.

### 4. Defendants' Material Misstatements and Omissions Are Not Inactionable Puffery

Defendants claim their alleged misleading statements regarding "the future renegotiation of its television contracts, the future of the WWE Network, and the future of its 2015 OIBDA results" are inactionable "corporate optimism" or so-called "puffery." Def. Br. at 34, 45, 63. In reality, allegations "go beyond claims of mere puffery" where defendants "made specific statements . . . reflecting optimism, knowing they were contrary to the company's actual situation." *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001).[6] *See also Novak v. Kasaks*, 216 F.3d 311, 315 (2d Cir. 2000) (statements that inventory situation was "in good shape" or "under control" when defendants knew the contrary was true were false and misleading) (citation omitted); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 662 (W.D. Tex. 2006) (company "is in an excellent financial position" and has ability to execute "plan for organic growth" are actionable); *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 320 (D.R.I. 2004) ("I see an even stronger organic growth story as we move forward because our businesses have gained a lot of momentum" was materially misleading); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34-35 (D. Mass. 2004) ("Defendants would have been obliged under the circumstances to disclose known facts about the animal studies that undermined their predictions of Soltara's success"); *Manavazian v. ATec Group, Inc.*, 160 F. Supp. 2d 468, 480 (E.D.N.Y. 2001) (business scheme was "framework" for "organic growth" and "blueprint" for "hyper-growth"; and company was "poised for future growth" and occupied a "strategic position in the technology industry" were

---

[6] Puffery means "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Gavish v. Revlon, Inc.*, No. 00-7291, 2004 U.S. Dist. LEXIS 19771, at *61 (S.D.N.Y. Sept. 30, 2004) (citations omitted).

actionable); *In re Quintel Entm't, Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 292-93 (S.D.N.Y. 1999) ("Quintel publicly hyped its unique and exciting partnership . . . as well as its success in decreasing chargebacks; therefore there was a duty to disclose when Quintel received information that rendered that hype misleading."); *In re Computer Associates Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 71 (E.D.N.Y. 1999) (the court found actionable that the company had falsely portrayed itself as a "booming company which was experiencing and would continue to experience rapidly rising sales and profits on its core products and new product offerings, and as a company whose order pipeline was 'strong.'").[7]

The Complaint adequately alleges that Defendants' optimistic statements could not have been further from the truth.   With regard to WWE's negotiation of its U.S. television contract and future OIBDA results, Defendants made specific statements that misled the market.  For example, by stating that "our key initiatives could potentially result in doubling or tripling our 2012 OIBDA results to a range of $125 million to $190 million by 2015," (¶69), Defendants misguided investors and even analysts that lowered ratings of WWE stock and noted "[c]ommon expectations were for a domestic deal worth at least double (and possibly triple) the collective value of expiring deals." ¶22.  As for the impact of the WWE, Defendants' statements that it was only "a USA view" that the WWE Network would not have a "cannibalistic" effect on the Monday Night Raw audience, was materially false and misleading because Defendant McMahon later admitted on May 19, 2014,

---

[7] "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 162 (2d Cir. 2000).  Thus, the trier of fact usually decides the issue of materiality.  *See Basic*, 485 U.S. at 240.  Material facts include information disclosing financial results, "but also facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Klein v. PDG Remediation*, 937 F. Supp. 323, 327 (S.D.N.Y. 1996).

at the close of the Class Period, that the WWE Network "definitely had a negative impact" on negotiations with NBC. ¶54. Moreover, Defendants brazenly lied about their social media presence, a matter to which the investing public would place great significance given well-known, current digital media trends in the marketplace. ¶57 ("[WWE has] 250 million social media followers. That is more than the NBA and all of its teams combined. That's more than the NFL and all of its teams combined. It is an amazing tool for us to reach and engage our audience. The social media chatter on the Network has been through the roof for us globally."]. This was a material misstatement of fact. *See* ¶67 (CW1 reported that "management would take the actual number of social media followers and erroneously multiply that number many times over up to the 200+ number").

Based on the foregoing, Defendants' statements "go beyond claims of mere puffery" because Defendants "made specific statements . . . reflecting optimism, knowing they were contrary to the company's actual situation." *In re Xerox Corp.*, 165 F. Supp. 2d at 218.

### C. Plaintiff Has Alleged Facts Giving Rise to a Strong Inference of Scienter

To state a claim under §10(b), a plaintiff must allege facts providing a strong inference that defendants acted with scienter. *ECA Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (citation omitted). A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Courts are not to engage in a dual inquiry by first sorting through each component of scienter in isolation, but are to review "all the allegations holistically."

*Matrixx*, 131 S. Ct. at 1324.  While a court may consider non-culpable competing inferences, those competing inferences must be derived solely from the four corners of the complaint.  *Tellabs*, 551 U.S. at 324.  If the competing inferences are equally plausible, the complaint should be sustained.  *Id.* at 331; *City of Brockton Ret. Sys. v. Shaw Group. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("the 'tie . . . goes to the plaintiff'"); *Sawant v. Ramsey*, 570 F. Supp. 2d 336, 343-44 (D. Conn. 2008).  "Whether respondents can ultimately prove their allegations and establish scienter is an altogether different question."  *Matrixx,* 131 S. Ct. at 1325.  As detailed herein, the collective inference of scienter weighs in Plaintiffs' favor.[8]  Defendants' purported innocent explanation (WWE's legitimate and genuine optimism about its future prospects) for their fraudulent actions is not plausible, as it is completely contrary to the well-pleaded facts alleged in the Complaint.

### 1.    CW1 and Internal Documents Corroborate Defendants' Scienter

Plaintiff has alleged numerous facts raising a strong inference of scienter for Defendants through "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 199.  Such an inference may be drawn where defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor."  *Id.*  The Complaint's allegations are corroborated by CW1, who worked as Vice President of WWE's global digital advertising sales team from December 2010 to January 2014. ¶8.  CW1's clear and coherent account strongly supports the

---

[8] Moreover, scienter is imputed to WWE for the acts of the Individual Defendants.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc*., 531 F.3d 190, 195 (2d Cir. 2008) ("It is possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1088 (N.D. Cal. 2001) ("So long as scienter is appropriately alleged for the officers and directors of a company, then it is appropriately alleged for the company itself.").

inference of Defendants' scienter during the Class Period.  *Novak v. Kasaks*, 216 F.3d at 314.

CW1 stated that he attended exclusive meetings during the Class Period held only for the top 1% of WWE management, which were also attended by defendants McMahon, Barrios and Wilson.  CW1 asserted that at one of the finance meetings (in which they discussed specific advertising revenue issues for the fourth quarter ending December 31, 2013), he told defendant Barrios that he projected advertising revenues would decrease by nearly ten million in 2014 and that on no less than two occasions, he spoke to defendant Wilson about the millions that would be lost in advertising revenues.  In response, defendant Barrios told CW1 that the revenue forecasts would not be altered.  ¶¶8, 13.  *See Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (upholding scienter based on meetings with defendants "to discuss the difficulties").  Internal, non-public documents confirm CW1's account that Defendants knew that WWE's audience (largely younger, low income and low education) had a negative impact on advertising revenue with repeat advertisers, ¶¶10-11, which in turn would have a material impact on WWE's ability to secure a lucrative television contract.

Further, according to CW1, Defendants knew or recklessly disregarded that WWE could not generate the type of advertising revenue that live sports generate, although they repeatedly told investors otherwise.  CW1 stated that one of the problems was that WWE did not accommodate sponsors like live sports did (including simply dropping sponsors), which drove away business.  ¶12.  In order for a network to enter into a $400 million annual deal (like the one NASCAR negotiated with NBC), with WWE, the Company would have needed to generate four times more per advertising spot, which was not possible." *See* ¶¶42 (according to CW1, both Defendants and the networks knew that this was not possible, including NBC), 52, 62 (CW1 attended meetings with defendant Barrios where WWE's inability to secure bluechip sponsors and maintain

24

relationships with advertisers were discussed). *See Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *68 (finding that allegations of defendants' knowledge of facts or access to contradictory information are sufficient to give rise to a strong inference of scienter).

CW1 maintained that another reason that networks would not pay premium for WWE licensing rights, as Defendants portrayed to investors would happen, was that the networks (including NBC) knew that WWE's fan base, as represented to the public by Defendants, was significantly inflated to convey a larger audience for the Company.  ¶¶6, 14.  According to CW1, this was confirmed by WWE's own internal research studies (as well as third party research) demonstrating that the actual fan base was a fraction of what was represented, ¶¶16, 44 (CW1 stated that defendants Barrios and McMahon knew the actual real figures, hidden from investors, because they had access to research reports regarding viewers and related data and because it was a regular topic of discussion), This was further confirmed by the fact that CW1 was repeatedly approached by defendant Wilson to present false viewership data to potential sponsors, which he refused to do.  ¶¶8, 16, 50.   As affirmed by CW1, Defendants were aware that NBC and the other networks knew the truth regarding the fan base size, which investors did not, because Defendants reviewed weekly viewership numbers.   The fan base size would directly impact how much the networks were willing to pay for the licensing contract, ¶¶14, 44, and that price would not "double or triple" WWE's operating income.  ¶38 (CW1 stated that he and other WWE employees "literally laughed" at the notion of WWE getting a deal worth two to three times more than the then-current deal when that statement was made because no network would ever pay that much).[9]  *See, e.g.,*

---

[9] *Compare Nakkhumpun v. Taylor*, No. 14-1060, 2015 U.S. App. LEXIS 5547, at *21 (10th Cir. Apr. 7, 2015) ("The defendants' explanation does not preclude a reasonable inference of recklessness. According to the defendants, they were attempting to entice potential strategic partners to consider a partnership with Delta. Because the defendants knew that strategic partners would conduct their own due diligence and would not ultimately rely on a $400 million valuation,

*Symbol Techs.,* 2013 U.S. Dist. LEXIS 171688, at *36 ("alleg[ations] that the Individual Defendants had access to and reviewed inflated sales projections because the inflated 'projections were forecasted through the sales department, consolidated by management, and 'rolled [out] . . . to the public''" gave rise to strong inference of scienter for each of the Individual Defendants); *In re Dynex Cap. Inc. Sec. Litig.,* No. 05-1897, 2009 U.S. Dist. LEXIS 96527, at *41-*51 (S.D.N.Y. Oct. 19, 2009) ("The SAC adequately alleges specific facts that were available to and reviewed by the senior management responsible for the public statements at issue that either put them on notice of the falsity of those statements or clearly should have done so.").

Additionally, CW1 confirmed that by October 13, 2013, the start of the Class Period, Defendants (defendants Barrios and Wilson were two of the lead negotiators for WWE) had already met with NBC regarding negotiating its new licensing deal (the negotiations began around May 2013, about a year before the expiration of the previous deal, ¶18), and NBC would not offer even close to an amount that would allow WWE to "double or triple" its operating income, ¶¶9, 18, which is the reason NBC allowed its exclusive negotiating window to expire.[10]   WWE also

---

the defendants imply that they did not intend to mislead anyone. But, the press release was directed to the public, not just to strategic partners. And, shareholders might not have the benefit of due diligence to assess Opon's $400 million valuation. Therefore, Mr. Taylor's statement created a risk of misleading shareholders . . .").

[10] The fact that CW1 left (on January 16, 2014) before WWE announced that it had concluded its negotiations with NBC does not discount his reliability or his knowledge base. He was there from the beginning of the negotiations in May 2013, was still there when NBC and WWE had already met about the renegotiation of the contract, and was still working for the Company in January 7, 2014, by which time WWE insiders knew that no network would pay WWE even close to the amount Defendants had led the market to expect.  *See, e.g., In re 21st Century Holding Co. Sec. Litig.,* No. 07-61057, 2008 U.S. Dist. LEXIS 108196, at *19 (S.D. Fla. Nov. 7, 2008) (relying on allegations from pre-class period to sustain complaint).  *See also In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001) (reversing district court for faulting plaintiffs for using pre-class period information "to establish that at the start of the class period, defendants had a basis for knowing" certain information, noting that "[a]ny information that sheds light on whether class period statements were false and misleading is relevant.");  *Inst. Investors Group v. Avaya,* 564

approached every other network about picking up the contract, but no one took the bait from the outset because, according to CW1, WWE was deemed less valuable by networks than Defendants represented to investors and categorically less valuable than live sports, as discussed herein.  ¶¶9, 18, 19.  This was also confirmed by an internal company presentation that shows that management knew that WWE was in a different league than live sports and would not get the same financial commitment from networks.  ¶17.[11]

Importantly, according to CW1, and as belatedly admitted by defendant McMahon after the Class Period,[12] WWE detrimentally impacted its negotiations with NBC by premiering the subscription-based WWE Network on February 24, 2014, ¶¶76, 77, although Defendants maintained during the Class Period that the launch would not have an adverse effect on the negotiations.  ¶20 (the impact was due to the same exact shows being aired pursuant to the licensing contract and then subsequently aired on the WWE network).

### 2.    The Importance of Television Licensing Contract Support Scienter for the High-Level Individual Defendants

Defendants' high-level positions at WWE, the importance of securing a lucrative, long-term television license contract to the Company's operating income, as well as the proximity of the misleading statements to the disclosure on May 15, 2014, provide additional support for inferring Defendants' scienter.  *See, e.g., Silverman v. Motorola, Inc.*, No. 07-4507, 2008 U.S.

---

F.3d 242, 249, n.13 (3d Cir. 2009) ("[B]oth post-class period and pre-class data could be used to confirm what a defendant should have known during the class period.").

[11] Analyst reports confirm that the NBC deal was not in line with WWE's statements to investors during the Class Period.  ¶22 (detailing various analyst reports issues soon after the deal was announced).

[12] *See also Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (W.D. Wash. 2006) ("The Court concludes that the Complaint adequately alleges that the 10-Q and SOX 302 certifications for third quarter 2002 through third quarter 2004 were false or misleading based on the disclosure in 2005 that there were material weaknesses in Cray's internal controls and procedures.").

Dist. LEXIS 76799, at *40 (N.D. Ill. Sept. 23, 2008) ("it is almost inconceivable that these defendants [corporate executives] were not aware of the production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company").[13]  As one court has explained, while position alone is not enough to plead scienter,

> High level corporate officers who signed SEC filings containing the company's financial statement have a duty to familiarize themselves with the facts relevant to the core operations of the company and the financial reporting of those operations. Such officers may not ignore reasonably available data that would indicate that the statements they issued regarding the company's finances were materially false or misleading.

*In re Winstar Commc'ns*, No. 01-3014, 2006 U.S. Dist. LEXIS 7618, at *23 (S.D.N.Y. Feb. 24, 2006).

Here, Defendants (excluding 20A defendant McMahon Levesque) were WWE's highest-level executives: defendant McMahon was Chairman of the Board and CEO, as well as the co-founder of WWE; defendant Barrios was WWE's Chief Strategy & Financial Officer and CFO; and defendant Wilson was WWE's Chief Revenue & Marketing Officer.  ¶¶32-34.[14]  Importantly,

---

[13]  *See also In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) ("the Fund's liquidity crisis and corresponding inability to satisfy redemption requests went to the Fund's 'core operations' and were of critical importance to the Fund, its investment adviser, RMCI, and management distributor"; "Accurate information concerning the level of redemptions and the Fund's resulting liquidity crisis – information that contradicts or undermines Defendants' assurances as outlined in the Complaint – was available on September 15 and was apparent, or should have been apparent to the Bents and other senior [ ] officers at the time the alleged false statements and omissions took place.").

[14]  Defendants' desire to protect their positions in the Company, especially defendant McMahon who co-founded the Company, also weighs in favor of the scienter inference.  *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp*., 320 F.3d 920, 944 (9th Cir. 2003); *see also In re Telxon Corp. Sec. Litig*., No. 5:98-2876, 2000 U.S. Dist. LEXIS 20192, at *53-*54 (N.D. Ohio Sept. 29, 2000) ("the Court cannot ignore the fact that Telxon and its officers were in a very difficult position, facing unusual pressures to perform during the class period, and stood to benefit substantially from a performance record which matched the healthy ones Brick continually projected to the public. The Court finds these allegations to be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred . . . when considered in tandem").

a new television license agreement, according to Defendants during the Class Period, was supposed to allow WWE to "double or triple" its operating income and transform the Company's earnings profile.  ¶¶5, 21.  Thus, the plausible inference is that Defendants knew every aspect of the chain of events in the negotiations of the Company's key content agreements (including with NBC, especially because defendants Barrios and Wilson were two of the lead negotiators with NBC) and the factors that would impact its value (*i.e.* advertising revenue, fan base) because the agreement was pivotal to the Company's future financial success.  *See, e.g., Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 871 (S.D.N.Y. 2011) (the "core operations" inference allows courts to impute knowledge of facts to "key officers" relating to the "core operations" of their company); *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 389 (S.D.N.Y. 2011) (because officers "have a duty to familiarize themselves with the core operations of the company," scienter imputed to CEO and CFO given magnitude of fraud related to mark-downs, the fact that they signed the 10-Q, and their duty to familiarize themselves with the mark-downs) (collecting cases); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001) (courts reasonably assume "that principal managers [ ] are aware of matters central to that business's operation").  *See also Makor Issues and Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (the pleading was sufficient to show scienter by top officers, regardless of the evidence tying them to the statements' preparation, because the fraud centered on statements central to the Company's profitability).[15]

---

[15] *See also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (strong inference was raised that directors had knowledge of restrictions that eliminated a "potentially significant source of income"); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006) ("knowledge of contradictory information [may] be imputed to individual defendants" if the statements involve matters that are "sufficiently significant" to the company).

However, even if Defendants did not inform themselves of every aspect of the negotiations, then their Class Period statements were made without a reasonable basis and constitute recklessness. *In re Pall Corp.*, No. 07-3359, 2009 U.S. Dist. LEXIS 88240, at *21 (E.D.N.Y. Sept. 21, 2009) ("so even if Defendants were unaware of information demonstrating that the financial statements were false, and even if the tax code is a complex subject, as Defendants argue, Plaintiffs have sufficiently established, for purposes of surviving this 12(b)(6) motion, that Defendants should have familiarized themselves with the facts relevant to tax and accounting practices to ensure that the SEC filings they signed were truthful and accurate").

### 3. Defendant McMahon's Admissions Support a Strong Inference of Fraud

On a May 19, 2014 conference call, defendant McMahon confirmed that WWE had not provided investors with an accurate portrayal of negotiations with NBC:

> [W]e announced our television deal with NBC last Friday, and tried to give you a degree of transparency as far as our network was concerned, the WWE network. And maybe we gave you too much information, or maybe not enough… But in the interest of transparency, that's why we're having this call, to clear up some degree of perhaps misunderstanding of what we're trying to do. We've always prided ourselves on being transparent, and hopefully today we can give a little bit more light during these lines.

Amended Complaint at ¶7.

McMahon also politely confirmed that the launch of the WWE network "definitely had a negative impact" on negotiations with NBC. These admissions support a strong inference of scienter for all defendants. *See, e.g., Chalverus v. Pegasys, Inc.*, 59 F. Supp. 2d 226, 233 (D. Mass. 1999) (Plaintiff may rely on the defendant's own disclosures . . . to allege that previously-made statements . . . were materially false or misleading." These admissions confirm the allegations based on CW1 and internal documents of the true state of affairs during the Class Period.

### 4. The Close Proximity of False Statements To the Revelation of the Truth Supports Scienter

The proximity of the misleading statements and the disclosure on May 15, 2014 evidences scienter. On May 1, 2014, just two weeks before the end of the Class Period, Defendants held an earnings call with analysts in which defendant Barrios made material false and misleading statements regarding the licensing negotiations and WWE's fan base. ¶¶69-72. The short time period between the misstatements and the disclosure of the true value of the Company's television licensing agreement with NBC further evidences scienter. *Berson v. Applied Signal Tech.*, Inc., 527 F.3d 982, 988 n.5 (9th Cir. 2008) (finding temporal proximity can "bolster" the inference of scienter); *Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 9 (1st Cir. 2006) ("[A] short time period between an alleged misstatement and a later disclosure of inconsistent information may be relevant to the question of scienter."); *Novak,* 216 F.3d at 312-13. ("[T]he complaint provides specific facts concerning the Company's significant write-off of inventory directly following the Class Period, which tends to support the plaintiffs' contention that inventory was seriously overvalued at the time [of the] statements").

### 5. Defendants' Strong Motives To Commit Fraud

Notwithstanding Defendants' arguments to the contrary, Def. Br. at 47, Plaintiffs need not allege motive at all to successfully state a claim. *Tellabs*, 551 U.S. at 325 ("[A]bsence of a motive allegation is not fatal."); *see also Freudenberg*, 712 F. Supp. 2d at 200 (pecuniary motive not required to plead scienter). A strong inference of scienter can be established even if Defendants did not sell stock during the Class Period. *Tellabs*, 551 U.S. at 325; *Pirraglia v. Novell, Inc*., 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not . . . infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors."); *No. 84 Employer-Teamster,* 320 F.3d at 944 (same), *see also Makor*, 513 F.3d at 510 (argument that defendants could have no

31

motive if they did not profit from the fraud "confuses expected with realized benefits"; defendant may have thought that a high risk gamble "would right itself"; "it is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing").

Here, Plaintiffs allege that defendant McMahon's daughter, defendant McMahon Levesque,[16] who has been the Chief Brand Officer since December 2013, sold 441,671 shares of her WWE stock for a total of $6,174,551.02,[17] under her married surname instead of her commonly-used maiden name, while in possession of adverse, material, non-public information. ¶¶23, 111, 112.[18]  Defendants argue that because defendant McMahon Levesque's shares were sold pursuant to a 10b5-1 plan, they are not suspicious.  Def. Br. at 49.[19]  However, the use of a trading plan is an affirmative defense that is inappropriate to consider on a motion to dismiss.

---

[16] Defendant Levesque is named only in the Section 20A count.

[17] While motive need not be alleged at all, smaller stock sales than those alleged here have been found to support a strong inference of scienter.  *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (sale of 175,000 shares, earning $3.5 million, was a large amount of insider trading, which in combination with timing of misrepresentations, satisfied scienter); *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994) ($760,599); *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 366 (S.D.N.Y. 2003) ("[B]ecause of the magnitude of the proceeds – ranging from $220,000 to $40,000,000 – it is fair to infer that the sales were 'unusual,' and therefore satisfy the motive prong at this stage."); *Oxford*, 187 F.R.D. at 140 (finding that profits of $1.7 million for one defendant and $621,000 for another to be "suspicious" sales); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996); *In re MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 980 n.4 (E.D.N.Y. 1995) (stock sales by one defendant of approximately 8,000 shares for profit of $173,000 raised strong inference of fraudulent intent).

[18] Defendants assert that Plaintiffs "falsely characterized" defendant McMahon Levesque as a member of the WWE board and state that she sold every single share of her WWE stock.  Def. Br. at 49.  In fact, however, Plaintiffs never alleged she was a member of the board during the Class Period.  As of the filing of the Complaint, however, as Defendants admit, she was a member of the board.  Def. Br. at 51.  Moreover, Plaintiffs corrected the allegation that she sold every single share, as Defendants admit.  *Id.*; *see also* Def. Br. at 6 n.2.

[19] *See In re APAC Teleservice, Inc. Sec. Litig.,* No. 97-9145, 1999 U.S. Dist. LEXIS 17908, at *22 (S.D.N.Y. Nov. 19, 1999) (factual issues concerning whether insider trading was done at suspicious times and/or in suspicious amounts should not be considered on a motion to dismiss).

Plaintiff is not required to negate an affirmative defense in the Complaint.  *See Stocke v. Shuffle*

*Master, Inc.,* 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009); *Malin v. XL Capital Ltd.*, 499 F. Supp.

2d 117, 156 (D. Conn. 2007) ("Because it is questionable whether the trading plans should be

considered and because issues of fact remain with regard to the trading plans, the Court will not

consider them."); *In re Cardinal Health, Inc. Sec. Litig.,* 426 F. Supp. 2d 688, 734 (S.D. Ohio

2006) ("As it is typically premature to raise affirmative defenses in a motion to dismiss, this Court

will not consider the impact of [the defendant's] purported 10b5-1 trading plan at this stage of the

pleadings.").[20]   As a result, such an affirmative defense does not defeat the inference of scienter

created by allegations of Defendant McMahon Levesque's insider sales during the Class Period.

*See In re InfoSonics Corp. Derivative Litig.*, No. 06-1336, 2007 U.S. Dist. LEXIS 66043, at *24-

*25 (S.D. Cal. Sept. 4, 2007) ("However, whether these trading plans were legitimately adopted

or were put in place after learning of material, nonpublic information that could affect the price of

stock, can not be resolved at the pleading stage."); *In re EVCI Colls. Holding Corp. Secs Litig*.,

469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) ("The fact that there might be an innocent explanation

for the timing of [defendant]'s sale is not enough to defeat the inference of scienter that arises from

plaintiffs' well-pleaded allegations – which, as defendants keep forgetting, I must accept as true

for purposes of this motion to dismiss." ).[21]   Additionally, the fact that defendant McMahon

---

[20] Defendants' alleged affirmative defense is not apparent on the face of the Complaint because
Defendants must prove, after discovery, that the plan was entered into in good faith and before the
insider became aware of material nonpublic information (and must prove that the plan specified
sufficient detail regarding the insider's future trading allowance and method).  *See* SEC Release
No. 34- 43154; *see also In re Fannie Mae Sec*., 503 F. Supp. 2d 25, 48 (D.D.C. 2007) (the court
could not determine "from the face of the pleadings" whether criteria required by Rule 10b5-1 had
been "sufficiently satisfied to establish this affirmative defense" by mere adoption of a 10b5-1
trading plan).

[21] Defendants also argue that there is "nothing at all suspicious about her trading" because
defendant McMahon Levesque's trading ended "nearly four months before the television
negotiations concluded and before the WWE network was even launched." Def. Br. at 50.

Levesque sold only a fraction of her shares does not making the sales less suspicious.  Courts have held that stock sales can be suspicious even when insiders did not sell a significant portion of their holdings.  *See, e.g., Middlesex Ret. Sys. v. Quest Software Inc*., 527 F. Supp. 2d 1164, 1186 (C.D. Cal. 2007) ("Thus, the fact that Plaintiff has not alleged that Defendants sold large percentages of their stock is without consequence. Because Plaintiff has pled the amount of stock sales with the appropriate degree of specificity, and the amount is substantial enough to justify an inference of motive, this sub-factor leans in favor of finding the stock sales 'suspicious.'").  Moreover, although defendant McMahon Levesque sold at various points before the Class Period, her trades before the Class Period were at prices of between $9.096 and $10.89 per share, while she traded at prices of $12.76 per share and up to $16.07 per share during the Class Period, and thus, benefited from the price inflation of the stock due to the false and/or misleading statements being issued to the public. Def. Ex. 26.

Further, particularized corporate motives can also demonstrate scienter.  Here, Defendants had a substantial motive to make false and/or misleading statements to convey a larger market value for the Company to be able to transform the Company's earning profile and "double or triple" its operating income.  *See*, *e.g*., *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-5571,

---

However, the Complaint alleges that defendant McMahon Levesque sold during the Class Period, including on December 2, 2013, December 3, 2013, December 4, 2013, December 5, 2013, December 6, 2013, as well as on January 6, 2014 and January 7, 2013, ¶112, when false and/or misleading statements were being made and the stock was inflated.  By October 13, 2013, the start of the Class Period, Defendants had already met with NBC about renegotiating its television licensing deal and knew, or recklessly disregarded, that NBC would not willing to offer WWE much more money.  ¶9.  Indeed, the negotiations began about a year before the contract was about to expire (around May 2013).  Plaintiff also alleges that by January 7, 2014, it was clear to WWE insiders that no network would pay WWE even close to the amount Defendants had misled the market to expect.  ¶23.  Finally, the Complaint alleges various meetings that occurred during the Class Period regarding advertising revenue issues, *e.g.,* ¶13, as well as internal reports, *e.g*., ¶17, that showed that Defendants were aware that their Class Period statements were false and/or misleading when made.

2004 U.S. Dist. LEXIS 7015, at *28-*29 (S.D.N.Y. Apr. 22, 2004) (finding scienter where defendants were motivated to engage in fraud to expand their enterprise); *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648-49 (E.D. Va. 2000) (particularized allegations that company was "further motivated [by a desire] . . . to portray the Company favorably with actual and potential creditors [in this case, sponsors] from whom MicroStrategy needed to borrow funds" was sufficient to plead motive); *see also In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ("However, the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement."); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (finding scienter where defendants knowingly made false statements in order to inflate its share price to acquire other companies).

Thus, when the overwhelming indicia of scienter is considered, as it must be, in its totality, it is clear that Plaintiffs have pled cogent and compelling facts that give rise to a strong inference of Defendants' scienter.

### E. Plaintiff Has Adequately Pleaded Loss Causation

Plaintiff has pleaded causation here. In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court explained that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47 (citations omitted); *see also Cellular Tech. Servs. Co. v. TruePosition, Inc*., 609 F. Supp. 2d 223 (D. Conn. 2009) ("the pleading of causation is governed by Rule 8"). There is no heightened standard for pleading loss causation. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008). For pleading purposes, loss causation exists "if the risk that caused

the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

Despite Defendants' assertions to the contrary, a "corrective disclosure" is not required under this Court's post-*Dura* case law. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss") citing Second Circuit cases). A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices. *Id.* at 307. *See also Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 624 (S.D.N.Y. 2008) (loss causation satisfied by allegations that plaintiff's loss was caused by foreseeable materialization of concealed risk of fund's undercapitalization).

Moreover, neither the Supreme Court in *Dura* nor any other court addressing the loss causation pleading standard require a corrective disclosure be a "mirror image" tantamount to a confession of fraud. *See In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ("a disclosure . . . can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity"). Because corporate wrongdoers rarely admit that they committed fraud, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the ***underlying circumstance that is concealed or misstated.***" *Lentell*, 396 F.3d at 173 (emphasis added).[22] Thus, the "relevant truth" required under *Dura* is not that a fraud was committed *per se*, but that the "truth" about the

---

[22] *See also Nursing Home Pension Fund v. Oracle Corp.*, No. 01-00988, 2006 U.S. Dist. LEXIS 94470, at *35 (N.D. Cal. Dec. 20, 2006) (*Dura* does not require a corrective disclosure); *In re Loewen Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 218 (E.D. Pa. 2005) ("'loss causation does not . . . require a corrective disclosure followed by a decline in price.'") (citation omitted); *In re Bristol Myers Squibb*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448, at *57 (D.N.J. Aug. 17, 2005) (case law does ***not*** "stand for the general proposition that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud").

company's underlying condition, when revealed, causes the "economic loss."

Here, the materialization of concealed risks and information regarding the true value of the Company's key content agreements suffices to plead loss causation. *See Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F. 3d 189, 198-99 (2d Cir. 2003) (cited with approval in *Dura*, 544 U.S. at 344-45). Defendants' odd argument that the May 15, 2014 price drop was due to a "new fact" rather than a corrective disclosure, Def. Br. at 53-54, seeks to inject an inappropriate issue of fact at this juncture and is not supported by the Complaint.[23] Moreover, the circumstances which Defendants mischaracterize as a new fact[24] actually corrected misstatements and/or materialized concealed risks, concerning WWE's ability to multiply and transform the Company's earning profile through the negotiation of a new, lucrative, long-term television license contract. On May 15, 2014, after the market closed, WWE issued a press release informing the market that the deal with NBC was worth a fraction of what Defendants had led the market to expect during the Class Period, as confirmed by analyst reports. ¶¶21, 22. As alleged in the Complaint, Defendants stated during the Class Period that the renegotiated television rights deal would allow WWE to "double or triple" its operating income, when in fact, as revealed on May 15, 2014, the actual value increase was only 40%. *Id.*[25] *See also* ¶¶22, 74, 75. As a result, WWE's

---

[23] Due to the highly fact-intensive nature of the loss causation analysis, it is widely accepted by many courts that a dismissal based on a failure to allege loss causation is not appropriate on a motion to dismiss. *See Emergent*, 343 F.3d at 197 (2d Cir. 2003) (loss causation "need not be decided on a Rule 12(b)(6) motion to dismiss").

[24] Further, it is well established that other contributing forces to the loss will not bar recovery under the loss causation requirement. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("[a] plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation."); *In re Charles Schwab Corp. Sec. Litig.*, No. 08-01510, 2009 U.S. Dist. LEXIS 8125, at *20 (N.D. Cal. Feb. 4, 2009); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) ("whether the decline was attributable to some other cause . . . is a matter for proof at trial.").

[25] *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261 (S.D.N.Y. 2005), Def. Br. at 53, does not lead to a different result. The court there stated that "to establish loss causation, 'a plaintiff

stock plummeted 43% on high trading volume.  *Id.* at ¶75.[26]  *See Nakkhumpun*, 2015 U.S. App. LEXIS 5547, at *24-*25 ("The July 2010 statement concealed the risk that the Vega Area assets were not marketable for $400 million. . . . But, this risk would not have been apparent to anyone following Delta's progress reports and Mr. Taylor's explanation for the impasse. . . . At this point, investors learned that no other buyer had offered an adequate price. Thus, the market became aware that the 37.5% interest was not marketable at or near $400 million.")

### E.   Plaintiff Adequately Alleges The Section 20A Claim Against Defendant McMahon Levesque

Section 20A of the Exchange Act states:

> Any person *who violates any provision of this title* [15 USCS §§ 78a et seq.] or the rules or regulations thereunder *by purchasing or selling a security while in possession of material, nonpublic information* shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

*See* 15 U.S.C. §78t-1(a) (emphasis added).  *See also Lamie v. United States Tr.*, 540 U.S. 526, 536 (2004) (interpreting statute by looking at its plain meaning).   The plain meaning of Section 20A requires only a predicate Exchange Act violation by someone, the violation does not have to be by the Section 20A defendant.  Thus, once the insider illegally sells, Section 20A provides standing to assert a private right of action for those illegal insider sales to those who contemporaneously

---

[26] must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 266 (internal citations omitted).   Here, Plaintiff has done just that by linking the announcement of the true value of its deal with NBC with the false and/or misleading statements during the Class Period regarding its television licensing negotiations and its ability to secure a lucrative television contract that would double or triple its operating income and transform the Company's earning profile.

[26] *Dalberth v. Xerox Corp.*, 766 F.3d 172, 174 (2d Cir. 2014), cited by Defendants, Def. Br. at 53, is inapposite because the loss causation issue there was dealt with on a summary judgment motion, not at the motion to dismiss stage.

purchase while the insider is selling and the remedy that may be sought.[27]

The Complaint specifically alleges that defendant McMahon Levesque (a WWE insider) personally profited by selling approximately 441,671 shares of WWE securities while in possession of adverse, material non-public information about WWE, acquiring a total of approximately $6,174,551.02 in illegal trading proceeds.  ¶¶23, 36, 111-14.  The Complaint also alleges Exchange Act violations by Defendants through the materially false and/or misleading statements issued during the Class Period.   Furthermore, Plaintiff has also met the contemporaneous trading requirement, ¶112,[28] and, thus, has adequately alleged a Section 20A claim.

Defendants assert that the Section 20A claim should be dismissed because defendant McMahon Levesque sold pursuant to a 10b5-1 plan, that she sold a fraction of her shares, and that she was not a director until after the Class Period ended.  Def. Br. at 62.  The fact that defendant McMahon Levesque was not a director until after the Class Period is irrelevant to the analysis, as she was still a Company insider (she was Chief Brand Officer since December 2013 and worked for the Company since 1998).  ¶36.  *See also United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (describing the meaning of a corporate insider).   As discussed in previous sections, Defendants' assertion that defendant McMahon Levesque traded pursuant to a 10b5-1 plan is a fact-based affirmative defense inappropriate for resolution on a motion to dismiss.  Defendants must prove, after discovery, that the 10b5-1 plan was entered into in good faith and before the insider became aware of material nonpublic information and must prove that the plan specified sufficient detail

---

[27] Further, an insider's trading while in possession of material non-public information is, itself, a §10(b) violation, *United States v. O'Hagan*, 521 U.S. 642, 651, (1997), as well Rule 10b-5.

[28] Defendants do not dispute that the Complaint alleges that Lead Plaintiff traded contemporaneously with defendant McMahon Levesque, nor could they.

regarding defendant McMahon Levesque's future trading allowances and methods.  *See, e.g.*, *In re Able Labs. Sec. Litig.*, No. 05-2681, 2008 U.S. Dist. LEXIS 23538, at *102-*103 n.40 (D.N.J. Mar. 24, 2008) ("Therefore, a 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith. Not only can this Court not make such factual findings when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party. Therefore, this Court cannot infer that Wadekar acted in good faith in adopting his 10b5-1 plan. The trade cannot be immunized from liability."); *InfoSonics*, 2007 U.S. Dist. LEXIS 66043, at *24-*25; *Cardinal Health*, 426 F. Supp. 2d at 734; *APAC*, 1999 U.S. Dist. LEXIS 17908, at *22.  Further, as previously explained, courts have held that stock sales can be suspicious even when insiders did not sell a significant portion of their holdings.  *See Middlesex*, 527 F. Supp. 2d at 1186 (C.D. Cal. 2007).

### F.  Plaintiff Has Adequately Pleaded 20(a) Control Person Liability Against Defendants McMahon, Barrios, and Wilson

Defendants assert Plaintiffs have no claim for control person liability because the Complaint purportedly fails to allege a primary violation.  Def. Br. at 63.  Further, although Defendants do not challenge that McMahon and Barrios are controlling persons, they argue that there are no well-pled allegations that defendant Wilson is a controlling person as to statements made by others.  *Id.*[29]  However, the preceding sections of this memorandum defeat any contention the Complaint fails to state primary violations of §10(b) by each Defendant, including WWE.[30]

---

[29] As discussed herein, defendant Wilson also made materially false and/or misleading statements during the Class Period.  *See* ¶51.

[30] Because a primary violation has been established, the Section 20(b) claims should be sustained as well.  *See* ¶¶105-08. Defendants do not cite a single case for their argument that there is no private right of action for a Section 20(b) claim.  Def. Br. at 63.  *But see, e.g.*, *Janus Capital Group, Inc. v. First Deriv. Traders*, 131 S. Ct. 2296, 2311 (2011) ("If the majority believes, as its footnote hints, that § 20(b) could provide a basis for liability in this case . . . then it should remand the case for possible amendment of the complaint.") (Breyer, J., dissenting); *Union Cent. Life Ins. Co. v.*

Further, the Complaint alleges that defendant Wilson acted as a controlling person of WWE within the meaning of Section 20(a).  *See* ¶¶8 (attended exclusive meetings held only for the top 1% of the Company where CW1 spoke to her about losses in advertising revenues; asked CW1 to represent false data to sponsors); 18 (was one of the lead negotiators on the NBC deal); 72 (access to pay-per-view numbers and internal and external reports regarding the actual number of the fan base); 102 (control established by, *inter alia*, attendance at high-level meetings, high-level position (Chief Revenue & Marketing Officer), ownership and contractual rights, direct and supervisory involvement in the day-to-day operations, participation in and/or awareness of WWE's operations and/or knowledge of the false financial statements, and access to reports, press releases, public filings and other statements); *see also* ¶¶13, 16, 34, 46, 50, 51.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.  In the event that all or any portion of Defendants' motion to dismiss is granted, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. Rule 15.  If any statements or omissions of opinion are dismissed, leave to replead is proper in light of new guidance and new controlling precedent in *Omnicare*.

---

*Credit Suisse Sec. (USA), LLC*, No. 11-2327, 2014 U.S. Dist. LEXIS 173613, at *19-*20 (S.D.N.Y. Dec. 10, 2014) (bringing Section 20(b) claim); *Tinsley v. Fleetboston Fin. Corp*., No. 2:01-215, 2001 U.S. Dist. LEXIS 25103, at *9-*10 (E.D. Va. July 17, 2001) (same); *Cohen v. Citibank, N.A.,* 954 F. Supp. 621, 629-30 (S.D.N.Y. 1996) (same).

Dated: April 30, 2015

    <u>/s/ Kim E. Miller</u>

**KAHN SWICK & FOTI, LLC**
KIM E. MILLER
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
kim.miller@ksfcounsel.com

*-and-*

Lewis S. Kahn
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Mohsin Ansari*

**BROWER PIVEN**, A Professional Corporation
David A.P. Brower
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300
brower@browerpiven.com

*-and-*

Charles J. Piven
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300
piven@browerpiven.com

*Additional Counsel for Plaintiffs*

**IZARD NOBEL LLP**
Mark P. Kindall (#ct13797)
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
mkindall@izardnobel.com

**ROME McGUIGAN, P.C.**
Jeffrey L. Ment (# ct12299)
Jonathan Chappell (# ct27237)
1 State Street, 13th Floor
Hartford, CT 06103
Telephone: (860) 549-1000
Fax: (860) 724-3921
jment@rms-law.com
jchappell@rms-law.com

*Local Counsel for Lead Plaintiff Mohsin Ansari*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date a copy of the foregoing Opposition to Defendants' Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic service. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system. For parties who have not registered with the Court's CM/ECF system, a copy will be sent by first class mail, postage pre-paid, as follows:

Mr. Warren Ganeus
18602 Redrock Woods
San Antonio, TX 78259

Mr. Dominic Varriale
77 Alandale Drive
North Haven, CT 06473

\s\ Mark P. Kindall
Mark P. Kindall