# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE WORLD WRESTLING ENTERTAINMENT, INC. SECURITIES LITIGATION | Civil No. 14c1070 (AWT) |

# DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. MCMAHON, GEORGE A. BARRIOS, MICHELLE D. WILSON, AND STEPHANIE MCMAHON LEVESQUE TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Jerry S. McDevitt (*pro hac vice*)
K&L Gates LLP
210 Sixth Avenue
Pittsburgh, PA 15222-2613
Telephone: 412 355-8608
Facsimile: 412 355-6501
E-mail: jerry.mcdevitt@klgates.com

Jon Eisenberg (*pro hac vice*)
K&L Gates LLP
1600 K Street, N.W.
Washington, D.C. 20006
Telephone: 202 778-9348
Facsimile: 202 778-9100
E-mail: jon.eisenberg@klgates.com

Jeffrey P. Mueller (ct27870)
Jonathan B. Tropp (ct11295)
Erick M. Sandler (ct25029)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
Telephone: 860-275-0100
Facsimile: 860-275-0343
Email: jmueller@daypitney.com
Email: jbtropp@daypitney.com
Email: emsandler@daypitney.com

Attorneys for World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios, Michelle D. Wilson, and Stephanie McMahon Levesque

## TABLE OF CONTENTS

**Page**

I.      Introduction.................................................................................................... 1

II.     Plaintiffs Have Failed to Plead a False Statement or Omission......................... 6

III.    Plaintiffs Have Not Pled Facts Creating a Strong Inference of Scienter ........... 9

    1.      The Confidential Witness Allegations Provide No Support For Plaintiffs' Scienter Argument. ........................................................................ 9

    2.      Excerpts from Two Documents Provide No Support For Plaintiffs' Scienter Argument. ...................................................................... 11

    3.      The "Core Operations" Doctrine Provides No Support For Plaintiffs' Scienter Argument. ..................................................................... 12

    4.      The So-Called "Admission" Provides No Support For Plaintiffs' Scienter Argument ......................................................................... 15

    5.      The "Close Proximity" Argument Provides No Support For Plaintiffs' Scienter Argument. .................................................................... 16

    6.      Defendants Had No Motive to Commit Fraud..................................... 18

IV.     Plaintiffs Have Failed to Plead Loss Causation. ............................................. 21

V.      The Company's Statements Are Protected by the PSLRA Safe Harbor   for Forward-Looking Statements.......................................................................... 23

VI.     The Section 20A Claim Against Levesque Should Be Dismissed. ................... 23

VII.    The Controlling Person and Indirect Liability Claims Should Be Dismissed. ................ 24

Conclusion ........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acito v. IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995)......................................................................................19

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
692 F.3d 34 (2d Cir. 2012)....................................................................................23

*Alaji Salahuddin v. Alaji*,
232 F.3d 305, 308 (2d Cir. 2000)..........................................................................25

*Bd. of Trustees of Ft. Lauderdale Gen. Employees Ret. Sys. v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011)...................................................................14

*Bellikoff v. Eaton Vance Corp.*,
481 F.3d 110 (2d Cir. 2007)..................................................................................25

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................16

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ..........................................................................19

*Chalverus v. Pegasys, Inc.*,
59 F. Supp.2d 226 (D. Mass. 1999) ......................................................................15

*City of Omaha, Neb. Civil Emps' Ret. Sys. V. CBS Corp.*,
679 F.3d 64 (2d Cir. 2012).....................................................................................7

*Elam v. Neidorff*,
544 F.3d 921 (8th Cir. 2008) ................................................................................21

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).................................................................................................9

*Ezra Charitable Trust v. Tyco International, Ltd.*,
466 F.3d 1 (1st Cir. 2006) (Pl. Opp. 31).............................................................16

*Friedman v. Mohasco Corp.*,
929 F.2d 77 (2d Cir. 1991).....................................................................................7

*Hensley v. IEC Electronics Corp.*,
2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)......................................................13

i

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) .......................................................................20

*In re Credit Suisse First Boston Corp.*,
   431 F.3d 36 (1st Cir. 2005)..........................................................................................7

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006).........................................................................20

*In re Gentiva Sec. Litig.*,
   932 F. Supp.2d 352 (E.D.N.Y. Mar. 25, 2013).........................................................21

*In re IAC/InterActive Corp. Sec. Litig.*,
   478 F. Supp. 2d 574 (S.D.N.Y. 2007)........................................................................21

*In re InfoSonics Corp. Deriv. Litig.*,
   2007 U.S. Dist. LEXIS 66043 (S.D. Cal. Sept. 4, 2007)..........................................20

*In re MannKind Sec. Actions*,
   835 F. Supp.2d 797 (C.D. Cal. 2011) ........................................................................21

*In re Shengdatech, Inc. Sec. Litig.*,
   2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)...........................................................13

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993)..............................................................................................7

*Indiana State District Council of Laborers v. Omnicare, Inc.*,
   583 F.3d 935 (6th Cir. 2009) .......................................................................................6

*Indiana State District Council of Laborers v. Omnicare, Inc.*,
   719 F.3d 498 (6th Cir. 2013) ...................................................................................6, 7

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) .....................................................................................22

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005), *cert. denied,* 546 U.S. 935 (2005)............................22

*Lormand v. U.S. Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .....................................................................................22

*Louisiana Mun. Police Emps. Ret. Sys. V. Green Mountain Coffee Roasters, Inc.*,
   2012 U.S. Dist. LEXIS 89192 (D. Ver. Dec. 20, 2013) ...........................................21

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007).................................................................19, 20

*No. 84 Employer-Teamers Joint Council Pension Trust Fund v. America West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) (Pl. Opp. 28-29) ............................................................14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)......................................................................................10, 17

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
   No. 13-435 (S.Ct. Mar. 24, 2015) ..............................................................................6, 7

*Oregon Public Employees Ret. Funds v. Apollo Group, Inc.*,
   774 F.3d 598 (9th Cir. 2014) ........................................................................................22

*Pearlstein v. Blackberry Limited*,
   No. 13-CV-7060 (S.D.N.Y. Mar. 13, 2015) ...........................................................13, 17

*S. Cherry St., LLC v. Hennessee Grp., Ltd.*,
   573 F.3d 98 (2d Cir. 2009)...............................................................................................9

*San Leandro Emergency Med. Plan v. Philip Morris*,
   75 F.3d 801 (2d Cir. 1996)............................................................................................19

*SEC v. Coffey*,
   493 F.2d 1304 (6th Cir.1974) .......................................................................................24

*Shields v. Citytrust Bancorp., Inc.*,
   25 F.3d 1124 (2d Cir. 1994).............................................................................................3

*Slayton v. American Express Co.*,
   604 F.3d 758 (2d Cir. 2010).............................................................................................9

*Stevelman v. Alias Research Inc.*,
   174 F.3d 79 (2d Cir. 1999).............................................................................................18

*Stoneridge Inv. Partners v. Scientific-Atl.*,
   128 S.Ct. 761 (2008)......................................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2504 (2007) .................................19

*Wade v. Wellpoint, Inc.*,
   892 F. Sup.2d 1102, 1137 (S.D. Ind. 2012) .................................................................21

*Wietschner v. Monterey Pasta Co.*,
   294 F. Supp.2d 1102 (N.D. Cal. 2003) .........................................................................21

*Yates v. Municipal Mortgage & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ........................................................................................20

*Yourish v. California Amplifier*,
191 F.3d 983 (9th Cir. 1999) ..............................................................................................17

iv

## I.   INTRODUCTION

The Company's public disclosures before and during the Class Period are described  at length at pages 4-25 of Defendants Memorandum of Law In Support of the Motion to Dismiss the Consolidated Amended Complaint ("Def. Mem."). They show that the Company provided investors a window into its 2013-2015 business plan, shared its goal of doubling or tripling OIBDA by 2015, explained that the two most critical initiatives were the launch and ultimate success of the WWE Network and the re-negotiation of four key television contracts, expressed optimism about the Company and these initiatives, and also disclosed that they carried significant risks and that the ultimate results could involve a wide range of outcomes, including restructuring of the Company if the initiatives were not successful.[1] Ultimately, the Company did negotiate four new television contracts that nearly doubled the revenues associated with the prior contracts and, less than a month after the end of 2014, announced that it had achieved over one million subscribers for the new WWE Network.

Plaintiffs' attempt to convert the Company's qualified optimistic opinions about the future fails as a matter of law because Plaintiffs' allegations do not come close to meeting the Rule 9(b) and PSLRA standards, which are designed to protect against loose allegations of fraud and fishing expeditions in search of a viable claim. Indeed, Plaintiffs have filed a textbook example of a complaint that the PSLRA was designed to eliminate—a complaint based not on any allegation of inaccurate historical financial data, but instead on a Company's normal optimism about the future. As confirmed by Plaintiffs' own Opposition to Defendants' Motion to

---

[1] The Amended Complaint alleges that the Defendants stated that the renegotiation of the television rights deal would allow WWE to double or triple its operating income.  (Amended Complaint ¶¶ 21, 60).  Plaintiffs, however, do not (and cannot) point to any such statement by any Defendant.  Defendants' disclosures were focused on the potential impact of a combination of initiatives, not simply the potential impact of the television negotiations.

Dismiss ("Pl. Opp."), the Amended Complaint should be dismissed for at least the following reasons:

**First,** Plaintiffs have failed to plead facts showing falsity. While Plaintiffs argue that the Supreme Court's decision in *Omnicare* overturns Second Circuit case law on standards for opinion liability, they ignore that *Omnicare* addressed opinion liability only under Section 11 of the Securities Act, which is a strict liability provision that applies to misrepresentations and omissions in a registration statement, and has no effect on the Second Circuit's holding that a plaintiff alleging that an opinion amounts to fraud under Section 10(b) of the Securities Exchange Act has to show defendants' subjective disbelief of the opinion. Plaintiffs have completely failed to meet that standard. Indeed, Plaintiffs have also failed to meet the *Omnicare* standard that applies to strict liability claims under Section 11.

**Second,** Plaintiffs have failed to plead facts creating a strong inference of scienter. Even apart from the fact that the sole confidential witness on which plaintiffs rely has denied every allegation that the Amended Complaint attributes to him, the Amended Complaint nowhere alleges that he had any involvement in television negotiations or even the television side of the Company's business, acknowledges that he left the Company four months before the television negotiations were concluded and before the negotiations with networks other than NBCU even began, references not a single meeting that the confidential witness ever had with McMahon, references only one meeting in four years with Barrios (at which advertising, rather than television negotiations, was discussed), and references no meetings he attended, much less attended with senior executives, on television negotiations, the WWE network, the Company's public statements, the basis for those public statements, any third-party survey of WWE's fan base, or discussions with any executives about those matters. Moreover, as discussed in

Defendants' Opposition to Plaintiffs' Motion to Strike, in deciding whether Plaintiffs can meet their pleading burden by relying on a confidential witness, this Court can, and indeed must, consider the fact that the confidential witness does not stand behind any allegation that the Amended Complaint purports to attribute to him. Plaintiffs' allegation that he was involved in digital advertising, that he attended some unidentified high-level meetings over the course of his career, and that he was willing to speculate about things completely outside his area do not create a strong inference of scienter; to the contrary, they confirm just how deficient Plaintiffs' claims are.

Likewise, tidbits from two barely identified documents on which Plaintiffs also purport to rely, for the "admission" that WWE is different than three other sports and that different sports have different fan demographics, also create no inference of scienter, much less a strong inference. And the fact that McMahon came to a slightly different view about one factor in the negotiations after the negotiations were concluded than he had before they were concluded is also meaningless. Plaintiffs have failed to plead scienter because the facts, individually and in the aggregate, suggest optimism rather than fraud. Nor is that surprising. "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).

**Third,** Plaintiffs have completely failed to plead loss causation under *Lentell. Lentell,* like this case, involved an allegation that defendants expressed fraudulent opinions. In affirming the district court's dismissal on loss causation grounds, the Second Circuit squarely rejected plaintiffs' argument here: it held that in an alleged false opinion case disclosures that

3

failed to show that the defendants disbelieved their earlier opinions (at the time they expressed those opinions) failed as a matter of law to demonstrate loss causation. Indeed, had it not reached that conclusion, it would have reversed the loss-causation dismissal.

**Fourth,** the Company's statements regarding the potential future outcome of television negotiations, and their potential future effect on the Company's financials in 2015 and beyond, are quintessentially forward-looking statements. They have nothing at all to do with the Company's current or historical financial results. Wholly apart from the opinion-liability cases, *forward-looking* statements like the forward-looking opinions expressed here are protected by the safe harbors in the PSLRA. Absent well-pled facts showing defendants knew their opinions about the future were false, which are completely absent here, the Amended Complaint must be dismissed. And, even apart from that, the claims must be dismissed because the opinions were accompanied by meaningful cautionary language. While Plaintiffs characterize the cautionary language as "generic," nothing could be further from the truth. The Company cautioned investors that the agreement with NBCU would end in September 2014 if not re-negotiated, that the Company had at least initially failed to reach an agreement with NBCU and was negotiating with other potential partners, and that "[t]he inability of the Company to enter into a domestic distribution agreement(s) on terms favorable to us could substantially affect the Company's financial outlook, liquidity, business and operating results and have a material adverse effect on the price of the Company's Class A Common Stock, which the Company believes reflects market expectations of a substantial improvement in future operating results." It is difficult to imagine cautionary language that is more pointed and less generic. Moreover, nearly every discussion of the potential outcome of the television negotiations included disclosures that the

4

statements were "forward-looking" and that "actual results could differ materially from those currently expected or anticipated."

**Fifth,** Plaintiffs cannot satisfy their pleading obligations with respect to insider trading by relying on trades of a single individual that were made pursuant to a 10b5-1 trading plan entered into and publicly disclosed seven months before the Class Period even began. The issue is not who would ultimately prevail if the 10b5-1 trading plan were challenged. The issue is whether Plaintiffs can satisfy their burden of pleading an insider trading fraud by pleading trades executed pursuant to a publicly-disclosed 10b5-1 trading plan entered into seven months before the Class Period. Courts have repeatedly granted motions to dismiss on the ground that trades executed pursuant to a Rule 10b5-1 trading plan do not create a strong inference of scienter. Moreover, even apart from the fact that the trades were executed under a 10b5-1 trading plan executed seven months before the Class Period began, Plaintiffs insider trading allegations fail-- contrary to the allegations in the Amended Complaint, Levesque was not a member of the Board when she sold her shares, she did not sell all or even most of her shares, and she began selling before the Class Period even began.  Moreover, even according to the Amended Complaint, she completed her sales months before the television negotiations were concluded, and Plaintiffs have alleged no basis for inferring that Ms. Levesque knew anything at all about the television negotiations at that time, much less that she knew what the ultimate results of the negotiations would be.

**Sixth,** there are no facts that support a claim that Wilson did anything at all wrong related to any of the allegations of unlawful conduct in the Amended Complaint.

**Seventh,** the controlling person allegations fail as a matter of law, and Section 20(b), on which Plaintiffs also rely, does not create an implied private right of action.

For each of these reasons, the Amended Complaint must be dismissed in its entirety.

## II.      Plaintiffs Have Failed to Plead a False Statement or Omission

As discussed in Def. Mem. 36-38 a plaintiff claiming that an opinion is fraudulent under Section 10(b) must allege that the defendants did not believe the opinions they expressed. Plaintiffs claim that the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,* No. 13-435 (S.Ct. Mar. 24, 2015) under Section 11 of the Securities Act changed this requirement – an odd concept given that Section 10(b) is a fraud rather than a strict liability statute like Section 11.

*Omnicare*, however, did not change the standards for pleading falsity under Section 10(b) or for applying the PSLRA safe-harbors to forward-looking statements. In *Omnicare,* the Sixth Circuit had issued two decisions on liability standards for opinions--one under Section 10(b) and one under Section 11 of the Securities Act. Neither involved a forward-looking opinion (the opinion was that the company was in legal compliance). With regard to Section 10(b), the Sixth Circuit held that the defendants' statement that they were in "legal compliance" was not actionable because the allegations did not show that the defendants knew that the statements were untrue. *Indiana State District Council of Laborers v. Omnicare, Inc.,* 583 F.3d 935, 945-47 (6th Cir. 2009). On a subsequent appeal of a different issue, the court explained, "It makes sense that a defendant cannot be liable for a fraudulent misstatement or omission under § 10(b) and Rule 10b-5 if he did not know a statement was false at the time it was made. The statement cannot be fraudulent if the defendant did not know it was false." *Indiana State District Council of Laborers v. Omnicare, Inc.,* 719 F.3d 498, 505 (6th Cir. 2013). The Supreme Court's decision in *Omnicare* left this Section 10(b) decision intact. This means it also left intact repeated holdings of the Second Circuit, and indeed other circuit courts in addition to the Sixth Circuit, that a fraud claim cannot be based on allegations of a false opinion unless plaintiffs show that the

6

defendants knew the opinion was false. *E.g., City of Omaha, Neb. Civil Emps' Ret. Sys. V. CBS Corp.,* 679 F.3d 64, 68 (2d Cir. 2012); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 266 (2d Cir. 1993); *Friedman v. Mohasco Corp.,* 929 F.2d 77, 78-79 (2d Cir. 1991). *See also, e.g., In re Credit Suisse First Boston Corp.,* 431 F.3d 36 (1st Cir. 2005) (subjective disbelief standard for opinion liability under Section 10(b)).

In the decision that the Supreme Court vacated, the Sixth Circuit also held that because Section 11 of the Securities Act is a strict liability statute, "objective falsity" (*i.e.,* a statement of opinion that is ultimately found to be incorrect even though believed at the time) rather than subjective falsity is enough to plead a violation of Section 11. Contrasting Section 10(b) and Section 11, the Sixth Circuit stated:

> Section 10(b) and Rule 10b-5 require a plaintiff to prove scienter, § 11 is a strict liability statute. It makes sense that a defendant cannot be liable for a fraudulent misstatement or omission under § 10(b) and Rule 10b-5 if he did not know a statement was false at the time it as made. The statement cannot be fraudulent if the defendant did not know it was false. Section 11, however, provides for strict liability when a registration statement "contain[s] an untrue statement of material fact." [citation omitted] No matter the framing, once a false statement has been made a defendant's knowledge is not relevant to a strict liability claim.

719 F.3d at 505.

The Supreme Court granted cert to review the Sixth Circuit's Section 11 decision, not its earlier Section 10(b) decision. The Supreme Court held that objective falsity is not enough even under a strict liability statute, but that under a strict liability statute limited to registration statements that carry with them substantial due diligence obligations, a statement of opinion could be misleading if defendants did not have a reasonable basis for the statements. *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,* No. 13-435 (S.Ct. Mar. 24, 2015).

Here, however, Plaintiffs do not rely on Section 11. They have no claim at all under the Securities Act and no claim at all based on a registration statement, to which Section 11 of the Securities Act applies. Instead, they rely exclusively on Section 10(b) of the Securities Exchange Act of 1934, an antifraud provision. *Omnicare* does not disturb the Second Circuit's standards for pleading that an opinion amounts to a Section 10(b) fraud, which requires knowledge of falsity and which plaintiffs have completely failed to meet here.

Moreover, even under Section 11, the Supreme Court stated that an issuer could avoid opinion liability by "making clear the real tentativeness of its belief" (slip op. 18). That is exactly what Defendants did here: nearly every time that they mentioned the television contract negotiations they disclosed that the statements were forward-looking, that the statements were subject to risks and uncertainties including the risk of renewing the television agreements, and that actual results could differ materially from those expected or anticipated. (Def. Mem. 58-61). Defendants even stated that if management was unable to meet its goals "management will undertake some form of restructuring to increase profitability" and that "if the worst happened, that's what we will go back to." (Def. Mem. 12). The Company's 10-K, its most important disclosure document during the putative class period, stated that the inability to enter into a domestic distribution television agreement with NBCU on favorable terms "could substantially affect the Company's financial outlook, liquidity, business and operating results and have a material adverse effect on the price of the Company's Class A Common Stock, which the Company believes reflects market expectations of a substantial improvement in future operating results." (Def. Mem. 58-59). Moreover, Defendants never stated that the television negotiations would, alone, potentially double or triple its 2015 OIBDA. The main focus was always the WWE Network, not the negotiations with NBCU, and Barrios stated that a "home run" on either the

8

WWE network or the negotiation of the four key television contracts would get the Company there, or "some success on both we'll look and feel pretty good." (Def. Mem. 13).

### III.    Plaintiffs Have Not Pled Facts Creating a Strong Inference of Scienter

As discussed in Def. Mem. 46-47, the Supreme Court has defined scienter to mean "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976). The Second Circuit has held that, in the case of forward-looking statements of the type here, scienter can be shown only by showing "knowing falsity" rather than recklessness, *Slayton v. American Express Co.,* 604 F.3d 758, 772-74 (2d Cir. 2010), and that even with regard to non-forward-looking statements, scienter requires at least "'conscious recklessness' – "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp., Ltd.,* 573 F.3d 98, 109 (2d Cir. 2009).

#### 1.    The Confidential Witness Allegations Provide No Support For Plaintiffs' Scienter Argument.

Plaintiffs persist in relying primarily on a single "confidential witness" to support the allegations of scienter. (Pl. Opp. 23-24). That's not surprising because Plaintiffs built their entire claim of fraud around him, and by abandoning the confidential witness they abandon their case. But continuing to rely on that witness also fails.

First, as discussed at length in Defendants' Opposition to Plaintiffs' Motion to Strike, Plaintiffs cannot meet their burden of creating a cogent inference of scienter by relying on allegations that the confidential witness does not stand behind. Plaintiffs admit that Mr. Maddox was their confidential witness. They nevertheless ask the court to turn a blind eye to the fact that they are seeking to plead a cogent inference of fraud by relying on someone who has repudiated the allegations they try to attribute to him. But under the Second Circuit's decision in *Campo v. Sears Holdings Corp.,* 371 F. App'x 212 (2d Cir. 2010) and related cases, Plaintiffs cannot meet

9

their pleading burden by relying on alleged statements that have been repudiated by the person who allegedly made them.

Second, as discussed at length in Def. Mem. 27-29 and 38-43, even if Mr. Maddox had not repudiated every statement Plaintiffs attribute to him, as he did, the Amended Complaint fails to set forth facts "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000). It fails that standard by the proverbial country mile. The Amended Complaint not reference a single specific meeting that the confidential witness ever had with McMahon. Nor does it allege more than one specific meeting with Barrios over a four-year period.  Nor does it allege that the one specific meeting with Barrios had anything at all to do with the television negotiations or, indeed, anything of relevance to the Amended Complaint. Nor does it allege any meetings with senior management at which the television negotiations were discussed.  Nor does it allege any meetings with senior management at which the Company's public statements were discussed.  Nor does it allege any meetings with NBCU.  Nor does it allege any meetings with other networks with whom the Company negotiated.  Nor does it allege that the confidential witness had any involvement whatsoever in the television negotiations.  Nor does it allege that he was with the Company when the negotiations concluded. Nor does it even allege that the confidential witness was privy to the Company's third-party research on the number of WWE fans.  Here's what the Amended Complaint does allege: that the admitted source was a manager on the digital sales team, that he left the Company four months before the television negotiations were concluded, that he left the Company before the television negotiations with third parties other than NBCU even began, and that over the course of his career he sometimes attended an unidentified number of meetings on unidentified topics

10

with unidentified people who were part of an unidentified "top 1%" of management. Based on the allegations in the Amended Complaint, the confidential witness has no more basis for speculating on the Defendants' state of mind with respect to the television negotiations or any other matter pertinent to the Amended Complaint than any of thousands of former or current WWE employees or, indeed, persons having no connection whatsoever to WWE.

As discussed at Def. Mem. 38 n.27, there are countless cases in which courts dismissed complaints based on far more substantial confidential witness allegations than the ones here. There are, of course, cases in which confidential witnesses carried the day. But Plaintiffs identify no case in which a court relied on a confidential witness so lacking in qualifications to satisfy a plaintiff's burden of pleading facts creating a strong inference of scienter.  The only strong, cogent inference the confidential witness creates is that Plaintiffs' fraud charges have no basis at all.

### 2. Excerpts from Two Documents Provide No Support For Plaintiffs' Scienter Argument.

Plaintiffs also persist in relying on tiny excerpts from two documents, one for the unremarkable proposition that WWE is "not the PGA, NFL, or MLB" and another for the unremarkable proposition that 40% of WWE's fan base has an annual household income of less than $40,000 or, stated in the reverse, 60% of the fan base has an annual household income of more than $40,000. (Pl. Opp. 3, 5, 18).  And they throw in that WWE is also not NASCAR. (Pl. Opp. 14). But so what? No one is alleged to have said WWE is the same as the PGA, NFL, or MLB (or indeed that the PGA, NFL or MLB are the same as each other); or provided a percentage of WWE fans that have an income above or below a certain level; or said that WWE is the same as NASCAR.

11

Here's what the Company did say. With respect to live sports, Wilson said that while the Company was "clearly entertainment-based," one characteristic of WWE's brand was "live action." The quote in the article was:

> We are clearly entertainment-based, but if you think about the characteristics of our brand, it's live action, and that's sports. We want to be compensated for a live audience, since live content is getting a very significant premium in the marketplace.

(Def. Mem. 3, 14 ).

The article in which Wilson was quoted also stated that WWE was a huge ratings generator for the USA Network, that without it the network would drop from first place to as low as No. 4 among basic entertainment channels, but that advertisers paid more modest advertising fees for WWE programs than they paid for other programs. (Def. Mem. 14). Barrios stated that live sports were getting five to 10 times as much per viewer hour as WWE, and "you can make your own judgment call about our opportunity there." (Def. Mem. 12-13). He did not state that WWE expected to get five to 10 times as much per viewer hour as it was currently getting. With respect to comparisons of fan demographics, the Defendants said nothing at all. (Def. Mem. 29, 44-45).

With respect to the NASCAR comparison, Barrios stated that the annual value of NASCAR's television contracts was roughly six times the annual value of WWE's television contracts even though WWE averaged 20% more viewers than NASCAR; he did not state that WWE and NASCAR were identical or that WWE expected to obtain a NASCAR-equivalent television contract, which would have meant a nearly 600% increase in WWE's existing television contracts. (Def. Mem. 12-13, 44-45).

### 3. The "Core Operations" Doctrine Provides No Support For Plaintiffs' Scienter Argument.

Plaintiffs include a curious discussion of the "core operations" doctrine in the scienter section of their brief. (Pl. Op. 28-29). Plaintiffs' reference to the core operations doctrine is curious because it has no application to this case.  This is not a case in which Defendants have claimed ignorance of the core operations of the Company; it is a case in which two defendants made optimistic statements about the Company and the Plaintiffs have claimed, without any basis, that it was a fraud to express optimism.

A recent case discussing the core operations doctrine is *Pearlstein v. Blackberry Limited,* 2015 U.S. Dist. LEXIS 31292 (S.D.N.Y. Mar. 13, 2015). In that case, defendants made optimistic statements about customers embracing a new Blackberry device, and the court dismissed on the ground that, "While the complaint succeeds in showing that defendants put a positive gloss on the company's performance, it fails to show how that gloss amounted to fraud." The court stated that the core operations doctrine did not support the scienter allegations because "it is well established that accusations founded on nothing more than a defendant's corporate position are entitled to no weight" and "here, the complaint is devoid of facts showing that defendants were aware of specific information contradicting their optimistic statements…." *See also, e.g., In re Shengdatech, Inc. Sec. Litig.,* 2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) ("[C]ourts in this Circuit have held that the general allegations regarding a defendant's involvement in the 'core operations' of a business cannot serve as an independent basis for scienter"); *Hensley v. IEC Electronics Corp.,* 2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ("As Defendants note, there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid….Courts applying the doctrine have generally 'required that the operation in question constitute nearly all of the company's business before finding scienter").

13

The cases on which Plaintiffs rely (Pl. Opp. 27-29) have literally no relevance to the types of allegations made in this case. To give just two examples, which apply equally to Plaintiffs' citations to other cases, consider Plaintiffs' purported reliance on *Bd. of Trustees of Ft. Lauderdale Gen. Employees Ret. Sys. v. Mechel OAO,* 811 F. Supp. 2d 853 (S.D.N.Y. 2011) and *No. 84 Employer-Teamers Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (Pl. Opp. 28-29).

In *Mechel*, the court granted defendants' motion to dismiss, stated that plaintiffs had neglected to acknowledge concerns about the continued viability and scope of the core operations pleading doctrine after the passage of the PSLRA, and cited eight district court decisions within the Second Circuit declining to apply the core operations inference. The court went on to hold that the core operations doctrine did not raise a strong inference of scienter.

In *America West,* on which Plaintiffs also rely, plaintiffs alleged that America West deferred maintenance costs and operational expenses and misrepresented that issues raised by the FAA had been fully addressed and that the settlement agreement would not have a material adverse effect on its financial results in order to overstate the company's operating income through the date on which major shareholders could freely sell their shares under a stockholder's agreement. During the Class Period, each of the defendants sold between 88% and 100% of their shares and those sales were "dramatically out of line with prior trading practices." In addition, plaintiffs offered internal reports (including the identity of the persons who directed their preparation), meetings with the FAA (including dates, content, and participants), FAA letters to America West regarding ongoing maintenance problems (including the dates, case numbers of the investigations, content, and who they were sent to), the settlement agreement with the FAA, FAA reports regarding the severity of the problems (including case numbers of the investigations

14

and content), FAA letters describing the penalties arising from investigations of specific incidents (including the dates, case numbers of the investigation, content, and to whom they were sent), and charts documenting maintenance difficulties, including the scope and effects of the deferred maintenance and a comparison of the company's performance to that of other major commercial carriers. To state the obvious, nothing remotely comparable exists in this case, and indeed the comparison shows just how lacking the Amended Complaint is in this case.

### 4. The So-Called "Admission" Provides No Support For Plaintiffs' Scienter Argument.

As previously discussed, after negotiations ended McMahon was asked whether, "with hindsight," he believed that the launch of the WWE Network had a negative effect on the negotiations with NBCU, and he stated he thought it did but did not know "if it was a significant aspect." (Def. Mem. 28-29, 45). Plaintiffs state this shows his previously expressed opinion to the contrary was fraudulent. To state the obvious, however, the fact that he had a different opinion about one of countless factors after the negotiations had concluded than he did several months before they had concluded does not show he disbelieved his earlier statement. Plaintiffs' cite one case, *Chalverus v. Pegasys, Inc.,* 59 F. Supp.2d 226 (D. Mass. 1999) in support of a contrary conclusion. (Pl. Opp. 30). But as with Plaintiffs' other very curious citations, that case provides no support at all for Plaintiffs' position. It simply held that a combination of GAAP violations, a large overstatement of earnings (from a gain of $2.2 million to a loss of $2.8 million), violation of the company's internal revenue recognition policies, failure to disclose a $12.9 million obligation, a profitability requirement in the company's line of credit, and the fact that the company was highly focused on reporting its 50th consecutive profitable quarter satisfied plaintiffs' burden of pleading scienter in that case. The fact that the Plaintiffs have to

rely on a not-even-remotely-relevant Massachusetts district court decision merely confirms, again, how inadequate Plaintiffs' claims are.

### 5.   The "Close Proximity" Argument Provides No Support For Plaintiffs' Scienter Argument.

Plaintiffs argue that Barrios made material misleading statements on a May 1 earnings call shortly before the end of the Class Period and that the "close proximity" between those statements and the end of the Class Period supports Plaintiffs' scienter argument. As discussed in Def. Mem. 21-22, what Barrios said at the earnings call was that the Company was in negotiations in India, that it would be announcing agreements in the U.S. in several weeks, and that "*we will not be answer[ing] any questions today about the status of these negotiations.*" He focused not on the television negotiations, but on the launch of the WWE network, which he said he believed was on track to achieve 1 million subscribers by year-end.

Plaintiffs have not alleged with particularity any misstatement at all, much less a misstatement in close proximity to the end of the Class Period. Thus, while it is true that in some cases some courts allow temporal proximity to "bolster" other facts already creating a strong inference of scienter, that reasoning has not application in this case. The three cases Plaintiffs rely on in this section are, yet again, irrelevant. In *Ezra Charitable Trust v. Tyco International, Ltd.,* 466 F.3d 1 (1st Cir. 2006) (Pl. Opp. 31), the First Circuit affirmed the dismissal of a securities class action with far more concrete allegations of misrepresentations and scienter than exist here. While it acknowledged that in some cases a short time period between an alleged misstatement and a later disclosure of inconsistent information might be "relevant" to the question of scienter, "The simple fact of a correction is also not particularly probative; 'plaintiffs may not simply seize upon disclosures made later and allege that they should have been made earlier.'"

16

In *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 988 n.4 (9ᵗʰ Cir. 2008) (Pl. Opp. 31), a company fraudulently included contracts that were the subject of stop-work orders when it touted its backlog of anticipated revenues from existing contracts. The Ninth Circuit stated in a footnote, "The size of the contract [subject to the stop order] and the prominence of the client raise a strong inference that defendants would be aware of this order" and that inference was "bolstered" by the fact that defendants disclosed it in an SEC filing two weeks later. *See also, e.g., Yourish v. California Amplifier,* 191 F.3d 983, 997 (9ᵗʰ Cir. 1999) ("We have allowed the temporal proximity of an allegedly fraudulent statement or omission and a later disclosure to *bolster* a complaint, but we have never allowed the temporal proximity between the two, *without more,* to satisfy the requirements of Rule 9(b)"); *Pearlstein v. Blackberry Limited,* 2015 U.S. Dist. LEXIS 31292 (S.D.N.Y. Mar. 13, 2015) (Temporal proximity "is too ephemeral a connection to raise a strong inference of scienter. Indeed, courts in this district have held that temporal proximity alone does *not* raise a circumstantial inference of fraud….Rather, plaintiffs must *specifically allege* defendants' knowledge of acts or access to information contradicting their public statements.")

In the last case cited by Plaintiffs, *Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000), the principal allegation was that the company intentionally issued fraudulent financial statements by including inventory that it knew to be obsolete and nearly worthless at inflated values and failed to adhere to the company's publicly stated markdown policy on out-of-date inventory stored in the company's warehouses. Although the Second Circuit reversed the dismissal, it stated, "[W]e have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight' and "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* at 309.

17

### 6.    Defendants Had No Motive to Commit Fraud.

As set forth at Def. Mem. 48, it would be difficult to imagine two people with less of a motive to defraud than the two persons whose statements plaintiffs allege were fraudulent. McMahon, the co-founder of the Company, owns a substantial majority of the Company's 43.8 million Class B shares, and is not alleged to have sold a single share during the Class Period. Barrios is the Chief Strategy & Financial Officer and is also not alleged to have sold any stock. Defendants pointed to over a dozen circuit court and lower court opinions stating that the absence of sales by insiders undermines allegations of scienter. (Def. Br. 48 n 32). If McMahon and Barrios thought the negotiations were going to have an unsatisfactory end, which would under any scenario be revealed to the market after the negotiations were concluded, they would have no reason to push the price of the stock up, only to then see it fall. Of course, there are cases where a company might be engaged in a sale of the company or a large borrowing transaction or other circumstances in which it would be advantageous to keep the price of the stock high for a discrete period of time, but there are no allegations of that type here. All there is here is that two Defendants expressed qualified optimism about the negotiations, that the negotiations did lead to a near doubling of the Company's television-related revenues, and that the negotiations did not lead to an even greater increase for which the Defendants had hoped.

In response, Plaintiffs point to some cases that stand for the unremarkable proposition that in some cases insider sales do support an inference of scienter and then argue that the court should infer scienter from the fact that a single defendant, Levesque, who is not alleged to have made any false statements, made sales pursuant to a 10b5-1 trading plan publicly disclosed in SEC filings seven months before the beginning of the Class Period (Pl. Opp. 32-34).

As with other parts of their case, Plaintiffs again cite a host of cases that provide no support for their position. For example, the only Second Circuit decision they cite is *Stevelman v.*

18

*Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir. 1999), where, unlike here, several insiders sold large portions of their stock and there was no Rule 10b5-1 plan. But here only one person is alleged to have sold any stock at all, and the Second Circuit in *Stevelman* reiterated, "[W]e have suggested that scienter may not be inferred 'strongly' when the alleged fraud is alleged to have benefitted only a single defendant in a corporate entity." The Second Circuit cited its holding in *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 814 (2d Cir. 1996), in which the Second Circuit similarly stated, "In the context of this case, we conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive." It also cited its holding in *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir. 1995), where the Second Circuit declined to infer scienter from one defendant's sales, and instead concluded, "The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'"

On the issue of whether a court may consider the existence of a Rule 10b5-1 trading plan in deciding whether trades support plaintiffs' burden of pleading a strong inference of scienter, Plaintiffs simply ignore the six district court decisions within the Second Circuit that Defendants cited at Def. Mem. 50. Plaintiffs have the burden in a fraud case of pleading a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2504 (2007) requires that district courts consider competing inferences at the motion to dismiss stage. At a minimum, plaintiffs have to show stock sales that are "unusual" or "suspicious," and a strong inference of scienter is not created where the very trades at issue were undertaken pursuant to a publicly-disclosed Rule 10b5-1 trading plan entered into before the Class Period even began.

19

The cases that Plaintiffs rely on are completely irrelevant. Plaintiffs cite only two decisions of district courts within the Second Circuit, and neither one is helpful to them. In *Malin v. XL Capital Ltd.,* 499 F. Supp. 2d 117 (D. Conn. 2007), the court acknowledged that under *Tellabs* a court may have to consider on a motion to dismiss competing inferences arising from the fact that trades were undertaken pursuant to a 10b5-1 trading plan, but found it unnecessary to decide the issue because it granted the motion to dismiss on other grounds and concluded, "The minimal stock sales prior to the announcement…fail to give rise to a 'strong inference' of scienter." *Id.* at 156. *In re EVCI Colls. Holding Corp. Sec. Litig.,* 469 F. Supp. 2d 88 (S.D.N.Y. 2006) did not even involve the issue of whether a court could consider that the trades were made pursuant to a 10b5-1 trading plan. There was no allegation of a Rule 10b5-1 trading plan in that case, and the sales—by the company's founder and chairman—were in violation of a court order limiting his right to transfer assets and occurred less than two weeks after the company received a critical letter from the New York State Education Department.

The other cases cited by Plaintiffs are from district courts in Nevada, Ohio and California and are also unhelpful to them. In one, *In re Cardinal Health Inc. Sec. Litig.,* 426 F. Supp. 2d 688 (S.D. Ohio 2006), defendant sold stock *before* the 10b5-1 trading plan was entered and other defendants sold without any 10b5-1 trading plan. In another, *In re InfoSonics Corp. Deriv. Litig.,* 2007 U.S. Dist. LEXIS 66043 (S.D. Cal. Sept. 4, 2007), the issue of the pleading standards under Rule 9(b) and the PSLRA did not even arise. Plaintiff in that case brought a shareholder derivative action under the California Corporations Code. As with so many of the cases cited by Plaintiffs for various propositions throughout their brief, examination of the cases reveals them to be completely irrelevant to the issues before this Court. Lest there be any doubt, there are many decisions from outside this circuit in addition to those from within this circuit cited in

20

Defendants' Memorandum holding that stock sales pursuant to 10b5-1 plans do not create an inference of scienter. *See, e.g., Yates v. Municipal Mortgage & Equity, LLC,* 744 F.3d 874, 891 (4th Cir. 2014) (""The fact that [defendants] traded MuniMae shares under non-discretionary Rule 10b5-1 plans further weakens any inference of fraudulent purpose"); *Elam v. Neidorff,* 544 F.3d 921, 928 (8th Cir. 2008) ("Stock sales pursuant to Rule 10b5-1 trading plans …[are] not suspicious"); *Louisiana Mun. Police Emps. Ret. Sys. V. Green Mountain Coffee Roasters, Inc.,* 2012 U.S. Dist. LEXIS 89192 (D. Ver. Dec. 20, 2013) ("[T]he fact that all but one of the sales were executed pursuant to a 10b5-1 trading plan also counts against a finding of scienter"); *In re Gentiva Sec. Litig.,* 932 F. Supp.2d 352, 382 (E.D.N.Y. Mar. 25, 2013) (Granting motion to dismiss where defendants claimed that many of the stock sales were made pursuant to 10b5-1 plans and "[t]he complaint does not allege anything to the contrary"); *Wade v. Wellpoint, Inc.,* 892 F. Sup.2d 1102, 1137 (S.D. Ind. 2012) (Stock sales pursuant to a 10b5-1 trading plan "do not give rise to a strong inference of scienter"); *In re MannKind Sec. Actions,* 835 F. Supp.2d 797, 814 (C.D. Cal. 2011) (stock sales pursuant to 10b5-1 trading plan do not provide basis for pleading scienter); *In re IAC/InterActive Corp. Sec. Litig.,* 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) ("Because [defendant's] sales were part of a periodic divestment plan [i.e., a 10b5-1 sales plan], the timing and amount of sales do not raise a strong inference of scienter"); *Wietschner v. Monterey Pasta Co.,* 294 F. Supp.2d 1102, 1117 (N.D. Cal. 2003) (sales pursuant to Rule 10b5-1 trading plan did not support inference of scienter).

## IV.    Plaintiffs Have Failed to Plead Loss Causation.

The Amended Complaint addresses loss causation under the heading, "Loss Causation/Economic Loss," (Amended Complaint ¶¶ 78-80) where Plaintiffs allege that the May 15, 2012 disclosure of the outcome of the television contract negotiations revealed Defendants' purported fraud and further allege that the stock price drop "was a direct result of the nature and

extent of Defendants' fraud being revealed to investors and to the market." (Amended Complaint ¶ 80). Def. Mem. 53-54, however, explains that the leading Second Circuit decision on loss causation, *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161 (2d Cir. 2005), *cert. denied,* 546 U.S. 935 (2005), holds that in a case involving allegations of a false opinion, the falsity of the prior opinion has to be disclosed to the market for there to be loss causation. *Id.* at 175 n.4.

In response, Plaintiffs argue that under *Lentell* loss causation can be satisfied if the risk that materialized was "within the zone of risk concealed by the misrepresentations and omissions alleged." (Pl. Opp. 35).  Regardless,, the fact is that *Lentell* holds that in a false opinion case, it is the opinion that must be revealed as false.  Moreover, it is absurd to suggest that the risk that the television negotiations might not produce more than a 100% increase from the prior contracts was "concealed." As discussed at length in Def. Mem. 20, 58-61, the risk that the television negotiations might not be successful – much less more successful than a nearly 100% increase from the prior contracts – was mentioned almost every time the negotiations were disclosed or discussed. To give but one example, the Company's February 24, 2014 Annual Report on Form 10-K – issued smack in the middle of the Class Period – stated, "The inability of the Company to enter into a domestic distribution agreement(s) on terms favorable to us could substantially affect the Company's financial outlook, liquidity, business and operating results and have a material adverse effect on the price of the Company's Class A Common Stock, which the Company believes reflects market expectations of a substantial improvement in future operating results." (Def. Mem. 20). It's simply impossible to assert that was a concealed risk.

Finally, Plaintiffs baldly assert that Rule 8 governs loss causation requirements (Pl. Opp. 35).  Plaintiffs ignore that two circuit courts have held that Rule 9(b), not Rule 8, applies to loss causation allegations, *Oregon Public Employees Ret. Funds v. Apollo Group, Inc.,* 774 F.3d 598

(9th Cir. 2014); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 471 & n. 5 (4th Cir. 2011); one court of appeals has held that Rule 8(a) applies, *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 258 (5th Cir. 2009); and the Second Circuit has stated the issue is unresolved within the Second Circuit. *Acticon AG v. China North East Petroleum Holdings Ltd.,* 692 F.3d 34, 38 (2d Cir. 2012). Thus, contrary to Plaintiffs' categorical assertion that Rule 8(a) governs, the authorities are split on the issue but lean in the direction of applying Rule 9(b).

## V.    The Company's Statements Are Protected by the PSLRA Safe Harbor for Forward-Looking Statements.

Plaintiffs argue that the PSLRA safe harbors do not apply (Pl. Opp. 15-20), but never come to terms with the fact that the opinions on which Plaintiffs rely are quintessentially forward-looking opinions about the ultimate outcome of negotiations that had not been concluded and the potential effect on the Company's future financial statements (Def. Mem. 58-59). Plaintiffs have based their allegations on allegedly affirmative misstatements, not omissions, and more specifically on misstatements that are in the form of forward-looking opinions. Those statements are subject to the PSLRA safe harbors. That means two things: first, Plaintiffs must show knowing rather than reckless misrepresentations, and here they have not shown any misrepresentations, let alone reckless nor knowing misrepresentations; second, Plaintiffs also fail if the statements were accompanied by meaningful, non-generic cautionary language, and here the cautionary language was both meaningful and non-generic (Def. Mem. 58-61). Indeed, it was directed specifically at the possibility that the television negotiations would not be successful and the potential effect on the Company's stock price if that turned out to be the case.

## VI.    The Section 20A Claim Against Levesque Should Be Dismissed.

Defendants Memorandum pointed out that the Amended Complaint's insider trading allegations against Levesque failed for six independent reasons (Def. Mem. 49-52, 61-62).

23

Plaintiffs' principal argument in response to the six independent reasons the Section 20A claim should be dismissed is that the Court should ignore that the trades were executed pursuant to a 10b5-1 plan executed months before the Class Period even began.  As discussed at pp. 19-21 above, that's clearly wrong and contrary to over a dozen decisions. Moreover, Plaintiffs offer no response to the fact that Levesque's sales 1) began well before the Class Period (Def. Mem. 51-52), 2) were only a small percentage of her total shares rather than, as alleged in the Amended Complaint, all of her shares (Amended Complaint ¶ 23; Pl. Opp. 32 n.18), 3) ended four months before the television negotiations were concluded (Amended Complaint ¶ 112), and that 4) Plaintiffs have alleged no facts at all to indicate Levesque knew what the outcome of the television negotiations would be when she sold her shares.  With regard to Plaintiffs' contention that they never alleged Levesque was a Board member at the time she sold her shares (Pl. Opp. 32 n.18), we simply refer the Court to paragraph 23 of the Amended Complaint.

**VII.     The Controlling Person and Indirect Liability Claims Should Be Dismissed.**

With regard to the controlling person allegations, absolutely nothing in the Amended Complaint or Pl. Opp. makes Ms. Wilson a controlling person with respect to the statements alleged in the Amended Complaint.  Her own alleged statement was innocuous, and nothing in the Amended Complaint shows that she was a controlling person with respect to the statements made by others.

Plaintiffs assert that this Court should imply a private right of action under Section 20(b) of the Securities Exchange Act, which makes it unlawful to do an unlawful act through another person.  (Pl. Opp. 40-41).  Apart from the fact that it has no application to anything in this case, Section 20(b) also does not provide for a private right of action.  As the Sixth Circuit observed in *SEC v. Coffey,* 493 F.2d 1304, 1318 (6th Cir.1974), the controlling person provision in Section

24

20(a) provides a cause of action to private persons suing to vindicate their interests, while Section 20(b) sets the standard that applies to an SEC action or criminal prosecution. While Plaintiffs cite cases that mention the possibility of liability under Section 20(b), none actually analyzes the implied private right of action issue or recognizes a private right of action under Section 20(b). Courts no longer imply private rights of action absent legislative intent to create a private right of action, and that simply doesn't exist where Congress enacts a statute that provides for express private rights of action in some provisions (e.g., Section 20(a)) and not in other provisions (e.g., Section 20(b)). *See, e.g., Stoneridge Inv. Partners v. Scientific-Atl.,* 128 S.Ct. 761, 772 (2008) ("[I]t is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one"); *Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110, 116 (2d Cir. 2007) ("This Court must 'begin…[its] search for Congress's intent with the text and structure' of the statute, and cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided"); *Alaji Salahuddin v. Alaji*, 232 F.3d 305, 308 (2d Cir. 2000) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate")(internal quotation omitted).

## CONCLUSION

For each of the above reasons, the Amended Complaint must be dismissed in its entirety. Given how many independent pleading requirements the Amended Complaint completely fails, that the complaint has already been amended once, and that the central allegations of the Amended Complaint have been repudiated, Defendants respectfully request that the dismissal be with prejudice.

Dated: June 1, 2015

25

Respectfully submitted,

_____

Jerry S. McDevitt (*pro hac vice*)
K&L Gates LLP
210 Sixth Avenue
Pittsburgh, PA 15222-2613
Telephone: 412 355-8608
Facsimile: 412 355-6501
E-mail: jerry.mcdevitt@klgates.com

Jon Eisenberg (*pro hac vice*)
K&L Gates LLP
1600 K Street, N.W.
Washington, D.C. 20006
Telephone: 202 778-9348
Facsimile: 202 778-9100
E-mail: jon.eisenberg@klgates.com

Jeffrey P. Mueller (ct27870)
Jonathan B. Tropp (ct11295)
Erick M. Sandler (ct25029)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
Telephone: 860-275-0100
Facsimile: 860-275-0343
Email: jmueller@daypitney.com
Email: jbtropp@daypitney.com
Email: emsandler@daypitney.com

Attorneys for World Wrestling Entertainment, Inc.,
Vincent K. McMahon, George A. Barrios, Michelle
D. Wilson, and Stephanie McMahon Levesque

26

**CERTIFICATION**

I hereby certify that on this date a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Jeffrey P. Mueller
Jeffrey P. Mueller (ct27870)