```
------------------------------- x
IN RE WORLD WRESTLING          :
ENTERTAINMENT, INC. SECURITIES :
LITIGATION                     :  Civil No. 3:14-cv-1070(AWT)
                               :
------------------------------- x
```

## RULING ON MOTION TO DISMISS

The lead plaintiff, Mohsin Ansari, and an additional plaintiff, Adnan Shafeeq, bring a federal securities class action pursuant to Fed. R. Civ. P. Rules 23(a) and (b)(3) on behalf of themselves and others who purchased World Wrestling Entertainment, Inc. securities between October 31, 2013 and May 16, 2014.

The plaintiffs allege violations of the Securities and Exchange Act of 1934 (the "Exchange Act") by World Wrestling Entertainment, Inc. ("WWE"); Vincent K. McMahon ("McMahon"); George A. Barrios ("Barrios"); Michelle D. Wilson ("Wilson"); and Stephanie McMahon Levesque ("Levesque"). Specifically, they allege violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by defendants WWE, McMahon, Barrios, and Wilson; violation of § 20(a) of the Exchange Act by defendants McMahon, Barrios, and Wilson; violation of § 20(b) of the Exchange Act by defendants McMahon, Barrios, and Wilson; and violation of § 20(A) of the Exchange Act by Levesque.

The defendants move to dismiss the plaintiffs' amended complaint, pursuant to Fed. R. Civ. P. Rule 9(b), Fed. R. Civ. P. Rule 12(b)(6), and the Private Securities Litigation Reform Act (PSLRA). The motion to dismiss is being granted.

## I.    FACTUAL BACKGROUND

"The complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." Monsky v. Moraghan, 127 F.3d 243, 244 (2d Cir.1997).

WWE is an integrated media and entertainment company that is incorporated in Delaware and is headquartered in Stamford, Connecticut. Defendant McMahon has been Chairman of the Board of Directors since 1980 and Chief Executive Officer since September 2009. Defendant Barrios has been Chief Strategy and Financial Officer since November 2013 and Chief Financial Officer since March 2008. Defendant Wilson is Chief Revenue and Marketing Officer. Defendant Levesque has been Chief Brand Officer since December 2013 and is a member of the Board of Directors. The time period over which the alleged Exchange Act violations took place runs from October 31, 2013 to May 16, 2014 (the "Class Period"). Lead Plaintiff Ansari purchased WWE common stock during the Class Period and additional plaintiff Shafeeq

purchased WWE securities during the Class Period. The gravamen

of the plaintiffs' claims is:

> Defendants engaged in a scheme to deceive the market, and
> [in] a course of conduct that artificially inflated WWE's
> stock price and operated as a fraud or deceit on Class
> Period purchasers of WWE's stock by misrepresenting the
> status of WWE's internal controls and disclosures.
> Ultimately, however, when Defendants' prior
> misrepresentations and fraudulent conduct came to be
> revealed to investors, shares of WWE declined precipitously
> – evidence that the prior inflation in the price of WWE's
> shares was eradicated. As a result of their purchases of
> WWE stock during the Class Period at artificially inflated
> prices, Plaintiffs and other members of the Class suffered
> economic losses when the Company's true condition . . . was
> finally and fully revealed and the artificial inflation was
> removed from price of the Company's stock[.]

(Amended Complaint for Violation of the Federal Securities Laws

(Doc. No. 71) ("Amended Complaint") ¶ 78.)

The plaintiffs allege that the defendants made "materially

false and misleading statements and omissions during the Class

Period regarding WWE's ability to multiply and transform the

Company's earnings profile." (Id. ¶ 5.) The plaintiffs allege

that the defendants made false and misleading statements

regarding television contract negotiations, suggesting that WWE

could command a contract comparable to that between NASCAR, NBC

and FOX. The plaintiffs further allege that the defendants

"grossly inflated the size of WWE's fan base in an effort to

convey a larger market value for the Company." (Id. ¶ 6.)

Additionally, the plaintiffs allege that the defendants "failed

to inform investors of the detrimental impact that the Company's

launch of its WWE Network, a 24/7 subscription-based streaming network . . . had on the television license negotiations with NBC." (Id. ¶ 7.)

Based on information from a confidential witness ("CW1"), who was the Vice President of WWE's global digital advertising sales team from December 2010 to January 2014, the plaintiffs allege that the defendants knew that their revenue forecasts were inflated, that their fan-base was smaller than they represented, and that they overstated the strength of their negotiation position in their negotiations with NBC.

On May 15, 2014, WWE announced that it had reached a multi-year contract with NBCU.[1] On the same day, after the market closed, WWE issued a press release outlining the details of the deal and revealing that instead of increasing its operating income by 200 to 300%, the contract only increased operating income by 40%. The following day, WWE stock dropped 43%, from $19.93 at close on May 15, 2014 to $11.27 on May 16, 2014.

With respect to defendant Levesque, the plaintiffs allege that, once it became clear to "WWE insiders" that the NBC contract would not be as profitable as the defendants had represented, defendant Levesque began selling her shares of WWE stock. In 16 transactions from October 3, 2013 to January 7,

---

[1] The plaintiffs refer to NBCU as "NBC."

2014, Levesque sold 441,671 shares for a total of $6,174,551.02. (Id. ¶ 23.)

**Materially False and/or Misleading Statements or Omissions**

The plaintiffs specifically allege that the defendants made the following materially false and/or misleading statements during the Class Period.[2]

On October 31, 2013, the defendants issued a press release announcing WWE's financial results. The press release quoted defendant McMahon as saying:

> These accomplishments reflect the strength of our brands, including a national television audience that exceeds the annual reach of most other sports and entertainment programs. This strength provides a solid foundation for the renegotiation of our TV contracts and the potential launch of a WWE network.

(Id. ¶ 37.) The press release also quoted defendant Barrios as stating:

> Given the rising value of live content that has a broad, loyal following, we are confident that we will be able to negotiate our key domestic agreements by the end of April next year and that our efforts, including the potential launch of a WWE network, will keep us on track to double or triple our OIBDA results of $63 million by 2015[.]

(Id.) The plaintiffs argue that these statements were materially false and/or misleading because the defendants knew or

---

[2] In the Amended Complaint, the plaintiffs also identify allegedly false and/or misleading statements made in a February 28, 2014 press release. However, as pointed out by the defendants and conceded by the plaintiffs, the referenced press release was issued on February 28, **2013,** before the Class Period. Therefore, the court does not consider it.

recklessly disregarded 1) that "WWE had already begun negotiating with NBC for a new television contact, and those negotiations had already failed to achieve a doubling or tripling of 2012 OIBDA results"; 2) that "WWE's television audience was younger, less educated, and had a lower average income than the audience for live sports, which caused WWE to generate much less advertising revenue than live sports"; and 3) that "networks viewed WWE as categorically different from and less valuable than the 'live content' that had garnered increasingly large television licensing deals." (Id. ¶ 38.)

This press release also contained a disclaimer stating:

Forward-Looking Statements: This press release contains forward-looking statements pursuant to the safe harbor provisions of the Securities Litigation Reform Act of 1995, which are subject to various risks and uncertainties. These risks and uncertainties include, without limitation, risks relating to maintaining and renewing key agreements, including television and pay-per-view programming distribution agreements. . . .

(Memorandum of Law in Support of the Motion of World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios, Michelle D. Wilson, and Stephanie McMahon Levesque to Dismiss the Consolidated Amended Complaint (Doc. No. 77-1) ("Defendants' Memorandum) at 18) (quoting Ex. 4, at 10)[3].

Also on October 31, 2013, the defendants held an earnings conference call for the Third Quarter. The plaintiffs allege

---

[3] The page numbers for the Defendants' Memorandum and Exhibits correspond to the ECF page number found at the top of the page.

that the following statement from defendant McMahon was misleading: "So we pretty much think that all of these initiatives are, if all the stars line up and we believe that they will, and we are working hard to make sure that happens, then our business is going to be transformed as we know it." (Amended Complaint ¶ 39.) As alleged by the plaintiffs, defendant McMahon knew or recklessly disregarded that the stars were not "lining up" and that "no network, including NBC, was going to ever pay WWE an amount double or triple the value of its then-current deal. Without the leverage of interest from other suitors, Defendants could not negotiate a contract that would 'transform[]' WWE." (Id. ¶ 40) (alterations in original).

The plaintiffs also allege that following statements by defendant Barrios during the October 31, 2013 conference call were misleading:

> We are confident that the rising value of content in the marketplace, and the potential launch of a WWE network will keep us on track to double or triple our 2012 OIBDA results by 2015. . . .
>
> Recent deals such as NASCAR with NBC Sports reinforce our view that the proliferation of distribution alternatives is driving up the value of content, especially compelling content with broad appeal. WWE shares the key determinants of value that are attributed to live sports . . . which makes WWE content like sports DVR-proof.
>
> The potential launch of a WWE network is another major source of future earnings growth. Our market research and analysis indicate that potential for a meaningful subscriber base and a significant economic opportunity.

(Id. ¶ 41.) The plaintiffs allege that, according to CW1, the defendants "knew or recklessly disregarded that WWE does not 'share[] the key determinants of value that are attributed to live sports' because WWE could not generate the type of advertising revenue that live sports generated." (Id. ¶ 42.) The plaintiffs allege that, "[a]ccording to CW1, in order for a network to enter into a $400 million annual deal with WWE, they would need to generate four times more per advertising spot, which per CW1, both Defendants and networks, specifically NBC, knew was impossible." (Id.) CW1 further alleges that internal documents indicated that WWE recognized that it was "not the PGA, NFL, or MLB[,]" but rather a company in its early growth stages. (Id.) The plaintiffs also allege that WWE is not like live sports because it is not "DVR-proof." (Id. ¶ 43.)

Furthermore, the plaintiffs allege that the "Defendants knew or recklessly disregarded that the WWE network would not be 'another major source of future earnings growth'" because internal research indicated that WWE did not have a large enough fan base. (Id. ¶ 44.) The plaintiffs allege that "CW1 stated that Barrios 'absolutely' knew these real figures, because it was a regular topic of discussion" between defendants Barrios and McMahon and because both of them had access to the reports. (Id.)

On the same October 31, 2013 conference call, defendant
Barrios also stated:

> Over the past 12 months, our programming surpassed the
> cumulative audience delivery of most sports and
> entertainment programs, including the national broadcast of
> Major League Baseball, NASCAR, the NHL and even The Walking
> Dead, and our total social media platform now reaches
> nearly 219 million followers, including more than 140
> million likes and 70 million Twitter followers . . .

(Id. ¶ 45.) The plaintiffs allege that these numbers were
drastically inflated, as one fan who was "following" a dozen
different wrestlers would be counted twelve times. The
plaintiffs also allege that defendant Wilson asked CW1 to
misrepresent viewership data to advertisers.

The defendants point out that the call started with the
statement: "In today's discussion, we'll be making several
forward-looking statements. These statements are based on
management estimates. Actual results may differ due to numerous
factors as described in our presentation and in our filings with
the SEC." (See Defendants' Memorandum at 18; Ex. 5, at 2)

On December 10, 2013 defendant Barrios participated in the
UBS Global Media and Communications Conference. At the
conference he compared a recent NASCAR deal with NBC to the deal
that WWE was negotiating with NBCU. He noted that whereas NASCAR
did 330 hours of programming in the previous year with an
average of 3 million viewers, WWE did 314 hours of programming

-9-

with an average of 3.7 million viewers. He then commented that because the NASCAR contract was $820 million and WWE was currently at about $100 million, the new contract negotiations were a "massive opportunity" for WWE. (Amended Complaint ¶ 47.) He stated:

> And we believe, with some success across [the four renewal negotiations], we double or triple our 2012 OIBDA and get to $120 million to $190 million. Internally, that's what we're shooting for. A homerun in either of the first two gets you there alone. Three or four million subs on a network gets you there alone. Get halfway between where we are and where NASCAR [it] gets you there alone. Some success on both will look and feel pretty good.

(Id.) During the conference, defendant Barrios also stated that WWE had 220 million social media followers around the world.

The plaintiffs allege that defendant Barrios "misled investors to believe that NASCAR and WWE's purportedly similar viewership hours would result in WWE achieving a similar television licensing contract as the $820 million annual deal NBC and FOX made with NASCAR." (Id. ¶ 48.) The plaintiffs allege that WWE would not be able to negotiate such a large contract because WWE brought in far less advertising revenue than NASCAR, in part because its audience had less spending power than live sports audiences. Accordingly, the plaintiffs allege that the defendants knew that it would be "impossible" to "get halfway between where we are today and where NASCAR is." (Id.) The plaintiffs also allege that defendant Barrios misrepresented the

-10-

size of WWE's fan base; he stated that WWE had 220 million social media followers around the world, but in reality WWE only had 4 to 6 million fans. Accordingly, the defendants knew or recklessly disregarded that it would be impossible to get "three or four million subs on a network." The plaintiffs allege the defendants knew the actual size of the fan base "because CW1 specifically refused to present these inflated numbers when asked by Defendant Wilson on the basis that they were false." (Id. ¶ 50.)

The defendants also note that during the question and answer period at the conference, defendant Barrios was asked about his comparison of NASCAR and WWE and whether advertisers found NASCAR to be more attractive. Defendant Barrios stated that he thought distribution agreements, rather than advertising revenue, would drive the contracts. He further stated, "the advertising should be pretty close but I don't have the hard data to support that." (Defendants' Memorandum, Ex. 6 at 9.)

The defendants also note that:

> In discussing the negotiation of the television contracts, Barrios stated that the NHL, NASCAR, major league baseball, and the NBA were "getting anywhere between 50 cents and $1 per viewer hour while WWE was getting around 10 cents per hour. (Ex. 6 [at 7]). He said, "[Y]ou can make your own judgment about opportunity there." (Ex. 6 [at 7]).

(Defendants' Memorandum at 19-20.)

-11-

On December 17, 2013, <u>Variety</u> magazine published an article entitled, "WWE Aims to Pin Down Rich New TV Rights Deals (EXCLUSIVE)." The article was based on interviews with defendants McMahon, Barrios, and Wilson. The plaintiffs allege that the following statement was materially false and/or misleading:

> "We've had to evolve our thinking," [Michelle] Wilson says, "We are clearly entertainment-based, but if you think about the characteristics of our brand, it's live action, and that's sports. We want to be compensated for a live audience since live content is getting a very significant premium in the marketplace." The company cites Nascar's impressive dealmaking this summer as an example. The racing league secured a new 10-year deal with NBC and Fox worth $820 million a year. And that increase came in the face of declining rates for many of its races. WWE argues that "Raw" and "SmackDown" alone are just as attractive, with a rabid fanbase that's helped build networks, and its series are diverse in ethnicity and age.

(Amended Complaint ¶ 51.) The plaintiffs argue that these statements were materially false and/or misleading because they "knew or recklessly disregarded that the 'characteristics of [the WWE] brand' were not similar to live sports" as evidenced by the fact that its internal documents "discuss the Company's recognition that WWE is 'not the PGA, NFL, or MLB . . .' and that WWE is 'still early in growth stages.'"(<u>Id.</u> ¶ 52.) The plaintiffs also allege that these internal documents belied defendant Wilson's representation that WWE wanted to "be compensated for a live audience." Additionally, the plaintiffs again challenge the appropriateness of the comparison to NASCAR

because the defendants knew or recklessly disregarded that WWE could not generate the same level of advertising revenue.

On January 14, 2014, the defendants had a conference call to discuss the launch of a WWE Network. During the call, an analyst asked about the possible cannibalistic impact that launching the WWE Network could have on its audience base for the NBCU and Syfy programs. Defendant McMahon represented that the network and the NBCU programming were distinct because NBCU would be airing the live programing. He further represented that it was both WWE's view and USA's view that the network was going to increase television ratings and overall interest in and awareness of WWE. The plaintiffs allege that defendant McMahon's statements were materially false and/or misleading because (a) he later admitted that "the WWE network 'definitely had a negative impact' on negotiations with NBC" and (b) he also allegedly admitted that whether the WWE network was going to increase television ratings was a "point of contention during the negotiation process." (Id. ¶ 54.)

The defendants note that the following statement was made at the beginning of the call:

> Today's discussion will include forward-looking statements. These forward-looking statements reflect our current views, are based on various assumptions and are subject to risks and uncertainties disclosed from time to time in our SEC filings. Actual results may differ materially and undue reliance should not be placed on them.

(Defendants' Memorandum, Ex. 25 at 1.) Furthermore, during the

call, defendant Barrios stated:

> Although these initiatives hold significant potential, our
> financial performance for 2014 could fall within a wide
> range of outcomes depending on the rate of Network
> subscriber acquisition, the level of potential pay-per-view
> cannibalization and the outcome of our content
> negotiations. This wide range of outcomes in 2014 includes
> potentially lower earnings in 2013. . . . Management may
> change its expectation that the planned Network will
> contribute to potentially doubling or tripling the
> company's 2012 OIBDA results of $63 million by 2015.

(Id. at 5.)

On January 16, 2014, WWE had a conference call with

analysts. During this call, defendant Barrios again compared WWE

with NASCAR and live sports, stating:

> The second major transformable opportunity for us is the
> renewal of our four largest TV agreements, two in the US
> with NBCU. . . . Up top you have the live gross rating
> points delivered by the major live – deliverers of life of
> [live] content which is sports – NBA 514; Major League
> Baseball 295; NASCAR 212. WWE delivered 344 live gross
> rating points over the last 12 months. The payment for
> those gross rating points sit[s] somewhere between $2
> million and $5 million currently in the marketplace. So the
> way that math works, if you are NASCAR, you have 212 gross
> rating points, you are averaging about $4 million per,
> NASCAR on average is $800 million of domestic rights fees a
> year. As I mentioned before, WWE's four largest deals are
> at $100 million globally. So the domestic gets obviously
> less than that. So the range of opportunity sits from
> somewhere where are today to those numbers. We've said with
> some level of success especially across the network and the
> rights renewal that we think we can double or triple 2012
> OIBDA by 2015.

(Amended Complaint ¶ 55.) The plaintiffs contend that "Defendant

Barrios misled investors to believe that WWE's television

license negotiations would lead to a contract akin to NASCAR's $800 million annual licensing deal because WWE's 'live gross rating points' were above both Major League Baseball and NASCAR." (Id. ¶ 56.) They allege that defendant Barrios omitted the crucial fact that in order to secure a contract even half of that size, WWE would have to garner four times more per advertising spot than it was currently getting. The plaintiffs allege that "CW1 stated that this was impossible and therefore NBC would never pay that much. Thus, it was also materially false and misleading to state that 'we think we can double or triple 2012 OIBDA by 2015' with the rights renewal." (Id.)

The plaintiffs allege that during this call, defendant Barrios again misrepresented the size of WWE's fan base, stating that WWE had "13 million to 14 million uniques to our website, 250 million social media followers. That is more than the NBA and all of its teams combined. That's more than the NFL and all of its teams combined." (Id. ¶ 57.) The plaintiffs allege that this statement is materially false and/or misleading because "[a]ccording to CW1, management would recount the same followers may times over in an effort to inflate the number of WWE fans . . . [and] because Defendants knew or recklessly disregarded that WWE's fan base was not nearly the size of other live sports." (Id. ¶ 58.)

On February 20, 2014, WWE issued a press release announcing
its 2013 Fourth Quarter and full year financial results. The
release quoted defendant Barrios as stating:

> Regarding our domestic TV licensing agreements, we are now
> engaged with potential partners after exiting our exclusive
> negotiations period with NBCU. Based on our analysis of the
> value of comparable programs and our extensive research
> regarding consumer interest in WWE Network, we continue to
> believe that we can double or triple our 2012 OIBDA results
> of $63 million by 2015.

(Id. ¶ 59.) The plaintiffs allege that this statement was
materially false and/or misleading because, according to CW1,
"from the onset other networks had expressed no interest in
working with WWE" and, thus, they were not engaged with other
potential partners at the time defendant Barrios made the
statement. (Id. ¶ 60.) In light of that fact, the plaintiffs
also allege that:

> Without the interest from other networks, Defendants knew
> or recklessly disregarded that WWE could not negotiate a
> contract that would 'double or triple' the operating income
> of WWE based on a new television contract, because the
> Company was only negotiating its contract with NBC without
> any bargaining power.

(Id.)

The defendants note that the press release contained the
following disclosure:

> Forward Looking Statement: This press release contains
> forward-looking statements pursuant to the safe harbor
> provisions of the Securities Litigation Reform Act of 1995,
> including, without limitations, forward-looking statements
> regarding the Company's growth plans. All of those forward-
> looking statements are subject to various risks and

uncertainties. These risks and uncertainties include, without limitation, risks relating to entering into, maintaining and renewing key agreements, including television and pay-per-view programming and our network distribution agreements. . . . Actual results could differ materially from those currently expected or anticipated.

(Defendants' Memorandum, Ex. 11 at 10.)

8.    On February 20, 2014, WWE also had an earnings conference call for its 2013 Fourth Quarter financial results. Defendant Barrios stated:

[W]e continue to believe that we can double or triple our 2012 OIBDA results by 2015. Our programs share the same key determinants of value that are attributed to live sports, significant first run hours, and the associated gross rating points, a passionate and loyal fan base and 90% live plus same day viewership, which makes WWE content like sports DVR-proof. Benchmarking our rights fees to the fees paid for sports programming and other original scripted series indicates that our license agreements could have meaningful upside potential.

(Amended Complaint ¶ 61.) The plaintiffs allege that this statement was "materially false and/or misleading when made because, among other things, Defendant Barrios knew or recklessly disregarded that WWE does not 'share[] the key determinants of value that are attributed to live sports' because WWE could not generate the type of advertising revenue that live sports generate." (Id. ¶ 62.) The plaintiffs allege that the defendants also knew that their fan base did not have significant spending power, which also had a negative impact on their negotiations. Additionally, the plaintiffs allege that WWE is not DVR-proof.

-17-

During the call, defendant Barrios also addressed a question as to whether or not the fact that the media paid a lower CPM ("cost per thousand") for WWE's content was a factor contributing to why WWE had not yet reached a deal with NBCU. Defendant Barrios responded,

> I don't want to characterize any of the discussions we've had including with NBCU. As I have said before right behind the NFL and the NBA comes WWE in terms of generating live gross rating points in the U.S. So that's ahead of NASCAR, ahead of NHL, it is ahead of Major League Baseball, and all their national deals. So we feel good about the value that we bring to a partner both in advertising, being able to drive their CPM as well as and more importantly in the value to their affiliate revenue streams.

(Id. ¶ 64.) The plaintiffs allege that this statement was "materially false and/or misleading when made because Defendants knew or recklessly disregarded that purportedly comparable 'gross rating points' for WWE to the NFL, MLB, NBA, NHL and NASCAR were in no way commensurate with how NBC valued WWE's television license." (Id. ¶ 65.) Accordingly, the plaintiffs allege that there was no reason that the defendants should "feel good" about WWE's ability to add value to an advertising partnership or to affiliate revenue streams. The plaintiffs also allege that "other networks had already declined to work with WWE, so the Company was only renegotiating its contract with NBC, who would not come close to the $400 million (of the total $800 million) that NASCAR received in its license deal." (Id.)

The defendants note that this conference call began with another forward-looking statements disclaimer, which was similar to those on prior occasions. They also note that defendant McMahon "stated that the requirement that WWE negotiate exclusively with NBC had expired and 'we're out in the marketplace [for] the first time in a long, long time.'" (Defendants' Memorandum at 25-26) (quoting Ex. 12 at 5). Defendant Barrios also noted that WWE had renewed agreements in the UK and Thailand and was also in discussions in India.

On May 1, 2014, the defendants had another earnings call with analysts, and defendant Barrios made the following statement:

> Regarding our television licensing agreements, we are
> continuing to negotiate with potential distribution
> partners in the U.S. and India. . . . we continue to
> believe that the successful execution of key initiatives
> could potentially result in doubling or tripling our 2012
> OIBDA results to a range of $125 million to $190 million by
> 2015.

(Amended Complaint ¶ 69.) The plaintiffs allege that this statement was materially false and/or misleading because, according to CW1, at the time these statements were made, WWE was only negotiating with NBC, not with any other "potential distribution partners." Furthermore, the plaintiffs allege that the statements were materially false and/or misleading because "according to CW1, NBC was not willing to pay an amount of money

for the contract that would come anywhere close to doubling or tripling 2012 OIBDA results." (Id. ¶ 70.)

During the same call, defendant Barrios also stated,

Our comprehensive consumer research demonstrates that more than 50% of TV homes across WWE's top global markets were about 120 million homes, report some level of affinity for WWE content. And among these WWE homes, more than 80 million are classified as active, representing more than 170 million passionate and casual fans.

(Id. ¶ 71.) The plaintiffs allege that this statement was materially false or misleading when made because, according to CW1, the defendants knew that their fan base was 4-6 million fans, not more than 80 million.

The defendants note that this earnings call started with a forward-looking statements disclaimer.

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 550, 555 (2007) (citing Papasan v. Allain,

478 U.S. 265, 286 (1986)(on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Twombly, 550 U.S. at 557).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)."  Id. (citations omitted).  However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face."  Id. at 1974.  "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"  Mytych v. May Dept. Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)).  "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims."  United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by

-21-

reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, allegations of securities fraud pled under § 10(b) of the Exchange Act and Rule 10b-5 are subject to the pleading requirements of Federal Rule of Civil Procedure Rule 9(b). Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir. 1994). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "[A] complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Shields, 25 F.3d at 1127-28 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Similarly, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that when a plaintiff claims that the defendant has made an untrue statement of a material fact or

omitted a material fact necessary to make a statement not misleading, the plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . ." 15 U.S.C. § 78u-4(b)(1)(2010). Furthermore, to state a claim for securities fraud, the plaintiff must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(2010). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)).


## III. DISCUSSION

The defendants move to dismiss the plaintiff's consolidated amended complaint, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA. They argue that the Amended Complaint should be dismissed because

> 1. it fails to plead non-conclusory facts showing a material false statement or omission, as opposed to genuinely believed optimism about the Company's future prospects; 2. it fails to plead non-conclusory facts creating the requisite strong inference of scienter; 3. it fails to plead non-conclusory facts showing loss causation; and 4. it is barred by the safe harbor in the PSLRA for forward-looking statements made without actual knowledge of their falsity.

(Defendants' Memorandum at 9.)

They further assert that "the claims against Wilson and Levesque should be dismissed because Plaintiffs have not alleged any elements of a violation against them and have ignored that Leveque's shares were sold pursuant to a Rule 10b5-1 plan that was executed and publicly disclosed seven months before the beginning of the class period." (Id. at 9.)

### A. Count I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 by defendants WWE, McMahon, Barrios, and Wilson

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

To state a claim for violation of Section 10(b) and Rule 10b-5[4], the plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter;

---

[4] Rule 10b-5, promulgated by the SEC to implement Section 10(b), makes it unlawful for any persons, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

(3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Conn. Ret. Plan and Trust Funds, 133 S.Ct. 1184, 1192 (2013) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011)).[5]

### 1. Material Misrepresentation or Omission

To state a claim, the plaintiffs must allege "that the defendant[s] made a statement that was 'misleading as to a material fact.'" Matrixx Initiatives, 563 U.S. at 38 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988)). The "materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Id., 563 U.S. at 38 (quoting Basic, 485 at 231-32

---

[5] The third and fifth elements do not appear to be contested in this case. The plaintiffs argue that reliance is established via the fraud-on-the-market doctrine. "The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." Amgen Inc., 133 S.Ct. at 1190. "[I]f a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities." Id. at 1192. The defendants do not contest the applicability of the fraud-on-the-market doctrine.

(2010)). "[W]hen presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Ganino, 228 F.3d at 162 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)). "While each allegation of fraud must be sufficiently particularized, allegations of materiality should not be considered in isolation." Manavazian v. Atec Grp., Inc., 160 F. Supp. 2d 468, 478 (E.D.N.Y. 2001).

"[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, 563 U.S. at 44 (quoting 17 CFR § 240.10b-5(b)).

Courts distinguish between false or misleading statements of fact and false or misleading statements of opinion. Statements of opinion are considered false or misleading if at the time a statement was made, "the speaker did not hold the belief she professed" or "the supporting fact[s] she supplied were untrue." Tongue v. Sanofi, No. 15-588-CV, 2016 WL 851797,

at *7 (2d Cir. Mar. 4, 2016) (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S.Ct. 1318, 1327 (2015)). The plaintiff

> must identify particular (and material) facts going to the
> basis for the issuer's opinion--facts about the inquiry the
> issuer did or did not conduct or the knowledge it did or
> did not have--whose omission makes the opinion statement at
> issue misleading to a reasonable person reading the
> statement fairly and in context.

Id. (quoting Omnicare, 135 S.Ct. at 1332). "[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." Id. (quoting Omnicare, 135 S.Ct. at 1332). "[A] reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at [the] time.'" Id. (quoting Omnicare, 131 S.Ct. at 1329). At the same time, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and, therefore, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" Id. at *8 (quoting Omnicare, 135 S.Ct. at 1329).

The Amended Complaint identifies many statements that the plaintiffs allege are false or misleading. Those statements fall

into four general categories: 1) the size of WWE's fan base, 2) the potentially cannibalistic effect of launching the WWE network, 3) comparison between WWE and live sports, 4) the status of negotiations with NBCU, and 5) statements regarding the potential to double or triple 2012 OIBDA by 2015. The plaintiff's central grievance -- the fact that WWE knew that the NBCU contract was not going to double or triple OIBDA -- is germane to most of these categories.

The court concludes that the plaintiffs have failed to allege facts sufficient to suggest that the defendants' statements about the size of WWE's fan base, statements about the cannibalistic effect of launching the WWE network, statements about the status of negotiations with NBCU, and statements regarding the potential to double or triple OIBDA were materially false or misleading. However, the court concludes that the plaintiffs have alleged facts sufficient to suggest that the defendants' repeated comparison between WWE and live sports, without referencing the discrepancy in advertising revenue between WWE and those sports, was materially misleading.

### a.    Statements about the size of WWE's fan base

The plaintiffs identify six statements in which they allege the defendants misrepresented the size of WWE's fan base.

In three instances, the plaintiffs allege that the defendants misrepresented the size of WWE's social media

following. (See Amended Complaint ¶¶ 45, 50, 57.) First, during

the October 31, 2013 call, defendant Barrios stated:

> [O]ur total social media platform now reaches nearly 219
> million followers, more than 140 million Facebook likes and
> 70 million Twitter followers, representing a 28% increase
> from the end of the preceding quarter and a 92% increase
> from the end of the third quarter last year. Building the
> strength of our brand is evidenced in these metrics, and
> taking advantage of that strength is a critical component
> of our long-term strategy.

(Id. ¶ 45.) Second, at the December 10, 2103 conference,

defendant Barrios stated:

> The thesis is we have 220 million social media followers
> around the world. I mentioned John Cena is the number 3
> athlete behind Kobe and LeBron in the entire world, in
> terms of followers. There are people monetizing that
> audience today. We are not doing as good a job in that
> front.

(Id. ¶ 50); (Defendants' Memorandum, Ex. 6 at 7.)

Third, during the January 16, 2014 conference call,

defendant Barrios stated,

> The third item I talked about is our social media and
> digital audience, 13 million to 14 million uniques to our
> website, 250 million social media followers. That is more
> than the NBA and all of its teams combined. That's
> more than the NFL and all of its teams combined. It is an
> amazing tool for us to reach and engage our audience. The
> social media chatter on the Network has been through the
> roof for us globally.

(Amended Complaint ¶ 57.)

The plaintiffs allege that these numbers are inflated

because management manipulated the number of their fans on

social media by counting the same fan multiple times. For

example, if one fan was "following" 12 wrestlers on social media, management counted this one fan as 12 fans. Though this may be true, given the context in which these representations were made, the plaintiffs have failed to allege that there is a substantial likelihood that a reasonable investor would find that the "correct" number of social media followers would have "significantly altered the 'total mix' of information made available." Matrixx Initiatives, Inc., 563 U.S. at 38 (quoting Basic, 485 U.S. at 231-232) (emphasis added).

When considering the misleading nature of a statement, the key question the court must ask is "whether defendants' representations, taken together and in context, would have mislead a reasonable investor[.]" McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990). These statements were made in the context of supporting other statements that the plaintiffs have not alleged are materially false or misleading. For example, the first statement was made in the context of the defendants identifying that WWE had experienced "a 28% increase from the end of the preceding quarter and a 92% increase from the end of the third quarter last year" in its social media platform. The plaintiffs have not alleged that this fact is false or misleading. The second statement was made in the context of stating that John Cena was very popular and that WWE needed to do a better job of mobilizing its social media fan

base. In that context, even if the numbers are misstated, the plaintiffs have failed to allege that the defendants' representations are materially misleading.

As to the third statement, the plaintiffs alleged with respect to the comparison to the NBA and the NFL, that "an internal company presentation" stated that "WWE is 'not the PGA, NFL, or MLB . . .' and that WWE is 'still in early growth stages and need[s] to manage [its] business accordingly.'" (Amended Complaint ¶ 58). However, the plaintiffs provide no context for the statement in the internal presentation and whether this statement relates at all to the size of the social media following for those sports as compared to WWE. Thus, the court cannot conclude that the plaintiffs have alleged facts sufficient to cause this statement to be misleading.

The plaintiffs also identify three instances in which they allege the defendants made false or misleading statements about WWE's television audience. First, they point to the October 31, 2013 press release that quoted defendant McMahon as stating,

> These accomplishments reflect the strength of our brands, including a national television audience that exceeds the annual reach of most other sports and entertainment programs. This strength provides a solid foundation for the renegotiation of our TV contracts and the potential launch of a WWE network. Based on our ability to create powerful, entertaining content and to expand distribution, we strongly believe that we are poised to transform our business.

(Id. ¶ 37.) The plaintiffs allege that this statement is false
or misleading because the "Defendants knew or recklessly
disregarded that WWE's fan base was smaller than live sports . .
. which mislead investors to believe that WWE's television
licensing was as valuable as or more valuable than live sports."
(Id. ¶ 38.) However, the plaintiffs do not allege facts that
could cause defendant McMahon's statement that WWE had a
"national television audience that exceeds the annual reach of
most other sports and entertainment programs" to be misleading.
Furthermore, defendant McMahon's statement is notably general.
He states that the strength of the WWE brand "provides a solid
foundation" for WWE's negotiations and notes WWE's "ability" to
expand distribution. Given the context in which this statement
was made, the plaintiffs have failed to allege facts sufficient
to suggest that defendant McMahon's statement was misleading,
let alone that it was materially misleading.

Second, the plaintiffs cite defendant Barrios's October
31, 2013 statement in which he stated, "Our market research and
analysis indicate the potential for a meaningful subscriber base
and a significant economic opportunity." (Id. ¶ 41.) The
plaintiffs allege that this statement is materially misleading
because WWE's internal research showed that WWE had "at most,
about 1.3 million viewers per month, and about 4 to 6 million
fans total--2.5 million of which were under the age of 18--in

-32-

the United States." (Id. ¶ 44.) Because WWE would need about 1 million subscribers to break even, WWE would need about 75% of its total fan base to sign up for the network which CW1 represented was "completely unrealistic." (Id.)

"[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008) (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."). CW1 does not specifically identify the report or statement that contained or reflected the data that WWE had "at most, about 1.3 million viewers per month, and about 4 to 6 million fans total--2.5 million of which were under the age of 18--in the United States." (Amended Complaint ¶ 44.)

Moreover, even if CW1's allegations are true, they do not cause defendant Barrios's statement to be misleading because having 4 to 6 million fans could constitute a "meaningful subscriber base." CW1 might have disagreed, but his disagreement

does not cause defendant Barrios's statement to be materially false or misleading.

Third, on May 1, 2014 defendant Barrios stated:

> Our comprehensive consumer research demonstrates that more than 50% of TV homes across WWE's top global markets or about 120 million homes report some level of affinity for WWE content.  And among these WWE homes, more than 80 million are classified as active, representing more than 170 million passionate and casual fans. Moreover, we believe that we have the potential to reengage some portion of the 40 million homes with lapsed fans in these markets. In our view, taking advantage of WWE's tremendous brand strength to expand the network globally will provide a platform for driving long-term growth over the next several years.

(Defendants' Memorandum, Ex. 15 at 6); (Amended Complaint ¶ 71.) Again, the court considers the context in which the statement was made. See McMahan, 900 F.2d at 579. This statement was made in the context of a discussion about expanding the WWE Network. During these same remarks, defendant Barrios stated that "the network [was] on track to achieve 1 million subscribers by year end and 2 million to 3 million subscribers at steady-state." (Defendants' Memorandum, Ex. 15 at 6.) He was then asked a follow-up question as to why, if WWE had a "market size . . . of about 140 million, plus about 40 million lapsed[,]" the estimate wasn't more like 6 million subscribers. (Id., Ex. 15 at 12.) Defendant Barrios then explained that comparing the numbers was a bit like comparing "apples and oranges" and that the 2 to 3 million was what they hoped for domestically and that the other

numbers measured WWE fans internationally. (Id.) Defendant

McMahon added that he thought the 2 to 3 million was a

conservative estimate.

The plaintiffs allege that defendant Barrios's statement

was false and misleading because, according to CW1, defendant

Barrios "had access to pay-per-view numbers and internal and

external research reports which indicated that at most WWE had

4-6 million active fans, not 'more than 80 million.'" (Amended

Complaint ¶ 72.) Again, the plaintiffs do not "specifically

identify the reports or statements containing this information."

Teamsters Local 445, 531 F.3d at 196. Moreover, even if data

known to CW1 directly contradicted the numbers presented by

defendant Barrios, the plaintiffs have failed to allege facts

that make such a misrepresentation material. The defendants

consistently updated analysts on the number of subscribers WWE

had, their goal to reach 1 million subscribers by year-end, and

their goal to hit 2-3 million at "steady-state." They also

explained that comparing these goals to the numbers represented

was like comparing "apples to oranges." Given the context in

which the defendants made these remarks about the size of WWE's

fan base and the total mix of information available to

investors, the court does not conclude that their

representations were materially misleading.[6]

### b.   Statements regarding the potentially cannibalistic effect of launching the WWE network

The plaintiffs allege that the defendants knew or

recklessly disregarded the potentially cannibalistic impact of

launching the WWE network. On January 14, 2014, defendant

McMahon responded to a question about the potential

cannibalistic effect of launching the network. He was asked,

"Given the fact that you will be rebroadcasting some of those

programs, just maybe elaborate on why the launch of the Network

wouldn't be somewhat cannibalistic to your -- potentially

cannibalistic to your current audience base for those key

properties?" (Amended Complaint ¶ 53.) He responded that he did

not believe it would be because the other shows were live and

that was part of their appeal; since the WWE network would not

be live, he did not think the network would cannibalize the

audience base for WWE's other programming. Defendant McMahon

added: "And by the way, this is not something that is just a WWE

point of view. This is also a USA point of view. Having

discussions, obviously, with management there, they too -- the

---

[6] Additionally, the plaintiffs do not allege any connection
between this alleged misrepresentation and the negotiation of
the NBCU contract. In their discussion of the NBCU contract
announcement on May 15, 2014, the plaintiffs do not mention
anything about the WWE network and its success or failure.

network, USA, they too believe this is going to increase television ratings." (Id.) During the May 19, 2014 conference call, defendant McMahon made, what the plaintiffs characterize to be, a "stunning Company admission" (id. ¶ 77) that he believed that the timing of the WWE Network launch "definitely had a negative impact" on the strength of their negotiating position with NBCU. (Id. ¶ 76.)

However, defendant McMahon's candor on May 19th does not show that he did not believe at the time his previously expressed opinion that launching the WWE Network would not have a cannibalizing effect, and the plaintiffs have offered no factual allegations that suggest that he did not honestly hold his belief when he answered the question. His opinion may have turned out to be wrong, but that does not mean that he did not actually believe his statement when he made it. Accordingly, under Sanofi and Omnicare, he cannot be held liable for this statement. See Omnicare 131 S.Ct. 1326.

The plaintiffs also allege that the statement that USA also believed that the launch of the WWE Network would increase ratings was misleading "because McMahon admitted that it was a point of contention during the negotiation process." (Amended Complaint ¶ 54.) However, the plaintiffs do not identify where, when, or how defendant McMahon "admitted" this. Therefore, the plaintiffs have not alleged facts sufficient to suggest that

defendant McMahon's statements about the potential cannibalizing effect of the Network launch was materially misleading.

### c. Statements comparing WWE and live sports

The plaintiffs allege that it was misleading for the defendants to represent WWE as having the "key determinants of value that are attributable to live sports" (Amended Complaint ¶¶ 41-42) and to benchmark WWE's television contracts against contracts obtained by live sports because the defendants knew or recklessly disregarded the fact that WWE brought in a fraction of the advertising revenue that live sports did. The plaintiffs allege that failure to disclose this fact was a material omission.

The plaintiffs identify seven instances in which the defendants compare WWE to live sports, including NASCAR. First, the October 31, 2013 press release quoted defendant Barrios as stating:

> Given the rising value of live content that has a broad, loyal following, we are confident that we will be able to negotiate our key domestic agreements by the end of April next year and that our efforts, including the potential launch of a WWE network, will keep us on track to double or triple our 2012 OIBDA results of $63 million by 2015[.]

(Id. ¶ 37.) The plaintiffs allege that it was misleading to characterize the WWE as "live content" because the "Defendants knew or recklessly disregarded that networks viewed WWE as categorically different and less valuable than the 'live

-38-

content' that had garnered increasingly large television

licensing deals." (<u>Id.</u> ¶ 38.) Second, during the conference call

on October 31, 2013, defendant Barrios stated:

> Recent deals such as NASCAR with NBC Sports reinforce our
> view that the proliferation of distribution alternatives is
> driving up the value of content, especially compelling
> content with broad appeal. WWE shares the key determinants
> of value that are attributed to live sports.  Significant
> first run hours and associated gross rating points, a
> passionate and loyal fan base, and 90% live plus same day
> viewership which makes WWE content like sports DVR-proof.

(<u>Id.</u> ¶ 41.)

Third, the plaintiffs point to defendant Barrios's comments

during the December 10, 2013 UBS conference during which he

stated:

> Let's take NASCAR, it's one of my favorites. NASCAR did
> about 330 hours of programming last year. They averaged
> about 3 million viewers across those 300 hours, so do that
> multiplication, it's about 940 million viewer hours, the
> total [in prescient]. Their contracts, their average annual
> value of their deals are about $820 million. So I mentioned
> ours are less than $100 million for those four deals. So
> they're at $820 million. So let's take that and compare it
> to the WWE. NASCAR did 334 hours, WWE did 314. NASCAR
> averaged about 3 million, WWE averaged about 3.7 million –
> so 20% more viewers than NASCAR did. They're at 800, we're
> at some number around 100. That's why we think this is a
> massive opportunity for us. Does that all get made up in
> one renewal cycle? Don't know. What I do know is live
> content today is incredibly valuable. All these properties
> are signed up for the long term other than the NBA and WWE,
> which are the ones coming up -- real opportunity.

(<u>Id.</u> ¶ 47.) Fourth, the December 17, 2013 <u>Variety</u> article, based

on interviews with defendants McMahon, Barrios, and Wilson,

stated:

"We've had to evolve our thinking," [Michelle] Wilson says. "We are clearly entertainment-based, but if you think about the characteristics of our brand, it's live action, and that's sports. We want to be compensated for a live audience, since live content is getting a very significant premium in the marketplace." The company cites Nascar's impressive deal making this summer as an example. The racing league secured a new 10-year deal with NBC and Fox worth $820 million a year. And that increase came in the face of declining ratings for many of its races. WWE argues that "Raw" and "SmackDown" alone are just as attractive, with a rabid fanbase that's helped build networks, and its series are diverse in ethnicity and age.

(Id. ¶ 51.)

Fifth, on the January 16, 2014 conference call with

analysts, defendant Barrios stated:

Up top you have the live gross rating points delivered by the major live -- deliverers of life content which is sports -- NBA 514; Major League Baseball 295; NASCAR 212. WWE delivered 344 live gross rating points over the last 12 months. The payment for those gross rating points sit[s] somewhere between $2 million and $5 million currently in the marketplace. So the way that math works, if you are NASCAR, you have 212 gross rating points, you are averaging about $4 million per, NASCAR on average is $800 million of domestic rights fees a year. As I mentioned before, WWE's four largest deals are at $100 million globally. So the domestic gets obviously less than that. So the range of opportunity sits from somewhere where we are today to those numbers.

(Id. ¶ 55.)

Sixth, during the 2013 Fourth Quarter financial results

conference call on February 20, 2014, defendant Barrios stated:

[W]e continue to believe that we can double or triple our 2012 OIBDA results by 2015. Our programs share the key determinants of value that are attributed to live sports, significant first run hours, and the associated gross rating points, a passionate and loyal fan base and 90% live plus same day viewership, which makes WWE content like

sports DVR-proof. Benchmarking our rights fees to the fees
paid for sports programming and other original scripted
series indicates that our license agreements could have
meaningful upside potential.

(Id. ¶ 61.)

Seventh, he also stated during that conference call:

As I have said before, right behind the NFL and NBA comes
WWE in terms of generating live gross rating points in the
US. So that's ahead of NASCAR, ahead of NHL, it is ahead of
Major League Baseball, and all their national deals. So we
feel good about the value that we bring to a partner both
in advertising, being able to drive their CPM as well as
and more importantly in the value to their affiliate
revenue streams.

(Id. ¶ 64.)

The statements above compare WWE to live sports based on

the metrics of gross rating points, same day viewership, first

run hours, and its passionate and loyal fan base. The defendants

make no comparisons of advertising revenue. Therefore, the court

considers whether omission of the alleged discrepancy between

WWE's advertising revenue and that of live sports rendered these

comparisons misleading. "[Section] 10(b) and Rule 10b-5(b) do

not create an affirmative duty to disclose any and all material

information. Disclosure is required under these provisions only

when necessary 'to make . . . statements made, in the light of

the circumstances under which they were made, not misleading.'"

Matrixx Initiatives, 563 U.S. at 44 (quoting 17 C.F.R. §

240.10b-5(b)). "Even with respect to information that a

reasonable investor might consider material, companies can

control what they have to disclose under these provisions by controlling what they say to the market." Id. at 45; see also In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts. As Time Warner pointedly reminds us, we have not only emphasized the importance of ascertaining a duty to disclose when omissions are at issue but have also drawn a distinction between the concepts of a duty to disclose and materiality." (citations omitted)).

The defendants point out that defendant Barrios did, in fact, disclose the discrepancy in advertising revenue to investors during the December 10, 2013 conference. Defendant Barrios stated that the NHL, NASCAR, MLB, and the NBA were "getting anywhere between $50 and $1 per hour" and WWE was getting $0.10.[7] (Defendants' Memorandum, Ex. 6, at 7.) He stated, "[Y]ou can make your own judgment call about our opportunity here." (Id.) He was also asked about the analogy between WWE and

---

[7] In their motion to dismiss, the defendants quote this statement as "[]getting anywhere between 50 cents and $1 per viewer hour while WWE was getting around 10 cents per viewer hour." (Memorandum at 12.) It appears that the conference transcript has a typo; where the transcript reads $50, it should read $0.50.

-42-

NASCAR and the gap between them. An analyst asked, "[H]ow do you

make that gap up, is it really the advertisers, Pepsi, Coke

saying hey, the demographics of NASCAR are more attractive than

the demographics of WWE?" (Id. at 11.) Defendant Barrios

responded:

> [I]f you looked at all those deals and looked at how much
> is generated in advertising dollars by the networks so if
> you say well NASCAR is generating $820 million in license
> fees from its partner how much advertising are the networks
> generating. Very little relatively speaking 200 maybe 300,
> so the question why are networks paying money they are not
> going to lose money if they only making that on the
> advertising. The reason they pay the money is because of
> the distribution fees. . . . So it's not just about the
> advertising, it's about both [the advertising and
> distribution fees], the question specifically on the
> advertising we don't have direct data on what everybody['s]
> CPMs are. We think if you look at the underlying demo they
> look pretty close so my guess is the monetization, the
> advertising revenue should be pretty close but I don't have
> the hard data to support that. But . . . networks make 70%
> of their money on average from distribution . . . and it's
> getting more, that percentage is skewing more and more
> everyday and on that front we compare to everybody.

(Id.) Additionally, when Barrios was asked to explain the

"disparity" between NASCAR and WWE, he responded:

> Either there is some fundamental difference in the delivery
> that we are not seeing and we've looked at everything
> including demographics and if anything I'd argue our
> demographics look a bit better because it's younger and
> more diverse. Household income is a little bit lower but
> not materially so. So there may be something that we are
> missing on that end or we just haven't done as good a job
> as we should have historically in negotiating these
> agreements. But if you believe . . . there is value in live
> eyeball and if you believe there is value in zero
> development risk in delivering those eyeballs, so we're not
> talking about a series that maybe it does well, maybe it
> doesn't and the hit rate's about one in ten. So if you

believe that there's value in live, built in fan base and
DVR proof there's value in our content. And I think if you
read the trades you know that's the only thing people are
valuing now, live and built in which is why sports [are]
where they are at. So it's a great question about help[ing]
us think through that. We can't find data to explain the
gap.

(Id. at 9.)

As noted, when considering the misleading nature of a
statement, the court must ask "whether defendants'
representations, taken together and in context, would have
mislead a reasonable investor." McMahan, 900 F.2d at 579.
Defendant Barrios's disclosure at the UBS conference provides
the context for other statements made at that conference and
that context includes the statistics about advertising revenue.
For this reason, the court does not consider his statements at
the UBS conference to be misleading.

However, the context of the other representations did not
include these statistics about advertising revenue. The
plaintiffs allege that, based on statements from CW1, omission
of this information was materially misleading. CW1 states that
in order for WWE to secure a contract even half the size of
NASCAR's, it would have had to get paid four times more per
advertising spot, and CW1 stated that this was not possible.

The court concludes that the plaintiffs have alleged facts
sufficient to suggest that there is a substantial likelihood
that the disclosure of the discrepancy in advertising revenue

-44-

"would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Matrixx Initiatives</u>, 563 U.S. at 38 (quoting <u>Basic</u>, 485 at 231-32). In addition, the court concludes that the plaintiffs have alleged facts sufficient to suggest that WWE had a duty to disclose the discrepancy in advertising revenue. Given the context in which the statements were made -- discussions about the defendants' contract negotiations with NBCU -- the plaintiffs have alleged facts sufficient to suggest that it was misleading to benchmark WWE against sports like NASCAR and that in order to render such a comparison not misleading, and the discrepancy in advertising revenue needed to be disclosed.

### d.   Statements about the status of negotiations with NBCU

The plaintiffs allege that the defendants made several false or misleading statements regarding their negotiations with NBCU. First, the February 20, 2014 press release states: "Regarding our domestic TV licensing agreements, we are now engaged with potential partners after exiting our exclusive negotiating period with NBCU." (Amended Complaint ¶ 59.) The plaintiffs allege that "[a]ccording to CW1, from the onset other networks had expressed no interest in working with WWE." (<u>Id.</u> ¶ 60.) However, CW1 was not an employee of WWE in February 2014, and the plaintiffs have not offered any other facts to support

their allegation that the statement in the press release was not true at the time it was made. Likewise, the plaintiffs point to a similar statement, made by defendant Barrios during the earnings call on May 1, 2014, as misleading. Barrios stated: "[w]e are continuing to negotiate with potential distribution partners in the U.S. and India." (Id. ¶ 69.) The plaintiffs allege that "Defendant Barrios's statements regarding the status of the U.S. television deal negotiations were materially false and misleading because at the time these statements were made, WWE was no longer negotiating with multiple 'potential distribution partners.'" (Id. ¶ 70.) Again the plaintiffs base this allegation on the representation of CW1 that "other networks had already expressed no interest in working with WWE, so the Company was only renegotiating its contract with NBC." (Id.) CW1 was not employed by WWE in May 2014, and the plaintiffs have not offered any other facts to support their allegation that this statement was untrue when it was made.

Accordingly, the court concludes that the plaintiffs have failed to allege facts sufficient to suggest that the defendants' statements regarding the status of their negotiations with NBCU were materially false and/or misleading when made.

### e. Statements regarding doubling or tripling 2012 OIBDA

The plaintiffs allege that it was materially false and/or misleading to represent that the NBCU deal would double or triple 2012 OIBDA because when the defendants made these representations, they knew or recklessly disregarded the fact the NBCU deal was not going to double or triple 2012 OIBDA.

The defendants argue that their representations were merely optimistic opinions. In support of this contention, they point to the defendants' use of conditional and aspirational language. For example, in discussing the contract negotiations, the defendants use language like "if successful," "if all the stars line up, and we believe that they will," and "we feel good about the value that we bring to a partner." (Defendants' Memorandum at 42) (emphasis in original). The defendants also note the use of words like "confident," "believe," and "potentially" when discussing the plan to double or triple OIBDA. (Id.)

In order to allege a misleading opinion, the plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." Sanofi, 2016 WL 851797, at *7 (quoting

Omnicare, 135 S.Ct. at 1332). "[A] reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at [the] time.'" Id. (quoting Omnicare, 131 S.Ct. at 1329).

The plaintiffs allege that the information that the defendants had at the time indicated that the NBCU deal would not double or triple OIBDA. However, the plaintiffs mischaracterize the defendants' representation of their goals. The defendants represent that they were optimistic that they would be able to double or triple OIBDA by 2015 through negotiation of domestic and international agreements, as well as the launch of the WWE network. Even in the May 15, 2014 announcement of the new NBCU deal, WWE stated, "Given the anticipated increase in television rights, and with successful WWE Network subscriber growth, WWE management continues to believe that the Company can achieve significant earnings growth, potentially doubling or tripling 2012 OIBDA results to a range of $125 million to $190 million by 2015." (Defendants' Memorandum, Ex. 16 at 2.)

The plaintiffs repeatedly allege that because the negotiation of the NBCU deal would not realistically double or triple OIBDA, the defendants' statements were materially false

-48-

and/or misleading. Yet, the plaintiffs have not alleged that the defendants ever stated that they believed that the NBCU deal alone would double or triple 2012 OIBDA by 2015. Rather, in the statements cited by the plaintiffs, the defendants represented that they were confident or hopeful that their deals collectively would double or triple 2012 OIBDA by 2015. Accordingly, the plaintiffs do not allege facts sufficient to suggest that the defendants' opinions that these deals collectively might result in doubling or tripling 2012 OIBDA by 2015 did not fairly align with information in WWE's possession at the time. Therefore, the plaintiffs have failed to allege facts sufficient to suggest that the defendants made material misrepresentations with respect to their goals for OIBDA.

### 2.  Scienter

"To meet the scienter requirement in a 10b-5 action under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "Although speculation and conclusory allegations will not suffice, neither [does the Second Circuit] require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" Ganino, 228 F.3d at 169 (quoting Stevelman

-49-

v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999)). "[A] complaint will survive [a motion to dismiss] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Slayton v. American Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)).

"The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" Ganino, 228 F.3d at 168 (quoting Ernst & Ernst, 425 U.S. 193 n. 12). "The requisite scienter can be established by alleging facts to show either (1) that the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (citing Ganino, 228 F.3d at 168-69). In order to plead "conscious recklessness," the plaintiffs must allege "a state of mind approximating actual intent, and not merely a heightened form of negligence." South Cherry St., LLC v. Hennessee Grp., Ltd., 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original) (quoting Novak, 216 F.3d at 312). "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or

should have known they were misrepresenting material facts with respect to the corporate business." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001).

The allegations in the complaint "are not to be reviewed independently or in isolation, but the facts alleged must be 'taken collectively.'" Slayton, 604 F.3d at 766 (quoting Tellabs, 551 U.S. at 323). If the court decides that the plaintiff has successfully pled either the conscious or reckless misbehavior prong or the motive and opportunity prong of scienter, it need not also consider the other prong. See Ganino, 228 F.3d at 170 ("Of course, if the court decides on remand that the Complaint successfully pleaded the defendants engaged in conscious or reckless misbehavior, it need not also consider the motive and opportunity prong of scienter.").

The court has concluded that the plaintiffs adequately pled material misrepresentations or omissions with respect to statements that compared WWE to NASCAR and other live sports without disclosing the discrepancy in advertising revenue, but not with respect to other categories of misrepresentations or omissions asserted. Therefore, the court only considers whether the plaintiffs have adequately pled scienter with respect to the statements that compared WWE to NASCAR and other live sports without disclosing advertising revenue. The court concludes that the plaintiffs have failed to do so.

**a. Motive and Opportunity**

The plaintiffs have failed to adequately plead scienter on
the basis of motive and opportunity. "In order to raise a strong
inference of scienter through 'motive and opportunity' to
defraud, Plaintiffs must allege that [the corporate defendant or
its officers] 'benefitted in some concrete and personal way from
the purported fraud.'" ECA, Local 134, 553 F.3d at 198 (quoting
Novak, 216 F.3d at 307-08). The plaintiffs have not alleged that
any of the defendants named in Count I benefited in any concrete
and personal way from the alleged fraud. For example, they have
not alleged that any of the defendants named in Count I sold any
of their stock during the Class Period. "The absence of stock
sales by insiders, or any other evidence of pecuniary gain by
company insiders at shareholders' expense, is inconsistent with
an intent to defraud shareholders." In re N. Telecom Ltd. Sec.
Litig., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000). The plaintiffs
have alleged that defendant Levesque sold stock during the Class
Period, however, "the sale of stock by one company executive
does not give rise to a strong inference of the company's
fraudulent intent; the fact that other defendants did not sell
their shares during the relevant class period sufficiently
undermines plaintiffs' claim regarding motive." San Leandro, 75
F.3d at 814; see also Scholastic, 252 F.3d at 75 ("We found in
[San Leandro and Acito] that the failure of other defendants to

sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price." (citing San Leandro, 75 F.3d at 814; Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995)). Also, the "plaintiffs have alleged no facts suggesting that [Levesque] acting alone had the opportunity to manipulate [WWE's stock] for [her] own advantage." San Leandro, 75 F.3d 814 n. 14.

Moreover, to the extent the plaintiffs allege a general motive to increase the profits of WWE or officer and director compensation,

> [m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute "motive" for purposes of this inquiry. Rather, the "motive" showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.

ECA, Local 134, 553 F.3d at 198.

The court concludes that the plaintiffs have not adequately pled scienter on the basis of motive and opportunity.

**b.    Conscious Recklessness**

The plaintiffs have also failed to adequately plead scienter on the basis of conscious recklessness. In order to plead conscious recklessness, the plaintiffs must allege "a state of mind approximating actual intent, and not merely a heightened form of negligence." South Cherry St., 573 F.3d at

109 (emphasis removed) (quoting Novak, 216 F.3d at 312). In

South Cherry St., the court stated:

> In elaborating as to what may constitute recklessness in
> the context of a private securities fraud action, we have
> referred to conduct that "'at the least ... is highly
> unreasonable and which represents an extreme departure from
> the standards of ordinary care to the extent that the
> danger was either known to the defendant or so obvious that
> the defendant must have been aware of it,'" In re Carter-
> Wallace, Inc. Securities Litigation, 220 F.3d 36, 39 (2d
> Cir. 2000) (quoting [Rolf v. Blyth, Eastman Dillon & Co.,
> Inc., 570 F.2d 38, 47 (2d Cir. 1978)](emphasis ours)); or
> to evidence that the "defendants failed to review or check
> information that they had a duty to monitor, or ignored
> obvious signs of fraud," and hence "should have known that
> they were misrepresenting material facts," Novak, 216 F.3d
> at 308 (emphases added). "An egregious refusal to see the
> obvious, or to investigate the doubtful, may in some cases
> give rise to an inference of ... recklessness." [Chill v.
> General Electric Co., 101 F.3d 263, 269 (2d Cir. 1996)]
> (internal quotation marks omitted) (emphases added); see,
> e.g., [SEC v. McNulty, 137 F.3d 732, 741 (2d Cir.), cert.
> denied, 525 U.S. 931 (1998)] (defendant corporate officer
> who prepared and proceeded to file documents with the SEC
> containing statements whose veracity he himself had
> questioned, had had an obvious duty to verify the
> suspicious information).

Id. (emphasis in original).

The plaintiffs have failed to allege facts sufficient to

suggest that the defendants' conduct represented an "extreme

departure from the standards of ordinary care." Throughout the

Amended Complaint, the plaintiffs allege that the defendants had

access to information that contradicted their public statements.

Although "[p]laintiffs can establish conscious recklessness by

adequately alleging that 'defendants knew facts or had access to

non-public information contradicting their public statements'

-54-

and therefore 'knew or should have known they were
misrepresenting material facts[,]'" the plaintiffs have failed
to do so here. In re Sanofi Sec. Litig., 87 F. Supp. 3d 510,
544-45 (S.D.N.Y. 2015) aff'd sub nom. Tongue v. Sanofi, No. 15-
588-CV, 2016 WL 851797 (2d Cir. Mar. 4, 2016) (quoting
Scholastic, 252 F.3d at 76). That is because with respect to the
statements comparing WWE to live sports without noting the
difference in advertising revenue, the plaintiffs have not
alleged facts that suggest that the information available to the
defendants contradicted the information they conveyed to the
public. The plaintiffs have identified only one instance where
the defendants discussed advertising revenue -- during defendant
Barrios's comments at the UBS conference -- and in this
instance, defendant Barrios shared the fact that WWE earned
significantly less per advertising spot than live sports such as
the NHL, NASCAR, MLB and the NBA.

The plaintiffs' contention of conscious recklessness,
therefore, must be premised on the fact that the defendants did
not disclose this information in the context of their other
statements comparing WWE to live sports. Mere non-disclosure,
however, does not satisfy the requirements for scienter. See In
re Sanofi Sec. Litig., 87 F. Supp. 3d at 534. ("[t]he mere
allegation that defendants failed to disclose [relevant
information] does not in and of itself constitute strong

-55-

evidence that they did so with scienter" (quoting <u>Fort Worth</u>
<u>Employers' Ret. Fund v. Biovail Corp.</u>, 615 F.Supp.2d 218, 226
(S.D.N.Y. 2009))).

In <u>Sanofi</u>, the defendants did not disclose the fact that
the FDA had expressed reservations about Genzyme's single-blind
drug trials. The court concluded that Genzyme's failure to
disclose the FDA's reservations did not support a strong
inference of scienter. Rather, the court concluded that
"[v]iewing the circumstances, as pled, in totality, an inference
of scienter is not plausible, and the inference that defendants
intended to mislead is not 'at least as compelling' as the
alternative inference, namely, 'that defendants did not know,
and had no reason to know, that the FDA would initially' reject
the sBLA for Lemtrada." <u>In re Sanofi Sec. Litig.</u>, 87 F. Supp. 3d
at 534-35 (quoting <u>Biovail</u>, 615 F.Supp.2d at 228). Here, one
competing inference to be drawn from the facts alleged in the
Amended Complaint is evidenced by defendant Barrios's
explanation at the UBS conference: the defendants knew about the
discrepancy in advertising revenue between WWE and live sports
but did not believe that it would have a major effect on their
contract negotiations with NBCU; they believed, instead, that
distribution fees would be a driving force and that WWE was
comparable to live sports along that metric. The inference
suggested by the plaintiffs is that the defendants knew that

this discrepancy would prevent WWE from securing a lucrative contract with NBCU and failed to disclose it in order to increase the value of the stock. However, the plaintiffs have failed to allege facts sufficient to suggest that this inference is "at least as compelling" as the competing inference.

Accordingly, the court concludes that the plaintiffs have failed to adequately allege scienter, and Count I is being dismissed.

**B.    Count II: Violation of Section 20(a) of the Exchange Act by defendants McMahon, Barrios, and Wilson**

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007)). If a plaintiff has failed to allege a primary violation, then the § 20(a) claims must be dismissed. See ATSI Commc'ns, 493 at 108.

Because the plaintiffs have not adequately pled a primary violation by any of the defendants, Count II is being dismissed.

### C. Count III: Violation of Section 20(b) of the Exchange Act by defendants McMahon, Barrios, and Wilson

Section 20(b) of the Exchange Act provides that "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b). The parties disagree as to whether § 20(b) creates a private right of action. However, the court need not decide whether or not this statute creates a private right of action because the court has concluded that the plaintiffs have not adequately pled violation of any of the "provisions of this chapter or any rule or regulation thereunder." Accordingly, Count III is being dismissed.

### D. Count IV: Violation of Section 20(A) of the Exchange Act by defendant Levesque

Section 20(A) of the Exchange Act provides:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a). The plaintiffs allege that defendant Levesque was "in possession of material, non-public information"

about the reality of WWE's contract negotiations and participated in "the scheme to defraud investors." (Amended Complaint ¶ 113.) The plaintiffs allege that while she was in possession of this adverse, non-public information, she sold approximately 441,671 shares of WWE stock for approximately $6,174,551.02. The lead plaintiff purchased WWE securities contemporaneously with Levesque's sale of securities. The plaintiffs allege that the lead plaintiff and other members of the putative class who purchased WWE securities contemporaneously with Levesque's sale of stock suffered "substantial damages" by paying an artificially inflated price for their stock and would not have purchased the stock had they known that the defendants' statements were false. (Amended Complaint ¶ 114.)

The defendants note that defendant Levesque sold her shares pursuant to a 10b5-1 plan that was entered into and disclosed in an SEC filing more than seven months before the Class Period began. (Defendants' Memorandum at 56-57, 69.) Additionally, the defendants point out that Levesque sold only a fraction of her shares and that she was not a director of WWE until after the Class Period ended. (Defendants' Memorandum at 69.)

"[I]n order to state a claim under § 20A, [the plaintiff] must plead as a predicate an independent violation of the '34 Act." Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,

32 F.3d 697, 704; <u>see</u> <u>also</u> <u>In re LaBranche Securities</u>
<u>Litigation</u>, 405 F.Supp.2d 333, 364 (S.D.N.Y. 2005) ("Since a
Section 10(b) claim has not been stated against [the defendant],
it follows that a Section 20A claim has not been stated.") The
plaintiffs in this case have not adequately pled independent
violation of the Exchange Act. Accordingly, Count IV is being
dismissed.


**IV.   CONCLUSION**

        For the reasons set forth above, the Motion of Defendants
World Wrestling Entertainment, Inc., Vincent K. McMahon, George
A. Barrios, Michelle D. Wilson, and Stephanie McMahon Levesque
to Dismiss the Consolidated Amended Complaint (Doc. No. 77) is
hereby GRANTED.

        The Clerk shall enter judgment in favor of the defendants
and close this case.

        It is so ordered.

        Signed this 31st day of March 2016, at Hartford,
Connecticut.


                                    _____
                                            /s/
                                    Alvin W. Thompson
                                    United States District Judge